

**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed:**
**June 20, 2018 11:34**

By: GREGORY E. O'BRIEN 0037073

Confirmation Nbr. 1417012

| | |
|---|---|
| FREEDOM SPECIALTY INSURANCE COMPANY | CV 18 899713 |
| vs. | |
| NEW HAMPSHIRE INSURANCE COMPANY | **Judge:** CASSANDRA COLLIER-WILLIAMS |

**Pages Filed:** 140

**IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO**

| | |
|---|---|
| FREEDOM SPECIALTY INSURANCE COMPANY<br>7 World Trade Center, 37th Floor<br>250 Greenwich Street<br>New York, NY 10007 | CASE NO.:<br><br>JUDGE: |
| *Plaintiff,* | |
| v. | **COMPLAINT** |
| NEW HAMPSHIRE INSURANCE COMPANY<br>175 Water Street, 18th Floor<br>New York, NY 10038 | For Declaratory Judgment and Contribution<br><br>Trial by Jury Demanded |
| *Defendant.* | |

Plaintiff Freedom Specialty Insurance Company ("Freedom"), states for its complaint for declaratory judgment and contribution against Defendant New Hampshire Insurance Company ("New Hampshire"), as follows:

**Nature of the Action**

1.      Freedom brings this complaint for declaratory judgment pursuant to Ohio Civ.R. 57 and Ohio R.C. 2721.01, et. seq., on the parties' respective and competing rights and obligations under: (1) Freedom 360° Private Company Package Policy No. PHF1700220 (the "Freedom Policy") issued by Freedom to Cavaliers Holdings, LLC (the "Cavaliers"); and, (2) Employment Practices Liability Insurance Policy No. 01-767-89-02 (the "New Hampshire Policy") issued by New Hampshire to the National Basketball Association, Inc. (the "NBA").

2.      A true and accurate copy of the Freedom Policy is attached as Exhibit A.

3.      A true and accurate copy of the New Hampshire Policy is attached as Exhibit B.

4.      Freedom brings this action for equitable contribution to recover sums paid by Freedom and owed to the Cavaliers under the Freedom Policy that were owed to the Cavaliers and should have been paid by New Hampshire under the New Hampshire Policy.

**Parties, Jurisdiction, and Venue**

5.      Freedom is a for-profit corporation with its principal place of business in Columbus, Franklin County, Ohio and is authorized to offer a variety of insurance products to the public in the State of Ohio, including Cuyahoga County.

6.      On information and belief, New Hampshire is a foreign, for-profit corporation with its principal place of business in New York.

7.      The Cavaliers are a Delaware limited liability company with its principal place of business in Cuyahoga County, Ohio; as used in this complaint, the "Cavaliers" sometimes also refers to Cavaliers Operating Company, LLC, also a Delaware corporation with its principal place of business in Cuyahoga County, Ohio.

8.      On information and belief, the NBA is a foreign, for-profit corporation with its principal place of business in New York, but regularly conducting business in Cuyahoga County.

9.      Mozelle Jackson ("Jackson") is a resident of Cuyahoga County, Ohio and a former employee of the Cavaliers who worked principally in the organization's Cuyahoga County offices.

10.     The Freedom Policy was issued to the Cavaliers in Cuyahoga County, Ohio.

11.     The insurance claims that are the basis for this action for declaratory judgment and contribution are premised on facts alleged to have transpired in Cuyahoga County, Ohio.

**The Claim**

12.     Jackson was first employed by the Cavaliers in 2010.

13.     Most recently, Jackson served as the Cavaliers' Chief Financial Officer.

14.     Beginning in February 2017 and at various times through April 2018, Jackson made complaints relating to the conditions of her employment with the Cavaliers and her relationship with other Cavaliers employees, which are described in the following paragraphs and are sometimes collectively referred to as the "Claim."

15.     In February 2017, Jackson complained to Cavaliers CEO Len Komoroski of gender discrimination and harassment.

16.     In September 2017, Jackson complained that the Cavaliers had demoted her and failed to promote her when it hired Nic Barlage as the organization's new president.

17.     In December 2017, Jackson complained to the Cavaliers' Human Resources Department of continuing harassment and sex discrimination.

18.     In March 2018, Jackson learned that Cavaliers employees had allegedly deleted electronic records pertaining to the discrimination claim of another Cavaliers employee.

19.     On March 23, 2018, through her lawyer, Jackson emailed Komoroski and complained about harassment and retaliation; she also asserted that she was engaged in protected activity and warned the Cavaliers not to improperly delete information.

20.     On April 10, 2018 Cavaliers' representatives including Komoroski, Barlage, and Howard Luckoff met with Jackson; they asserted that she and the Cavaliers had irreconcilable differences and asked her to depart the organization.

21.     On April 11, 2018 Jackson demanded $3,000,000 to settle the Claim; otherwise she threatened a lawsuit and an attendant media circus.

**The Jackson Suit**

22.     On May 10, 2018 Jackson filed Case No. CV-18-897540 in the Court of Common Pleas, Cuyahoga County, Ohio (the "Suit").

23.     On May 14, 2018 Jackson filed an amended complaint in the Suit.

24.     A true and accurate copy of the amended complaint is attached as Exhibit C.

25.     In the Suit, Jackson named as Defendants the Cavaliers, Komoroski, Luckoff, and Barlage, as well as five "John/Jane Does."

26.     In the Suit, Jackson alleged that she was an employee of the Cavaliers and that all of the Defendants were either her employer, supervising co-employees, or otherwise jointly liable with the Cavaliers for its employment related acts and omissions.

27.     In the Suit, Jackson alleged that she was wrongfully terminated from her position with the Cavaliers as Chief Financial Officer in retaliation for reporting and refusing to acquiesce in or condone the illegal or tortious activity of other Cavaliers employees with respect to the alleged deletion of certain electronically stored information.

28.     The amended complaint filed in the Suit asserted claims sounding in Retaliation under Ohio R.C. Section 4112.02(I) and Violation of Ohio Public Policy.

29.     In the Suit, Jackson sought past and future economic and non-economic damages in excess of $25,000, back pay, front pay, loss of benefits and perquisites, punitive damages, interest, all attorneys' fees expert fees, and costs, as well as any other relief deemed appropriate.

**The Settlement**

30.     On April 3, 2018, the Cavaliers gave first notice of Jackson's Claim to Freedom.

31.     Between April 12, 2018 and May 18, 2018, Freedom was actively engaged in attempting to settle the Claim and later, the Suit.

32.     During the course of these negotiations, Freedom learned that the Cavaliers were an Additional Named Insured under the New Hampshire Policy issued to the NBA.

33.     Freedom urged the Cavaliers to submit the Claim to New Hampshire for coverage under the New Hampshire Policy.

34.     After the Cavaliers gave first notice of the Claim to New Hampshire, the Cavaliers, Freedom and New Hampshire jointly engaged in negotiations with Jackson and her representatives in an effort to resolve the Claim and settle the Suit.

35.     In addition to negotiating the gross amount of the settlement with Jackson, Freedom, New Hampshire and the Cavaliers also negotiated the respective amounts of the settlement to be borne by each of them.

36.     During the course of these negotiations, Freedom steadfastly asserted that any amount in excess of the Cavaliers' own contribution to the settlement should be divided between the insurers pro rata, based on their relative policy limits.

37.     New Hampshire asserted that the insurers should contribute in equal shares.

38.     Ultimately, in order to resolve the Suit for its insured without undue adverse media exposure, Freedom agreed to contribute to the settlement in equal shares with New Hampshire, so long as its right to seek contribution was preserved.

39.     On or around May 25, 2018 Jackson and the Cavaliers settled the Suit on behalf of all Defendants for a confidential amount that was less than the limits of either the Freedom Policy or the New Hampshire Policy.

40.     In addition to the portion of the settlement contributed by the Cavaliers, Freedom and New Hampshire contributed the balance in equal shares, with Freedom reserving its right to pursue this claim for declaratory judgment and contribution against New Hampshire.

41.     The final draft of the settlement agreement resolving Jackson's Suit against the Cavaliers and its representatives is still being negotiated. A true and accurate copy will be filed with the Court (potentially under seal) once it is available.

**The Freedom Policy**

42.     Freedom issued the Freedom Policy to the Cavaliers for a one year term commencing May 1, 2017 to May 1, 2018.

43.     The Freedom Policy provided, among other coverages, Employment Practices Liability ("EPL") coverage on a "Claims Made" basis with a "maximum aggregate limit of liability" for all liability coverages of $5,000,000.

44.     The EPL coverage under the Freedom Policy was issued on PHF-P-2 (6-15) and is provided on the following terms:

     I.     INSURING AGREEMENTS

     A.     Employment Practices Liability Coverage

     The **Insurer** shall pay, on behalf of an **Insured**, **Loss** resulting from an **Employment Claim** first made against the **Insured** during the **Policy Period**, … for an **Employment Practices Wrongful Act**.

45.     The following terms are defined in the Policy:

     II.     DEFINITIONS

               * * *

     F.     **Employment Claim** means any of the following which are brought and maintained against an **Insured** by or on behalf of any actual or alleged past, present or prospective **Employee** or applicant for employment of an **Organization,** including, if applicable, any appeal therefrom:

          1.     written demand against an **Insured** for monetary damages or non-monetary or injunctive relief commenced by the **Insured's** receipt of such demand, including a written demand for reinstatement, reemployment, or re-engagement;

    2.    civil proceeding against an **Insured** commenced by the service of a complaint or similar pleading upon the **Insured;**

\* \* \*

I.    **Employment Practices Wrongful Act** means any of the following actually or allegedly committed by an **Organization** or by an **Insured Person** in their capacity as such:

\* \* \*

    4.    **Retaliation;**

\* \* \*

    7.    **Wrongful Termination;**

committed, attempted, or allegedly committed or attempted by an **Organization** or by an **Insured Person** while acting in his or her capacity as such.

\* \* \*

L.    **Insured** means any **Organization** and any **Insured Person.**

M.    **Insured Persons,** either in the singular or plural, means any:

    1.    **Employee** other than an **Independent Contractor;**

    2.    **Executive;** or

\* \* \*

N.    **Loss** means the amount the **Insured** becomes legally obligated to pay as a result of any **Claim,** including **Defense Costs;** compensatory, punitive, exemplary or multiple damages; judgments; settlements; an award of pre-judgment or post-judgment interest with respect to covered damages; liquidated damages awarded in accordance with the Age Discrimination in Employment Act, the Family and Medical Leave Act or the Equal Pay Act; back pay and front pay; and claimant's attorney's fees awarded by a court against an **Insured** or, in connection with a settlement, agreed to by the **Insurer.**

\* \* \*

O.    **Retaliation** means retaliatory treatment against an **Employee** based upon such individual:

1. refusing to violate any law, or opposing any unlawful practice, or exercising his or her rights under law;

2. threatening to disclose or disclosing to: (i) a **Manager;** or (ii) any governmental agency, any alleged violations of law by an **Insured;**

3. having assisted, testified or cooperated with a proceeding or investigation (including an **Organization's** internal investigation conducted by its human resources or legal department) regarding the **Insured's** alleged violations of law; or

\* \* \*

W. **Wrongful Termination** means any wrongful dismissal, termination or discharge of employment, including constructive dismissal, termination or discharge.

46. The Policy provides for the allocation of coverage among multiple insurers when more than one insurance policy covers a particular claim.  The Freedom Policy's "Other Insurance" clause provides:

V. OTHER INSURANCE

A. The coverage provided under this EPL Coverage Section for **Employment Claims** shall be primary to and not excess of any other valid and collectible insurance, unless specifically stated to the contrary within this EPL Coverage Section,

\* \* \*

**The New Hampshire Policy**

47. New Hampshire issued the New Hampshire Policy to the NBA for a one year term commencing July 31, 2017 to July 31, 2018.

48. The New Hampshire Policy provided EPL coverage on a "Claims Made" basis with an Each Insured Event Limit of $15,000,000 subject to Total Policy Period Limit of $15,000,000.

49. The EPL coverage under the New Hampshire Policy is provided on the following terms:

II. INSURING AGREEMENT

 A. Indemnity

  1. Subject to all of the terms, limitations, conditions, definitions, exclusions and other provisions of this policy, **we** will pay all **Loss Amounts** that the **Insured** is legally obligated to pay because of an **Insured Event** to which this insurance applies. The amount **we** will pay is limited as described in Item 3 of the Declarations and in the Sections of this policy dealing with LIMITS OF INSURANCE, DEFENSE, SELF INSURED RETENTION and OTHER INSURANCE.

   * * *

50. The New Hampshire Policy includes a section that describes the persons and entities entitled to coverage under it. The "Who is an Insured" section provides:

III. WHO IS AN INSURED

   * * *

 F. Additional Named Insureds:

  1) The following organization are **Named Insureds** under this policy, but solely in connection with any such organization's operation of an **NBA Team, NBADL Team** or **WNBA Team**:

   * * *

  Cavaliers Holding LLC; Cavaliers D League LLC

  2) The following organizations are **Named Insureds** under this policy, but solely in connection with any such organization's operation of an **NBA Team, NBADL Team, WNBA Team**, or any other event operation:

   * * *

  Cleveland Cavaliers (Cavaliers Operating Company LLC)

   * * *

51.   The following terms are defined in the New Hampshire Policy:

VII.   DEFINITIONS

G.   "Insured Event means… (3) your former Employee alleging Wrongful Termination by an Insured, (4) your Employee or former Employee…alleging Workplace Torts by an Insured.

I.   Loss Amount means all forms of compensatory damages, monetary damages statutory damages, multiplied damages, back pay, front pay, punitive or exemplary damages, judgments, settlements, statutory attorney fees, and Defense Costs arising of Claim(s0 alleging Discrimination, Sexual Harassment, Wrongful Termination or Workplace torts.

* * *

Y.   Workplace Torts means retaliation….

* * *

AA.   Wrongful Termination means termination of an employment relationship in a manner which is against the law and wrongful or in breach of an implied agreement to continue employment. .

* * *

52.   The following conditions apply to the Policy's farm liability coverage:

X.   CONDITIONS

It shall be a condition precedent to our obligations under this policy that the Insureds comply with all of the Conditions.

* * *

B.   OTHER INSURANCE

1.   Primary Insurance – Unless expressly written to be excess over other applicable insurance, it is intended that this insurance be primary with respect to Wrongful Termination, Discrimination, Sexual Harassment and Workplace Torts.

### Grounds for Declaratory Judgment

53.     An actual case or controversy exists between Freedom and New Hampshire with respect to the amounts owed by each to the Cavaliers under their respective Policies in settlement of Jackson's Claim and Suit.

54.     Speedy and effective relief is necessary to preserve Freedom's rights.

55.     A declaratory judgment establishing the rights, status and other legal relations of the parties would terminate the controversy among the parties with regard to all coverage issues.

56.     All persons who have any claims or interests in the subject matter of this action and who would be affected by the requested declaratory relief are parties to this action.

57.     Freedom is entitled to declaratory relief pursuant to Ohio law.

### Grounds for Equitable Contribution

58.     Freedom and New Hampshire were separately and independently liable to the Cavaliers under their respective policies for the entirety of Jackson's Claim and Suit.

59.     Freedom and New Hampshire---as between themselves---were equitably entitled to be reimbursed by the other in the amount of either's payment in excess of their respective proportionate share of their mutual obligation to the Cavaliers.

60.     Freedom has been compelled to pay a portion of the mutual obligation to the Cavaliers that New Hampshire should have paid.

61.     Freedom is entitled to contribution from New Hampshire to obtain reimbursement of the portion of Freedom's settlement contribution in excess of its proportionate share.

### Count 1 - Declaratory Judgment

62.     The Freedom Policy provided the Cavaliers with EPL coverage for Jackson's Claim and Suit on a "Claims Made" basis with limits of liability of $5,000,000.

63.     The New Hampshire Policy provided the Cavaliers with EPL coverage for Jackson's Claim and Suit on a "Claims Made" basis with limits of $15,000,000.

64.     The EPL coverage available to the Cavaliers under the Freedom Policy was primary coverage for Jackson's Claim and Suit.

65.     The EPL coverage available to the Cavaliers under the New Hampshire Policy was primary coverage for Jackson's Claim and Suit.

66.     Under Ohio law, Freedom's and New Hampshire's "Other Insurance" clauses were mutually repugnant and the insurers owed EPL coverage to the Cavaliers pro rata based on their respective limits of coverage, up to those limits.

67.     Freedom is entitled to a declaration of its and New Hampshire's rights and obligations under their respective policies for the settlement of Jackson's Claim and Suit against the Cavaliers.

## Count 2 - Contribution

68.     Freedom and New Hampshire each separately owed primary EPL coverage to the Cavaliers for Jackson's Claim and Suit up to the limits of their respective policies.

69.     To discharge that obligation in good faith, Freedom settled the Claim and Suit against the Cavaliers by contributing with New Hampshire in equal shares, but reserved its right to seek contribution from New Hampshire.

70.     The settlement of Jackson's Claim and Suit resulted in Freedom paying a portion of the settlement that should have been paid by New Hampshire.

71.     Freedom expressly reserved its rights to seek contribution from New Hampshire for any amounts paid in excess of its pro rata share.

72.     Freedom is entitled to recover from New Hampshire in contribution the portion of the settlement paid in excess of its pro rata share.

## Prayer for Relief

WHEREFORE, Freedom Specialty Insurance Company requests the Court to declare the rights and duties of the parties under their respective policies and to award more than twenty-five thousand dollars ($25,000) damages in contribution to Freedom and against New Hampshire Insurance Company as follows:

1.     The Freedom Policy provided the Cavaliers primary EPL coverage with limits of $5,000,000.

2.     The New Hampshire Policy provided the Cavaliers primary EPL coverage with limits of $15,000,000.

3.     Freedom and New Hampshire each had separate and independent obligations to provide primary EPL coverage to the Cavaliers for Jackson's Claim and Suit up to the limits of their respective policy limits.

4.     Because the parties settled Jackson's Claim and Suit for an amount that was less than the limits of either policy, Freedom and New Hampshire owed the claim pro rata based on the limits of their respective policies.

5.     Because Freedom and New Hampshire contributed to the settlement between Jackson and the Cavaliers in equal shares, Freedom paid a portion of the settlement that should have been paid by New Hampshire.

6.     Freedom is entitled to recover from New Hampshire in contribution the portion of the settlement it paid in excess of its pro rata share.

7.     Freedom is likewise entitled to recover from New Hampshire its attorneys' fees, litigation expenses and costs incurred in prosecuting this suit for contribution and any other relief the Court deems just.

8.     To award any other relief which the Court deems just and proper.

Respectfully submitted,

/s/ Gregory E. O'Brien
Gregory E. O'Brien (0037073)
CAVITCH FAMILO & DURKIN, CO. L.P.A.
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio  44114
Telephone        (216) 621-7860
Facsimile         (216) 621-3415
Email              gobrien@cavitch.com
*Attorney for Plaintiff Freedom*

## **JURY DEMAND**

Plaintiff respectfully requests a Jury in the maximum number allowed by law at the time

of the Trial of this matter on any disputed issue of material fact.

## **PRAECIPE FOR SERVICE**

Plaintiff requests the Clerk of Courts to serve the Defendant New Hampshire Insurance

Company by Federal Express at the address shown in the caption of this complaint.

/s/ Gregory E. O'Brien
GREGORY E. O'BRIEN
*Attorney for Plaintiff Freedom*

 **Nationwide**®

Underwritten by: Freedom Specialty Insurance Company
7 World Trade Center, 37th Floor
250 Greenwich Street
New York, NY 10007-0033
A Stock Company

In Witness Whereof, the Company has caused this policy to be executed and attested.

_____                    _____
Secretary                                        President

The information contained herein replaces any similar information contained elsewhere in the policy.

Electronically Filed 06/20/2018 11:34 / / CV 18 899713 / Confirmation Nbr. 1417012 / CLJSZ

EXHIBIT A



**FREEDOM SPECIALTY**
INSURANCE COMPANY®

A Stock Insurance Company, herein called the Insurer
Freedom Specialty Insurance Company
7 World Trade Center, 37th Floor
250 Greenwich Street
New York, NY 10007-0033

FREEDOM 360°
**PRIVATE COMPANY PACKAGE POLICY**

**GENERAL TERMS AND CONDITIONS DECLARATIONS PAGE
("GTC DECLARATIONS")**

**NOTICE:** THE COVERAGE PROVIDED UNDER THE **LIABILITY COVERAGE SECTIONS** IS LIMITED TO ONLY THOSE **CLAIMS** FIRST MADE DURING THE **POLICY PERIOD**, OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY **DEFENSE COSTS,** AND **DEFENSE COSTS** WILL BE APPLIED AGAINST THE RETENTION. THE INSURER WILL NOT BE LIABLE FOR **DEFENSE COSTS** OR OTHER **LOSS** IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY. PLEASE REVIEW THE POLICY CAREFULLY. THIS POLICY CONTAINS IMPORTANT EXCLUSIONS AND CONDITIONS.

| Item 1. Parent Organization and Principal Address: | |
|---|---|
| CAVALIERS HOLDINGS, LLC<br>1 CENTER CT.<br>CLEVELAND, OH 44115 | Policy No.: PHF1700220<br>Agent No.: 12405<br>Renewal No.: NEW<br>Agent Name and Mailing Address:<br>AON<br>200 E RANDOLPH 8TH FL<br>CHICAGO, IL 60601 |

**Item 2.** **Policy Period:** From _____05/01/2017_____ to _____05/01/2018_____
12:01 A.M. Standard Time at address shown in Item 1. above.

**Item 3.** Maximum Aggregate Limit of Liability for all **Liability Coverage Sections,** combined:
$ _____5,000,000_____

**Item 4.** Coverages applicable to this Policy:

| Coverage Section | Purchased | Not Purchased | Separate Limits | Shared Limits | Limits Shared With |
|---|---|---|---|---|---|
| A. Directors & Officers and Entity Liability ("D&O") | ☒ | ☐ | ☐ | ☒ | EPL AND FL |
| B. Employment Practices Liability ("EPL") | ☒ | ☐ | ☐ | ☒ | D&O AND FL |
| C. Fiduciary Liability ("FL") | ☒ | ☐ | ☐ | ☒ | EPL AND D&O |
| D. Crime ("Crime") | ☐ | ☒ | ☐ | ☐ | N/A |

**Item 5.** Extended Reporting Period Options (NOT applicable to Crime Coverage Section):

Extended Reporting Period      Percent (%) of Full Annual Premium
___12/24/36___ Months      100/150/200 % of the Full Annual Premium

"Full Annual Premium" means the annualized premium level in effect for the Policy or applicable Coverage Section immediately prior to the end of the **Policy Period.**

EXHIBIT A

Item 6.  Premium:

Coverage Sections Purchased:                                      Premium for Coverage Section:
DIRECTORS AND OFFICERS AND ENTITY
LIABILITY
EMPLOYMENT PRACTICES LIABILITY
FIDUCIARY LIABILITY

Total Premium:  $ _____ 66,452

Item 7.  Notice to Company:
Freedom Specialty Insurance Company                Telephone: (800) 423-7675
Attention: Claims Manager                          E-mail: FSReportALoss@freedomspecialtyins.com
7 World Trade Center, 37th Floor
250 Greenwich Street
New York, NY 10007-0033

**THESE DECLARATIONS TOGETHER WITH THE GENERAL TERMS AND CONDITIONS, PURCHASED COVERAGE SECTIONS, AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, CONSTITUTE THE ABOVE NUM-BERED POLICY.**

_____

Authorized Representative: _____  Date Issued: _____

EXHIBIT A

**FREEDOM SPECIALTY**
INSURANCE COMPANY®

## SCHEDULE OF FORMS AND ENDORSEMENTS

Policy No. _PHF1700220_                    Effective Date: _05/01/2017_

                                           12:01 A.M., Standard Time

Named Insured _CAVALIERS HOLDINGS, LLC_    Agent No. _12405_

---

```
            PRIVATE COMPANY
            UTF-COVPG  1-16        Cover Page
            PHF-D-5  6-15          GTC Declarations
            UTF-SP-2  6-11         Schedule Of Forms And Endorsements
            PHF-1  6-15            General Terms And Conditions
            PHF-D-1  6-15          D&O Declarations
            PHF-P-1  6-15          D&O Coverage Section
            PHF-D-2  6-15          EPL Declarations
            PHF-P-2  6-15          EPL Coverage Section
            PHF-D-3  6-15          FL Declarations
            PHF-P-3  6-15          FL Coverage Section
```

### ADDITIONAL FORMS

```
            UTF-3g  3-92           Reliance Upon Other Carrier's Application
            UTF-3g  3-92           Amend EPL and Third Party Retention Amount
            UTF-3g  3-92           Player and Coaches Excess Coverage Endorsement
            UTF-3g  3-92           Amend Insured V. Insured Exclusion
            UTF-3g  3-92           Amend Definition of Loss Endorsement
            UTF-3g  3-92           Amend Definition of Administration Endorsement
            UTF-3g  3-92           Workplace Violence Endorsement
            UTF-3g  3-92           Amend Definition of Executive
            UTF-3g  3-92           Amend Defintion of Application
            UTF-3g  3-92           Amend Notice Trigger Endorsement
            UTF-3g  3-92           Amend Conduct Exclusion
            UTF-3g  3-92           Major Shareholder Exclusion Endorsement
            PHF-53-OH  6-15        Ohio Amendatory Endorsement
            UTF-3g  3-92           State Amendatory Inconsistent
            UTF-3g  3-92           Add Sub-limit of Liability for: Patient
```

---

EXHIBIT A

UTF-SP-2 (6-11)



FREEDOM SPECIALTY
INSURANCE COMPANY®
a Nationwide Insurance® company

## GENERAL TERMS AND CONDITIONS

In consideration of the payment of the premium and in reliance upon the **Application** and subject to the Declarations, these General Terms and Conditions (hereinafter "GTC"), and any Coverage Section(s) that have been purchased as set form in Item 4. of the GTC Declarations, and subject to all other terms of this Policy, including all endorsements hereto, the **Insurer** and the **Parent Organization,** on behalf of all **Insureds,** agree as follows:

I.  TERMS AND CONDITIONS

The terms and conditions set forth in these General Terms and Conditions shall apply to all Coverage Sections of this Policy purchased, as set forth in Item 4. of the GTC Declarations. If any provision of these General Terms and Conditions is inconsistent or conflicts with the terms and conditions of any Coverage Section, the terms and conditions of such Coverage Section shall control for purposes of that Coverage Section.

II.  DEFINITIONS

A.  **Application** means, with respect to a Coverage Section:

1.  any application provided by or on behalf of the **Insured** to the **Insurer** with regard to such Coverage Section, including attachments and other materials submitted therewith or referenced or incorporated therein; and

2.  any warranties provided to the **Insurer** over the last three years relating to any Coverage Section or policy of which any Coverage Section or this Policy is a renewal or replacement;

provided that solely for purposes of the Employment Practices Liability Coverage Section and the Fiduciary Liability Coverage Section, **Application** shall also include any documents filed by or on behalf of the **Insured** over the last three years with any federal, state, local or foreign regulatory agency, including all such schedules, audited financial statements and other documents filed with the U.S. Department of the Treasury, Internal Revenue Service, the U.S. Department of Labor, Employee Benefits Security Administration, or the Pension Benefit Guarantee Corporation.

B.  **Claim** shall have the meaning set forth in each applicable Coverage Section.

C.  **Defense Costs** shall have the meaning set forth in each applicable Coverage Section.

D.  **ERISA** means the Employee Retirement Income Security Act of 1974 (including amendments thereto as contained in the Consolidated Omnibus Budget Reconciliation Act of 1985 and the Health Insurance Portability and Accountability Act of 1996), the English Pension Scheme Act 1993 or the English Pensions Act 1995; all as amended; any similar statutory or common law anywhere in the world; or any rule or regulation promulgated under any such act or similar law.

E.  **Executive** means any natural person who was, is or shall become a duly elected or appointed director, officer, member of the Advisory Board, **Manager,** in-house general counsel or risk manager of any **Organization** or a holder of an equivalent position in any **Organization.**

F.  **Financial Impairment** means:

1.  the **Organization** becoming a debtor-in-possession;

2.  the appointment of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Organization;** or

EXHIBIT A

3. the filing of a bankruptcy petition by or against the **Organization** under the bankruptcy laws of the United States of America or any equivalent event outside of the United States of America.

G. **Insured** shall have the meaning set forth in each applicable Coverage Section.

H. **Insured Person** shall have the meaning set forth in each applicable Coverage Section.

I. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

J. **Liability Coverage Section** means the following Coverage Sections, if purchased as set forth in Item 4. of the GTC Declarations:

1. Directors & Officers and Entity Liability;

2. Employment Practices Liability; and

3. Fiduciary Liability.

K. **Loss** shall have the meaning set forth in each applicable Coverage Section.

L. **Manager** means any natural person who is a former, present or future manager, managing member, general partner, member of the board of managers or equivalent executive of an **Organization** that is a limited liability company or limited partnership.

M. **Non-Liability Coverage Section** means the Crime Coverage Section, if purchased as set forth in Item 4. of the GTC Declarations.

N. **Organization** means the **Parent Organization** and any **Subsidiary,** including any such organization as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

O. **Outside Capacity** means service by an **Insured Person** in any of the following positions with an **Outside Entity:**

1. director or officer;

2. manager or member of the board of managers;

3. trustee, regent, governor; or

4. other executive positions equivalent to of any of the foregoing;

provided that such service in such position is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the **Insured Person** by the **Organization.**

P. **Outside Entity** means, with respect to a Coverage Section:

1. any not-for-profit corporation, community chest, fund or foundation that is exempt from federal income tax as an entity described in Section 501(c)(3), 501(c)(4), 501(c)(7) or 501(c)(10) of the Internal Revenue Code of 1986, as amended, or any other entity organized for a religious or charitable purpose under any nonprofit organization act or statute; or

2. any for-profit organization specifically included as an **Outside Entity** by endorsement to such applicable Coverage Section; provided that **Outside Entity** shall not include an **Organization.**

Q. **Parent Organization** means the entity set forth in Item 1. of the GTC Declarations.

R. **Plan** shall have the meaning set forth in the Fiduciary Liability Coverage Section.

S. **Policy Period** means the period of time set forth in Item 2. of the GTC Declarations, subject to its earlier cancellation or termination.

Electronically Filed 06/20/2018 11:34 / / CV 18 899713 / Confirmation Nbr. 1417012 / CLJSZ

                                                     EXHIBIT A

T. **Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, asbestos, asbestos products, mold or waste. Waste includes materials to be recycled, reconditioned or reclaimed.

U. **Securityholder Derivative Demand Investigation Costs** shall have the meaning set forth in the D&O Coverage Section.

V. **Subsidiary** means:

1. any organization in which more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors or equivalent position is owned by one or more **Organizations,** in any combination;

2. any organization in which one or more **Organizations,** in any combination, have the right, pursuant to a written contract with or the bylaws, charter, operating agreement or similar document of such organization, to elect or appoint a majority of the directors or equivalent position of such organization; or

3. any not-for-profit foundation, charitable trust or political action committee controlled or exclusively sponsored by one or more **Organizations.**

W. **Voluntary Compliance Program Loss** shall have the meaning set forth in the Fiduciary Liability Coverage Section.

X. **Wrongful Act** shall have the meaning set forth in each applicable Coverage Section.

III. LIMITS OF LIABILITY AND RETENTIONS

A. With respect to the **Liability Coverage Sections:**

1. The **Insurer's** maximum aggregate liability for all **Loss** under all **Liability Coverage Sections** combined shall be the Combined Maximum Aggregate Limit of Liability, if any, set forth in Item 3. of the GTC Declarations.

2. The **Insurer's** maximum aggregate liability for all **Loss** under any single **Liability Coverage Section** shall be the Maximum Aggregate Limit of Liability for such Coverage Section as set forth in Item 2. of the Declarations for that Coverage Section, which shall be part of and not in addition to the Combined Maximum Aggregate Limit of Liability set forth in Item 3. of the GTC Declarations.

3. The **Insurer's** maximum aggregate liability under all **Liability Coverage Sections** that are subject to a shared Limit of Liability as indicated in Item 4. of the GTC Declarations shall be the largest single Maximum Aggregate Limit of Liability applicable to any one Coverage Section subject to such shared Limit of Liability, which shall be part of and not in addition to the Combined Maximum Aggregate Limit of Liability, if any, set forth in Item 3. of the GTC Declarations. However, nothing in this paragraph shall operate to increase the **Insurer's** maximum liability under any **Liability Coverage Section** to an amount greater than the Maximum Aggregate Limit of Liability for such Coverage Section.

4. The **Insurer's** maximum aggregate liability for any coverage which is subject to a Sublimit of Liability as provided in any **Liability Coverage Section** shall be the Sublimit set forth in Item 2. of the Declarations for such Coverage Section which contains the sublimited coverage. The Sublimit of Liability shall be part of and not in addition to the Maximum Aggregate Limit of Liability applicable to such Coverage Section and any applicable shared maximum Limit of Liability, as well as the Combined Maximum Aggregate Limit of Liability, if any, set forth in Item 3. of the GTC Declarations.

5. If an Extended Reporting Period is purchased for any **Liability Coverage Section,** then the Limit of Liability for the Extended Reporting Period shall be part of, and not in addition to, any Limit of Liability applicable to the **Policy Period.** The purchase of an Extended Reporting Period shall not increase or reinstate the applicable Limits of Liability for the **Policy Period.**

6.  **Defense Costs** under all **Liability Coverage Sections** are part of, and not in addition to, the applicable Limits of Liability, and payment by the **Insurer** of **Defense Costs** shall reduce and may exhaust all such Limits of Liability.

7.  If the Combined Maximum Aggregate Limit of Liability for all **Liability Coverage Sections** is exhausted by payments made thereunder, the **Insurer's** obligations (including any duty to defend) under all **Liability Coverage Sections** shall be completely fulfilled. If the Maximum Aggregate Limit of Liability for any one **Liability Coverage Section** is exhausted by payments made thereunder, the **Insurer's** obligations (including any duty to defend) under that Coverage Section shall be completely fulfilled. If the Maximum Aggregate Limit of Liability for any **Liability Coverage Section** which is subject to a shared Limit of Liability is exhausted by payments made, in the aggregate, under all such Coverage Sections subject to that shared Limit of Liability, the **Insurer's** obligations (including any duty to defend) under all such Coverage Sections shall be completely fulfilled. However, this paragraph shall not apply with respect to coverage afforded by reason of the Supplemental Limit of Liability Solely for Executives, if purchased pursuant to the D&O Coverage Section.

8.  If any single **Claim** is afforded coverage under more than one **Liability Coverage Section,** then the applicable Limit of Liability for each such **Liability Coverage Section** shall be applied separately to the part of such **Claim** covered under the respective Coverage Section but the sum of such limits shall not exceed the largest applicable limit under all such Coverage Sections.

B.  With respect to Retentions under any **Liability Coverage Section:**

1.  The **Insurer's** liability under any **Liability Coverage Section** shall apply only to that part of **Loss** which is in excess of the Retention set forth in the Declarations for such Coverage Section. The Retention(s) under the **Liability Coverage Sections** shall apply separately to each **Claim** and shall be borne by the **Insured** and remain uninsured. The Retention shall not reduce or increase the Limits of Liability.

2.  No Retention shall apply to any **Loss** incurred by an **Insured Person** if such **Loss** cannot be indemnified by an **Organization** because such **Organization** is not permitted by common or statutory law to indemnify such **Insured Person,** or is permitted or required to indemnify such **Insured Person** but is unable to do so by reason of **Financial Impairment**. The **Organization** shall be deemed to provide indemnification to an **Insured Person** for **Loss** or advancement of **Defense Costs** to the fullest extent permitted or required by law and hereby agrees to indemnify the **Insured Person** for such **Loss** or to advance such **Defense Costs** to the full extent permitted or required by law, regardless of whether actual indemnification to the **Organization** is made.

3.  Solely with respect to the Employment Practices Liability Coverage Section, if a **Claim** is fully resolved within thirty (30) days after the **Claim** is first made for purposes of this Policy, then the amount of the Retention applicable to such **Claim** shall be reduced by ten percent (10%).

4.  If an **Organization** is permitted or required by common or statutory law to indemnify an **Insured Person** for any **Loss,** or to advance **Defense Costs** on their behalf, and does not do so other than because of **Financial Impairment,** then no Retention shall apply with respect to such **Loss** or **Defense Costs,** but such **Organization** and the **Parent Organization** shall reimburse and hold harmless the **Insurer** for the **Insurer's** payment of such **Loss** or **Defense Costs** up to the amount of the Retention that would have applied had such indemnification or payment been made. The **Organization** shall be deemed to provide indemnification to an **Insured Person** for **Loss** or advancement of **Defense Costs** to the fullest extent permitted or required by law and hereby agrees to indemnify the **Insured Person** for such **Loss** or to advance such **Defense Costs** to the full extent permitted or required by law, regardless of whether actual indemnification to the **Organization** is made.

5. For purposes of the Retention, an **Insured Person** who is a member of an Advisory Board of an **Organization** shall be deemed to be entitled to, and shall be deemed to be, indemnified to the same extent as a director or officer of the **Organization.**

6. If different parts of a single **Claim** are subject to different Retentions, the applicable Retentions shall be applied separately to each part of such **Claim,** but the sum of such Retentions shall not exceed the largest applicable Retention.

C. With respect to the **Non-Liability Coverage Sections,** the **Insurer's** maximum liability and the applicable Retentions shall be set forth in the Declarations of each **Non-Liability Coverage Section.**

IV. DEFENSE, SETTLEMENT AND COOPERATION

A. Except as otherwise stated in any **Liability Coverage Section,** the **Insurer** shall have the right and duty to defend any **Claim** covered by any **Liability Coverage Section,** including without limitation the right and duty to select defense counsel for the **Insureds** in such **Claim.** Coverage shall apply regardless of whether or not any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability.

B. The **Insurer** may make any investigation it deems necessary and may, with the consent of the **Insureds,** make any settlement of any **Claim** it deems appropriate.

C. The **Organization** and other **Insureds** shall provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests, and agree to do nothing that may prejudice the **Insurer's** position or its potential or actual rights of recovery. Such assistance and cooperation shall include but not be limited to:

1. providing to the **Insurer** copies of documents and any other items held by or available to the **Insured,** which relate to any **Claim, Wrongful Act,** transaction, incident or event which may have given, or may give, rise to the **Claim** or coverage under this Policy;

2. submitting to examination and interview by a representative of the **Insurer,** under oath if requested;

3. attending hearings, depositions and trials;

4. assisting in effecting settlement, securing and providing evidence, and obtaining the attendance of witnesses in the conduct of suits;

5. providing written statements to the **Insurer's** representatives and meeting with such representatives for purpose of investigation or defense; and

6. further cooperating with the **Insurer** and doing whatever is necessary to secure and effect any right of indemnity, contribution or apportionment, which the **Organization** or any other **Insured** may have.

Failure by any **Insured** to comply with this paragraph shall not impair coverage for any other **Insured Person.**

D. The **Organization** and all other **Insureds** shall not, with respect to any **Claim** covered under this Policy, except at their own cost, make any payment, admit liability, settle, offer to settle, assume any obligation, agree to arbitration or any similar means of resolution of any dispute, waive any rights or incur **Defense Costs** without the **Insurer's** prior written consent, which shall not be unreasonably withheld. Any costs and expenses incurred by the **Organization** or any other **Insured** prior to the **Insured** giving written notice of the **Claim** to the **Insurer** shall be borne solely by the **Insured** and will not constitute reduction or satisfaction of the Retention or the applicable Limits of Liability.

E. The **Insurer** may, with the consent of the **Insured,** make any settlement of any **Claim** covered under a **Liability Coverage Section** which the **Insurer** deems expedient. Solely with respect to the

Employment Practices Liability Coverage Section, if the **Insured** against whom the **Claim** is made withholds consent to any settlement acceptable to the claimant and recommended by the **Insurer** (a "Proposed Settlement"), the **Insurer's** liability for all **Loss,** including **Defense Costs,** incurred by such **Insured** on account of such **Claim** shall not exceed the amount of the Proposed Settlement plus **Defense Costs** incurred up to the date of the **Insured's** refusal to consent to the Proposed Settlement of such **Claim.**

V.    REPORTING AND NOTICE

A.   As a condition precedent to exercising any right to coverage under any **Liability Coverage Section,** the **Insured** shall give to the **Insurer** written notice of any **Claim** as soon as practicable after the chief executive officer, chief financial officer, in-house general counsel, director of human resources, or risk manager of an **Organization** (or the equivalent thereof) first learn of such **Claim;** provided that such written notice shall not be later than:

1.   ninety (90) days after the end of the **Policy Period** if the applicable **Liability Coverage Section** is not renewed; or

2.   the expiration of the Extended Reporting Period, if exercised; and further provided that if written notice of termination of any **Liability Coverage Section** for nonpayment of premium is sent to the **Parent Organization** by the **Insurer,** an **Insured** shall provide the **Insurer** written notice of any such Claim under such **Liability Coverage Section** prior to the effective date of such termination.

B.   If during the **Policy Period,** or the Extended Reporting Period, an **Organization** or any **Insured Person** becomes aware of a specific **Wrongful Act** or circumstance that may reasonably be expected to give rise to a **Claim** against any **Insured,** and during such **Policy Period** or the Extended Reporting Period, if exercised, gives written notice to the **Insurer** of such potential **Claim** as required below, then any **Claim** subsequently made against any **Insured** arising out of such specific **Wrongful Act** or circumstance shall be deemed to have been first made during the **Policy Period** or Extended Reporting Period in which such specific **Wrongful Act** or circumstance was first reported to the **Insurer,** provided that such subsequent **Claim** is reported to the **Insurer** as provided in paragraph A. above.

C.   A written notice of a potential **Claim** pursuant to paragraph B. above must include:

1.   a description of the specific **Wrongful Act** or circumstance, including all relevant dates;

2.   the names of the persons involved in the **Wrongful Act,** circumstance or potential **Claim,** including names of the potential claimants;

3.   particulars as to the reasons for anticipating a **Claim** which may result from such specific **Wrongful Act** or circumstance;

4.   the nature of the alleged or potential damages arising from such specific **Wrongful Act** or circumstance; and

5.   the manner in which the **Organization** or **Insured Person** first became aware of the specific **Wrongful Act** or circumstance.

No coverage is afforded under this Policy for costs, charges, fees, expenses or other loss incurred in connection with a potential **Claim** prior to the time such potential **Claim** becomes an actual **Claim.**

D.   Solely with respect to the Employment Practices Liability Coverage Section, if the portion of an **Employment Claim** consisting of an administrative or regulatory proceeding or a written demand for monetary damages or non-monetary or injunctive relief against an **Insured** is made during the policy period of a prior Employment Practices Liability policy or coverage part issued by the **Insurer** to the **Organization** and if the portion of such **Employment Claim** consisting of a civil lawsuit is made

during the **Policy Period** of this Policy, the **Insurer** shall not deny coverage for such civil law-suit under this Policy based solely on the **Insured's** failure to give timely notice of such admin-istrative or regulatory proceeding or written demand during such prior policy period, provided this paragraph D. shall not apply to such **Employment Claim** if:

1.  a probable cause finding was issued to the **Insured** in connection with such administrative or regulatory proceeding prior to inception of this Policy; or

2.  prior to the commencement of such civil lawsuit during the **Policy Period,**

    a.  an **Insured** made a monetary settlement payment or monetary settlement offer or re-sponded to a monetary settlement demand in connection with the alleged wrongdoing underlying such civil lawsuit; or

    b.  the **Insurer** paid loss under the prior policy with respect to such administrative or regulatory proceeding.

If this paragraph D. applies to an **Employment Claim,** any coverage afforded by the **Insurer** with re-spect to such **Employment Claim** shall be pursuant to the terms and conditions (including the then-remaining limit(s) of liability) of either this Policy or such prior policy, whichever affords lesser coverage, but shall not be covered under both this Policy and such prior policy; provided that in no event shall the **Insurer** be liable for any **Loss** resulting from such civil lawsuit prior to the **Insured** giving notice of that civil lawsuit to the **Insurer** under this Policy.

E.  Except as otherwise provided in this Policy, all notices under any provision of this Policy shall be in writing and given by prepaid express courier, certified or regular mail, email or fax properly ad-dressed to the appropriate party. Notice to the **Insureds** may be given to the **Parent Organization** at the address set forth in Item 1. of the GTC Declarations.

F.  Notice to the **Insurer** shall be given to the address set forth in the heading of the GTC Declarations. Notice to the **Insurer** of a **Claim**, potential **Claim,** loss or insured event shall be sent to the attention of the **Insurer's** Claim Department at such address.

G.  Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier, sub-ject to proof of transmittal.

VI.  INTERRELATED WRONGFUL ACTS

Solely with respect to the Liability Coverage Sections, all **Claims** arising out of the same Wrongful Acts or Interrelated Wrongful Acts shall be deemed a single **Claim** made on the earliest date that such Claim was made or deemed to have been made in accordance with the applicable **Liability Coverage Section** reporting provisions, whether such date is before or during the Policy Period.

VII.  EXTENDED REPORTING PERIOD

A.  If the **Parent Organization** shall cancel this Policy, or the **Parent Organization** or the **Insurer** re-fuses to renew this Policy or any **Liability Coverage Section,** then solely with regard to the **Liability Coverage Section(s)** which was cancelled or nonrenewed, the **Parent Organization** shall have the right, upon payment of the additional premium set forth in Item 5. of the GTC Declarations, to an extension of the coverage granted by such **Liability Coverage Section** (herein referred to as the "Extended Reporting Period"), for **Claims** first made against any **Insured** during said Extended Re-porting Period immediately following the effective date of such cancellation or nonrenewal, but only for **Wrongful Acts** taking place prior to the effective date of such cancellation or nonrenewal and otherwise covered by the cancelled or nonrenewed **Liability Coverage Section.**

B. The right to purchase such Extended Reporting Period must be exercised by written notice to the **Insurer** not later than sixty (60) days following the Policy or Coverage Section termination, and must include:

    1. a designation of the length of the Extended Reporting Period being purchased; and

    2. payment of the premium for the applicable Extended Reporting Period as well as payment of all other premiums due the **Insurer.** If such notice is not so given to the **Insurer,** the **Insureds** shall not be entitled to exercise such right at a later date.

C. The entire additional premium for the Extended Reporting Period shall be deemed fully earned at the inception of the Extended Reporting Period.

D. The **Insurer's** offer of renewal terms and conditions or premiums that are different from those in effect prior to such renewal shall not represent a refusal to renew.

E. The rights contained in this Extended Reporting Period clause shall not apply to any cancellation resulting from non-payment of premium.

F. The Limit(s) of Liability applicable to the Extended Report Period shall be part of, and not in addition to, the applicable Limit(s) of Liability for the **Policy Period.**

G. In the event of a Change in Control Event as described in Clause VIII. **CHANGES IN EXPOSURE,** subparagraph B., the **Parent Organization** shall have the right, within thirty (30) days before the end of the **Policy Period,** to request an offer from the **Insurer** for an Extended Reporting Period under any **Liability Coverage Section** for up to six years in length, but only with respect to **Wrongful Acts** occurring prior to the effective date of such event. The **Insurer** shall offer such Extended Reporting Period pursuant to such terms, conditions, and premium as the **Insurer,** in its sole discretion, may require. In the event of a Change in Control Event, the right to purchase an Extended Reporting Period thereafter shall not otherwise exist except as indicated in this paragraph.

VIII. CHANGES IN EXPOSURE

A. Acquisition or Creation of Another Entity

If, before or during the **Policy Period,** an **Organization** acquires securities or voting rights in another entity, or creates another entity, which results in such other entity becoming a **Subsidiary,** then:

    1. any applicable coverage otherwise afforded under any **Liability Coverage Section** of this Policy shall automatically apply to such new **Subsidiary** and its **Insureds,** but only with respect to **Wrongful Acts** occurring after such acquisition or creation; or

    2. any applicable coverage otherwise afforded under any **Non-Liability Coverage Section** of this Policy shall automatically apply to such new **Subsidiary** and its **Insureds,** subject to the provisions of such **Non-Liability Coverage Section.**

B. Acquisition of Parent **Organization**

If during the **Policy Period** any of the following events occur, herein referred to as a "Change in Control Event":

    1. the acquisition of all or substantially all of the **Parent Organization's** assets by another entity, person or group of entities and/or persons acting in concert, or the **Parent Organization** merges into or consolidates with another entity such that the **Parent Organization** is not the surviving entity;

2. another entity, person or group of entities and/ or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of directors or equivalent position of the **Parent Organization; or**

3. as of the effective date set forth in the plan of reorganization, the **Parent Organization** emerges from bankruptcy; then:

   a. any applicable coverage under:

      i. any **Liability Coverage Section** will continue until the end of the **Policy Period,** but only with respect to **Claims** for **Wrongful Acts** occurring prior to such Change in Control Event;

      ii. any **Non-Liability Coverage Section** shall terminate immediately upon the Change in Control Event, subject to the provisions of such Coverage Section;

   b. written notice of such Change in Control Event shall be provided to the **Insurer** by the **Parent Organization** as soon as practicable, along with any information that the **Insurer** requires; and

   c. the full annual premium for the **Policy Period** will be deemed fully earned immediately upon the occurrence of such Change in Control Event.

C. Cessation of Subsidiaries

If before or during the **Policy Period** an **Organization** ceases to be a **Subsidiary,** then:

1. for any **Liability Coverage Section,** coverage with respect to such **Subsidiary** and the **Insureds** of such **Subsidiary** shall continue until the earlier of cancellation or termination of this Policy under Clause IX. paragraph F., but only with respect to **Claims** for **Wrongful Acts** occurring while such **Organization** was a **Subsidiary; or**

2. for any **Non-Liability Coverage Section,** coverage shall cease for such **Subsidiary** and the **Insureds** of such **Subsidiary** as of the effective date of such cessation and coverage under such Coverage Section shall apply only as provided in such **Non-Liability Coverage Section.**

IX. CONDITIONS

A. Action Against The **Insurer**

No person or organization shall have the right under this Policy to join the **Insurer** as a party to any action against any **Insured** to determine the liability of the **Insured,** nor shall the **Insurer** be impleaded by the **Insureds** or their legal representatives in any such action.

B. Alteration, Assignment and Headings

No change in, modification of, or assignment of interest under this Policy shall be effective unless made by a written endorsement to this Policy, which is signed by an authorized representative of the **Insurer.**

The titles and headings to the various clauses, sections, subsections, paragraphs, subparagraphs and endorsements of this Policy are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions or existence of such clauses, sections, subsections, paragraphs, subparagraphs or endorsements.

C. Application Misrepresentation and Non-Rescindable Coverage

1. The **Insurer** has relied upon the declarations and statements in the **Application** for this Policy and any applicable Coverage Section in providing coverage under this Policy to the **Insureds.** Such declarations and statements are the basis of the coverage under this Policy

and such declarations and statements shall be incorporated into and shall constitute part of this Policy.

2. The **Application** for coverage under this Policy or any **Liability Coverage Section** shall be considered to be a separate **Application** for coverage by each **Insured Person.** With respect to the declarations and statements in such **Application,** no knowledge possessed by an **Insured Person** shall be imputed to any other **Insured Person.**

3. If such **Application** contains any misrepresentation or omission made with the actual intent to deceive or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the **Insurer** under a **Liability Coverage Section,** then with respect to any **Claim** based upon, attributable to, or arising out of any such misrepresentation or omission, no coverage shall be provided under the respective **Liability Coverage Section** for any:

   a. **Insured Person** who knew the facts that were not truthfully disclosed in such **Application** (whether or not such misrepresentation or omission in the **Application** was known by such **Insured Person**) or any **Organization** to the extent it indemnifies any such **Insured Person; and**

   b. **Organization,** provided that any past or present chief executive officer or chief financial officer (or any equivalent position to any of the foregoing) of the **Parent Organization** knew the facts that were not truthfully disclosed in such **Application** (whether or not such misrepresentation or omission in the **Application** was known by such individual).

4. The **Insurer** shall not rescind or void, in whole or in part, any coverage under any **Liability Coverage Section** for any reason.

D. Authorization Clause

By acceptance of this Policy, the **Parent Organization** agrees to act on behalf of each **Insured** with respect to giving and receiving notices of a **Claim** or cancellation, paying premiums and receiving any return premiums that may become due under this Policy, agreeing to endorsements, electing or failure to elect an Extended Reporting Period, and giving or receiving notices provided for in this Policy, and each **Insured** agrees that the **Parent Organization** shall act on their behalf with respect to all such matters.

E. Bankruptcy

1. Bankruptcy or insolvency of an **Insured** shall not relieve the **Insurer** of any of the **Insurer's** obligations under this Policy, nor deprive the **Insurer** of any of the **Insurer's** rights or defenses under this Policy.

2. In the event a liquidation or reorganization proceeding is commenced by or against an **Organization** pursuant to the United States Bankruptcy Code, as amended, or any similar foreign, state or local law, the **Organization** and the **Insured Persons** hereby:

   a. waive and release any automatic stay or injunction which may apply in such proceeding to this Policy or its proceeds under such bankruptcy law; and

   b. agree not to oppose or object to any efforts by the **Insurer,** the **Organization** or any **Insured Person** to obtain relief from any such stay or injunction.

F. Cancellation and Non-Renewal

1. This Policy shall be cancelled as of the following times, whichever is earlier:

   a. when written notice of cancellation from the **Parent Organization** is received by the **Insurer,** provided that the **Parent Organization** may not cancel this Policy after the effective date of any event set forth in Clause VIII. paragraph B. above;

b. twenty (20) days after receipt by the **Parent Organization** of written notice from the **Insurer** of cancellation for nonpayment of premium, provided that this Clause IX. subparagraph F.1.b. shall not apply if the **Insurer** receives such premium within such twenty (20) day period; or

c. such other time as may be agreed to by the **Parent Organization** and the **Insurer.**

2. If this Policy is cancelled by the **Parent Organization,** the **Insurer** will promptly send to the **Parent Organization** the unearned premium refund, computed at customary short rates. Any other refund under any other cancellation provision shall be computed pro rata. The cancellation will be effective even if the **Insurer** has not made or offered a premium refund.

3. Both the **Insurer** and the **Parent Organization** may refuse to renew this Policy, or any Coverage Section of this Policy. The **Insurer** shall provide written notice of non-renewal to the **Parent Organization** at least sixty (60) days prior to the expiration of the **Policy Period.** Except as prohibited by law, an offer of terms, conditions or premium different than this Policy shall not be considered a refusal to renew.

4. This policy shall terminate on the Expiration Date set forth in Item 2. of the GTC Declarations, or the effective date of cancellation, whichever is earlier.

G. Compliance with Trade Sanctions

This insurance does not apply to the extent that trade or economic sanctions or other similar laws or regulations prohibit the **Insurer** from providing insurance.

H. Coverage Extension

Subject to this Policy's other terms and conditions, coverage under the **Liability Coverage Sections** shall extend to **Claims** for **Wrongful Acts** of an **Insured Person** made against:

1. the lawful spouse or domestic partner of such **Insured Person** solely by reason of such spouse or domestic partner's status as a spouse or domestic partner, or such spouse or domestic partner's ownership interest in property which the claimant seeks as recovery for an alleged **Wrongful Act** of such **Insured Person;** or

2. the estate, heirs, legal representatives or assigns of such **Insured Person** if such **Insured Person** is deceased, or the legal representatives or assigns of such **Insured Person** if such **Insured Person** is legally incompetent, insolvent or bankrupt;

provided that no coverage afforded by this Clause IX. paragraph H. shall apply with respect to any loss arising from an act, error or omission by an **Insured Person's** spouse, domestic partner, estate, heirs, legal representatives or assigns.

I. Allocation

If in any **Claim** under a **Liability Coverage Section** the **Insureds** incur an amount consisting of both **Loss** that is covered and also loss that is not covered under such **Liability Coverage Section** either because the **Claim** is made against both **Insureds** and others or because the **Claim** includes both covered and uncovered matters:

1. **Defense Costs:** one hundred percent (100%) of **Defense Costs** incurred by such **Insured** resulting from such **Claim** shall be covered **Loss,** provided that with respect to any **Insured** for whom coverage is excluded pursuant to Clause IX. paragraph C. (Application Misrepresentation and Non-Rescindable Coverage) of the GTC or with respect to any **Claim** for which the **Insureds** have the duty to defend under this Policy, such **Defense Costs** shall be allocated between covered **Loss** and non-covered loss based on the relative legal exposures of the parties to such matters; and

2. loss other than **Defense Costs:** all remaining loss incurred by such **Insured** from such **Claim** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal exposures of the parties to such matters.

J. Other Insurance

If any **Loss** under a **Liability Coverage Section** is insured under any other valid and collectible insurance policy (other than a policy that is issued specifically as excess of the insurance afforded by such **Liability Coverage Section** or a personal umbrella policy purchased by an **Insured Person**), such **Liability Coverage Section** shall be excess of and shall not contribute with such other insurance, regardless of whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

K. Subrogation

1. With respect to any payments made under this Policy on behalf of any **Insured,** the **Insurer** shall be subrogated to the extent of those payments to the **Insured's** rights of recovery, including without limitation any right of recovery from the **Organization.** The **Insured** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the **Insurer** to bring suit in the name of the **Insured,** including but not limited to an action against the **Organization** for nonpayment of indemnity due and owing to the **Insured Persons** by the **Organization.**

2. To the extent this Policy responds as excess insurance, it is agreed that in case of any payment under this Policy, the **Insurer** will act in concert with all other interests concerned (including the **Insured**).

3. In no event shall the **Insurer** exercise its right of subrogation against an **Insured Person.**

L. Territory

With respect to the **Liability Coverage Sections,** and subject to the terms herein, this Policy covers **Wrongful Acts** taking place, or **Claims** made anywhere in the world. With respect to the **Non-Liability Coverage Sections,** the respective Territory clauses of such Coverage Sections shall apply.

M. Valuation

All premiums, Limits of Liability, retentions, loss and any other monetary amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, or settlement is denominated, or another component of loss under this Policy is expressed in any currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is entered, settlement amount is agreed upon, or another component of loss is due, respectively.

EXHIBIT A



**FREEDOM SPECIALTY**
INSURANCE COMPANY®
a Nationwide Insurance® company

A Stock Insurance Company, herein called the **Insurer**
Freedom Specialty Insurance Company
7 World Trade Center, 37th Floor
250 Greenwich Street
New York, NY 10007-0033

## FREEDOM 360°
## PRIVATE COMPANY PACKAGE POLICY DECLARATIONS

## DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE SECTION
## ("D&O DECLARATIONS")

| | |
|---|---|
| **Item 1.** Parent Organization: <u>Cavaliers Holdings, LLC</u> | |
| **Item 2.** Limits of Liability: | |
| A. Maximum Aggregate Limit of Liability for this Coverage Section: ........ <u>$5,000,000</u> | |
| B. Securityholder Derivative Demand Investigations Costs Sub-limit of Liability: ................................................................ <u>N/A</u> | |
| C. Privacy Event Expenses Sub-limit of Liability:..................................... <u>$25,000</u> | |
| **Item 3.** Retentions: | |
| A. Insuring Agreement A: | |
| Individual Non-Indemnified Liability Coverage: .................................... None | |
| B. Insuring Agreement B: | |
| Individual Indemnified Liability Coverage: ........................................... <u>$75,000</u> | |
| C. Insuring Agreement C: | |
| Entity Liability Coverage: .................................................................. <u>$75,000</u> | |
| D. Insuring Agreement D: | |
| Securityholder Derivative Demand Investigation Costs Coverage:...... None | |
| E. Insuring Agreement E: | |
| Privacy Event Expenses Coverage .................................................... None | |
| **Item 4.** Pending or Prior Proceedings Date: | |
| A. Insuring Agreement A and B: ........................................................... <u>5/1/2017</u> | |
| B. Insuring Agreement C:..................................................................... <u>5/1/2017</u> | |

PHF-D-1 (6-15)

**EXHIBIT A**

**FREEDOM SPECIALTY**
INSURANCE COMPANY®
A Stock Insurance Company, herein called the **Insurer**

## FREEDOM 360° PRIVATE COMPANY PACKAGE POLICY
## DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE SECTION

In consideration of the payment of the premium and in reliance upon the **Application,** which is hereby made a part of this Policy, and subject to the Declarations, General Terms and Conditions and to all other terms of this Policy including all endorsements hereto, the **Insurer** and the **Parent Organization,** on behalf of all **Insureds,** agree as follows:

I. INSURING AGREEMENTS

A. Individual Non-Indemnified Liability Coverage

The **Insurer** shall pay, on behalf of an **Insured Person, Loss** which the **Insured Person** becomes legally obligated to pay resulting from a **Claim** first made against the **Insured Person** during the **Policy Period,** or, if applicable, the Extended Reporting Period, for a **Wrongful Act,** but only to the extent that such **Loss** is not indemnified by an **Organization.**

B. Individual Indemnified Liability Coverage

The **Insurer** shall pay, on behalf of an Organization, Loss which an **Insured Person** becomes legally obligated to pay resulting from a Claim first made against the **Insured Person** during the Policy Period, or, if applicable, the Extended Reporting Period, for a Wrongful Act, but only to the extent the Organization has indemnified the **Insured Person** for such Loss.

C. Entity Liability Coverage

The **Insurer** shall pay, on behalf of an **Organization, Loss** which the **Organization** becomes legally obligated to pay resulting from a **Claim** first made against the **Organization** during the **Policy Period,** or, if applicable, the Extended Reporting Period, for a **Wrongful Act.**

D. Securityholder Derivative Demand Investigation Costs Coverage

**Insurer** shall pay, on behalf of an **Organization, Securityholder Derivative Demand Investigation Costs** incurred with the **Insurer's** prior written consent, which the **Organization** becomes legally obligated to pay resulting from a securityholder derivative demand first made against the **Organization** during the **Policy Period,** or, if applicable, the Extended Reporting Period, for a **Wrongful Act** by an **Executive.**

The **Insurer's** maximum liability for all **Securityholder Derivative Demand Investigation Costs** covered pursuant to this Clause I., paragraph D. shall not exceed in an aggregate amount the **Securityholder Derivative Demand Investigations Costs** sublimit of Liability as set forth in Item 2.b. of the D&O Declarations, which aggregate amount shall be part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2.a. of the D&O Declarations and no Retention shall apply to such amount.

E. Privacy Event Expenses Coverage

If the **Organization** has a **Privacy Event** which first occurs during the Policy Period and, as conditions precedent:

1. notifies the **Insurer** in writing of such **Privacy Event** within thirty (30) days of its first occurrence; and

EXHIBIT A

2.  at all times endeavors to use its best efforts to mitigate the effect and duration of such **Privacy Event,** then, subject to the **Insurer's** prior written consent, such consent not to be unreasonably withheld, the **Insurer** shall reimburse the **Organization** for **Privacy Regulatory Expenses** and **Notification and Credit Monitoring Expenses** resulting from such **Privacy Event,** subject to the following additional terms and conditions:

    a.  All **Privacy Events** that have as a common nexus any fact, circumstance, situation, event, transaction, goal, motive, methodology, or cause or series of causally connected facts, circumstances, situations, events, transactions, goals, motives, methodologies or causes are deemed one **Privacy Event** first occurring on the date of the first such dissemination of **Nonpublic Personal Information;**

    b.  All exclusions applicable to **Loss** under this **Liability Coverage Part,** other than Exclusion V.B., also apply to any **Privacy Regulatory Expenses** and **Notification and Credit Monitoring Expenses;**

    c.  Coverage provided herein shall be subject to an aggregate sublimit of $50,000. Such sublimit shall be the maximum aggregate amount that the **Insurer** shall pay under this **Liability Coverage Part** for all **Privacy Regulatory Expenses** and **Notification and Credit Monitoring Expenses** from all **Privacy Events.** Such sublimit shall be part of, and not in addition to, the Aggregate Limit of Liability applicable to this **Liability Coverage Part;** and

    d.  No retention applies to the coverage provided in this Insuring Agreement E.

II.  SUPPLEMENTAL LIMIT OF LIABILITY SOLELY FOR EXECUTIVES (Optional)

If the Supplemental Limit of Liability Solely For Executives is purchased as set forth in Item 2.c. of the D&O Declarations:

A.  Notwithstanding anything to the contrary set forth in this Policy, this D&O Coverage Section shall provide an additional Limit of Liability in an amount not to exceed the Supplemental Limit of Liability Solely for **Executives** set forth in Item 2.c. of the D&O Declarations, and such amount shall be in addition to, and not part of, both the Maximum Aggregate Limit of Liability set forth in Item 2.a. of the D&O Declarations and any other limit of liability applicable under this Policy.

B.  Such Supplemental Limit of Liability Solely for Executives shall be:

1.  available only for **Loss** incurred by **Executives** and covered under Insuring Agreement A as set forth in Clause I. of this D&O Coverage Section provided;

    a.  the **Organization** shall be deemed to provide indemnification to the **Executives** to the fullest extent permitted or required by law, and hereby agrees to indemnify the **Executives** to the fullest extent permitted or required by law; and

    b.  excess of any valid and collectible insurance that is specifically excess to this D&O Coverage Section, and such excess insurance must be completely exhausted by payment of loss, damages, or defense costs thereunder before the **Insurer** shall have any obligation to make any payment on account of such Supplemental Limit of Liability Solely for Executives.

III.  DEFINITIONS

A.  **Claim** means any of the following, including, if applicable, any appeal therefrom:

1.  written demand against an **Insured** for monetary damages or non-monetary or injunctive relief commenced by the **Insured's** receipt of such demand;

2.  civil proceeding against an **Insured** commenced by the service of a complaint or similar pleading upon the **Insured;**

3. criminal proceeding against an **Insured** commenced by:

    a. an arrest of the **Insured; or**

    b. the return of an indictment, information or similar document against the **Insured;**

4. formal administrative or formal regulatory proceeding against an **Insured** commenced by the filing of a notice of charges, formal investigative order or similar document which names the **Insured** as a target or subject of such proceeding, but any such proceeding against an **Organization** shall constitute a **Claim** only while such proceeding is also pending against an **Insured Person;**

5. arbitration or mediation proceeding against an **Insured** commenced by the **Insured's** receipt of a demand for arbitration or mediation, or similar document;

6. official request for **Extradition** of an **Insured Person;**

7. civil, criminal, administrative or regulatory investigation of an **Insured Person** commenced by the service upon or other receipt by the **Insured Person** of a notice, target letter or other written notice from the investigating authority identifying by name the **Insured Person** as an individual against whom a proceeding may be commenced;

8. written request to toll or waive a statute of limitations relating to a potential **Claim** as set forth in this Clause III., subparagraphs A.1. through 7. above commenced by the **Insured's** receipt of such request;

9. solely for the purposes of Insuring Agreement A as set forth in Clause I. of this D&O Coverage Section, and solely with respect to **Defense Costs,** any written request or subpoena:

    a. to interview or depose an **Insured Person** in his or her capacity as such; or

    b. to produce documents by an **Insured Person** in his or her capacity as such; if such request or subpoena is in connection with any claim or investigation, whether or not the **Insured Person** who received such request or subpoena allegedly committed a Wrongful Act; provided that such request or subpoena (i) is not part of an examination, audit or inspection in the Organization's normal course of business, or general oversight or compliance activity, and (ii) shall constitute a Claim only if and when the **Insureds** elect, in their sole discretion, to give to the **Insurer** written notice thereof; or

10. solely for purposes of Insuring Agreement D as set forth in Clause I. of this D&O Coverage Section, any securityholder derivative demand.

B. **Defense Costs** means that part of a **Loss** consisting of reasonable costs, charges, fees (including attorneys' fees, experts' fees and **Electronic Discovery Defense Expenses**) and expenses (other than regular or overtime wages, salaries, fees or benefits of the **Insured Persons**) incurred:

1. in the defense or appeal of any **Claim,** including the premium for appeal, attachment or similar bonds, provided that the **Insurer** shall not be obligated to apply for or furnish such bonds; or

2. to assist the **Insurer,** at the **Insurer's** request, in investigating a **Claim.**

C. **Electronic Discovery Defense Expenses** means costs relating to the collection, processing, converting, reviewing and producing electronically stored information.

D. **Employee** means any natural person whose service or labor was, now is, or shall become engaged and directed by an **Organization,** including any part-time, leased, seasonal or temporary employee, intern or volunteer. Any natural person who is contracted to perform work for the **Organization,**

or who is an independent contractor for the **Organization,** shall also be an **Employee,** but only if the **Organization** has agreed pursuant to a written agreement, prior to the date of any alleged **Wrongful Act,** to provide indemnification to such individual in the same manner as that provided to the **Organization's** employees.

E.  **Extradition** means any formal process by which an **Insured Person** located in any country is or is sought to be surrendered to any other country for trial, or otherwise to answer any criminal accusation, for a **Wrongful Act.**

F.  **Insured** means any **Organization** and any **Insured Person.**

G.  **Insured Persons,** either in the singular or plural, means

1.  any **Executive** or **Employee** of an **Organization;** and

2.  any **Executive** or **Employee** of an **Organization** while serving in an **Outside Capacity.**

H.  **Loss** means the amount the **Insured** becomes legally obligated to pay as a result of any **Claim,** including **Defense Costs,** compensatory, punitive, exemplary or multiple damages, judgments, settlements, an award of pre-judgment and post-judgment interest with respect to covered damages, and civil fines or civil penalties assessed against an **Insured Person** for an unintentional or non-willful violation of law (including without limitation pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 16 U.S.C. § 78dd-2(g)(2)(B)), and claimant's attorney's fees awarded by a court against an **Insured,** or in connection with a settlement, agreed to by the **Insurer.**

**Loss** shall not include any of the following, provided this sentence does not exclude **Defense Costs** with respect to any of the following:

1.  cost of compliance with respect to non-monetary relief or injunctive relief;

2.  amounts which are uninsurable under the law pursuant to which this D&O Coverage Section is construed;

3.  taxes imposed by law, except solely for the purposes of Insuring Agreement A as set forth in Clause I. of this D&O Coverage Section, any tax imposed upon an **Organization** for which an **Insured Person** is legally liable solely by reason of the bankruptcy, receivership, conservatorship, or liquidation of the **Organization;**

4.  amounts incurred by an **Insured** in the investigation or defense of any action, proceeding or demand that was not then a **Claim** even if:

    a.  such amount also benefits the defense of a covered **Claim;** or

    b.  such action, proceeding or demand subsequently gives rise to a **Claim;**

5.  fines or penalties imposed by law, other than civil fines or penalties described above; or

6.  amounts which represent or are substantially equivalent to an increase in the consideration paid, or proposed to be paid, in connection with the purchase of any securities or assets.

The insurability of any punitive, exemplary or multiple damages, fines, penalties or taxes otherwise covered under this D&O Coverage Section shall be determined under the internal laws of any applicable jurisdiction most favorable to the **Insured,** including without limitation the jurisdiction in which the **Organization,** the **Insured,** the **Insurer,** this Policy or such **Claim** is located or has a substantial relationship.

Solely for purposes of Insuring Agreement D. set forth in Clause I. of the D&O Coverage Section, **Loss** means **Securityholder Derivative Demand Investigation Costs.**

I.  **Nonpublic Personal Information** means a natural person's first name and last name in combination with any one or more of the following:

    a.  social security number;

    b.  medical or healthcare information or data;

    c.  drivers license number or state identification number; or

    d.  financial account information that would permit access to that individual's financial account.

J.  **Notification and Credit Monitoring Expenses** means the amount of reasonable and necessary expenses incurred by the **Organization:**

    a.  to notify its customers or clients of a Privacy Event to comply with Notification Laws;

    b.  for credit monitoring services offered by the **Insured Organization** to individuals after a **Privacy Event** to comply with **Notification Laws; or**

    c.  to provide courtesy notifications to individuals when such notifications are not mandated by **Notification Laws** but are reasonably necessary to preserve the reputation and good name of the **Organization.**

K.  **Notification Laws** means any U.S. statute or regulation that, at the time of a **Privacy Event,** requires an Organization that stores **Nonpublic Personal Information** on a computer system to provide notice to specified individuals of any actual or potential **Privacy Event.** However, **Notification Laws** shall not include any foreign law, regulation or statute.

L.  **Privacy Event** means any **Organization's** negligent and improper dissemination of **Nonpublic Personal Information.**

M.  **Privacy Laws** means any U.S. federal, state, territorial and local statutes and regulations governing the confidentiality, control and use of **Nonpublic Personal Information** including but not limited to:

    1.  Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) ("HIPAA");

    2.  Gramm-Leach-Bliley Act of 1999 ("G-L-B"), also known as the Financial Services Modernization Act of 1999;

    3.  State privacy protection laws, including but not limited to the California Database Protection Act of 2003 (Cal. SB 1386) and Cal. Civ. Code § 1798.82, that require commercial internet sites or online services that collect personal information or medical information (as defined by such laws or acts) to post privacy policies and adopt specific privacy controls or to notify those impacted by identity or data theft, abuse or misuse;

    4.  Federal and state consumer credit reporting laws, including but not limited to the Federal Fair Credit Reporting Act (FCRA) and the California Consumer Credit Reporting Agencies Act (CCCRAA); or

    5.  The Fair and Accurate Credit Transaction Act of 2003 (FACTA). However, **Privacy Laws** shall not include any foreign law, regulation or statute.

N.  **Privacy Regulatory Expenses** means fines or penalties incurred by an **Organization** and assessed pursuant to a **Privacy Laws** in a **Privacy Regulatory Proceeding.**

O.  **Privacy Regulatory Proceeding** means a civil, formal administrative or formal regulatory proceeding against an Insured by a U.S. federal, state or local governmental authority alleging violation of any **Privacy Laws.**

P.  **Professional Services** means services which are performed by the **Insureds** for others in connection with an **Organization's** business, regardless of whether or not such services are compensated or uncompensated.

Q. **Securityholder Derivative Demand Investigation Costs** means reasonable costs, charges, fees and expenses (other than regular or overtime wages, salaries, fees, or benefits of the **Insured Persons**) incurred by an **Organization** (including its Board of Directors or any committee of its Board of Directors) solely with respect to an evaluation of whether it is in the best interest of the **Organization** to prosecute the claims alleged in a securityholder derivative demand. In no event shall **Securityholder Derivative Demand Investigation Costs** include any costs, charges, fees or expenses incurred in the defense or appeal of a **Claim.**

R. **Wrongful Act** means:

1. any actual or alleged error, misstatement, misleading statement, neglect, breach of duty, omission or act committed or attempted by any **Insured Persons** in their capacity as such or in an **Outside Capacity** or with respect to Insuring Agreement C as set forth in Clause I. of this D&O Coverage Section, by the **Organization;** or

2. any matter claimed against any **Insured Persons** solely by reason of their serving in such capacity or in an **Outside Capacity.**

IV. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

The **Insurer** shall not be liable to pay any **Loss** resulting from, and shall not be obligated to defend, any **Claim** against an **Insured:**

A. based upon, attributable to, or arising out of any fact, circumstance, situation, transaction, event or **Wrongful Act** which has been the subject of a written notice under any prior insurance policy or coverage section of which this D&O Coverage Section is a direct or indirect renewal or replacement; provided the **Insurer** of such prior policy or coverage section does not reject such notice as invalid;

B. based upon, attributable to, or arising out of any written demand, suit or other proceeding pending against, or decree, judgment or order entered for or against any **Insured,** on or prior to the applicable Pending or Prior Proceedings Date set forth in Item 4. of the D&O Declarations, or the same or substantially the same **Wrongful Acts, Interrelated Wrongful Acts,** facts or circumstances alleged in or underlying such written demand, suit, proceeding, decree, judgment or order;

C. for bodily injury, sickness, mental anguish, humiliation, emotional distress, disease or death of any person, false arrest or imprisonment, invasion of privacy, assault, or battery or for damage to or destruction of any tangible property, including the loss of its use, whether or not it is damaged or destroyed;

D. for any actual or alleged violation of the responsibilities, obligations or duties imposed by **ERISA;**

E. based upon, attributable to, or arising out of:

1. any actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of **Pollutants** at any time; provided, however, this Exclusion E.1. shall not apply to:

    a. **Loss** under Insuring Agreement A as set forth in Clause I. of this D&O Coverage Section for which neither an **Organization** nor **Outside Entity** has indemnified the **Insured Person** either because the **Organization** or **Outside Entity** is not permitted by common or statutory law to grant such indemnification or because of **Financial Impairment** of the **Organization** or **Outside Entity;** or

    b. **Loss** in connection with any **Claim** brought by a securityholder of the **Organization** in their capacity as such, while acting totally independent of and without the solicitation, assistance, participation or intervention of the **Organization** or any **Insured Person;** or

2. any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants;**

F.   for a **Wrongful Act** by an **Insured Person** while serving in an **Outside Capacity,** if such **Claim** is brought or maintained:

   1.   by or on behalf of the **Outside Entity,** other than a securityholder derivative action brought and maintained without the active assistance, participation or solicitation of any **Executive** of an **Organization** or of the **Outside Entity,** provided this exclusion shall not apply if such assistance, participation or solicitation is by an **Executive** protected by any whistleblower law; or

   2.   by a duly elected or appointed director, officer, trustee, governor or equivalent position of the **Outside Entity** in any capacity, other than a **Claim** for contribution or indemnity arising from another **Claim** otherwise covered under this D&O Coverage Section;

   provided this Exclusion F. shall apply only if the **Insured Person** is serving in his or her **Outside Capacity** for such **Outside Entity** at the time such **Claim** is first made.

G.   brought or maintained, directly or indirectly, by or on behalf of any:

   1.   **Organization** against any other **Organization;**

   2.   **Organization** against any **Insured Person** of such **Organization,** provided that this Exclusion G.2. shall not apply to a **Claim:**

      a.   brought following the **Financial Impairment** of the **Organization;**

      b.   brought as a securityholder derivative action if such action is brought and maintained without the active assistance, participation or solicitation of any **Executive** whose conduct is not protected by any applicable whistleblower law; or

      c.   brought outside the United States or Canada;

   3.   **Insured Person** in any capacity against an **Insured,** provided that this Exclusion G.3. shall not apply to a **Claim:**

      a.   brought by an **Employee,** who is not an **Executive,** in his or her capacity as a shareholder of an **Organization;**

      b.   brought by an **Executive,** provided that such **Executive** has not:

         i.   served in such capacity; nor

         ii.   acted as a consultant to the **Organization,** for at least four year, prior to the **Claim** being first made;

      c.   for contribution or indemnity arising out of another **Claim** otherwise covered under this Coverage Section;

H.   for any actual or alleged:

   1.   employment-related matters, including discrimination, harassment, retaliation, wrongful discharge, termination, violation of any employment-related statute, rule or regulation, or any other employment-related or employment practice claim; or

   2.   discrimination against, or sexual harassment of, any third party;

I.   based upon, attributable to, or arising out of any purchase or sale, or offer to purchase or sell, any securities issued by any **Organization** or **Outside Entity;** provided that this Exclusion I. shall not apply to a **Claim:**

   1.   based upon, attributable to, or arising out of any such purchase, sale or offer exempted from registration under the Securities Act of 1933, or any applicable similar foreign law that regulates the purchase, sale or offering of securities, including the exemption pursuant to Title III of the Jumpstart Our Business Startups Act ("JOBS Act") for crowdfunding;

2. made by any securityholder of an **Organization** for **Wrongful Acts** relating to the failure of the **Organization** to undertake or complete the initial public offering or sale of securities of such **Organization;** or

3. for **Wrongful Acts** relating to an **Organization's** preparation for any proposed public offering of securities (including any offering pursuant to the JOBS Act), including any research or road show presentation to potential investors by the **Organization** and its **Executives** via any medium in connection with such public offering, if such proposed offering does not occur; or

J. based upon, attributable to, or arising out of such **Insured:**

1. gaining any personal profit, financial gain, remuneration or other financial advantage to which such **Insured** is not legally entitled, if a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by or against the Insurer establishes that such **Insured** gained such personal profit, gain, remuneration or advantage; or

2. committing any deliberately fraudulent act or omission or any willful violation of law, if a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by or against the **Insurer** establishes such an act, omission or willful violation, provided that with re-spect to this Exclusion J.:

   a. no conduct or intent of any **Insured Persons** shall be imputed to any other **Insured Per-son;** and

   b. only the conduct or intent of any past, present or future chief financial officer, chief execu-tive officer or chief operating officer (or any equivalent position to any of the foregoing) of an **Organization** shall be imputed to such **Organization** and its **Subsidiaries;** or

K. based upon, attributable to, or arising out of the rendering of or failure to render **Professional Ser-vices,** provided that this Exclusion K. shall not apply to **Claims** brought by a securityholder of the **Organization** in their capacity as such while acting totally independent of and without the solicita-tion, assistance, participation or intervention of the **Organization** or any **Insured Person.**

V. EXCLUSIONS APPLICABLE TO INSURING AGREEMENT C: ENTITY LIABILITY COVERAGE

The **Insurer** shall not be liable to pay any **Loss** resulting from, and shall not be obligated to defend, any **Claim** against an **Organization:**

A. based upon, attributable to, arising from or in consequence of any liability of the **Organization** under any oral or written contract or agreement, provided that this Exclusion A. shall not apply to the extent that such **Organization** would have been liable in the absence of such contract or agreement;

B. based upon, attributable to, or arising from or in consequence of price fixing, restraint of trade, monopolization, unfair trade practices or any violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto or any rules or regulations promulgated thereunder or in connection with such statutes; or any similar provision of any federal, state, or local statutory law or common law anywhere in the world;

C. based upon, attributable to, or arising out of any detention or imprisonment; malicious prosecution or malicious use or abuse of process; libel, slander, oral or written publication of defamatory or dis-paraging material; wrongful entry or eviction; invasion of the right of private occupancy; or loss of consortium;

D. based upon, attributable to, or arising out of any goods or products manufactured, produced, pro-cessed, packaged, sold, marketed, distributed, advertised or developed by the **Organization;**

provided that this Exclusion D. shall not apply to **Claims** brought by a securityholder of an **Organization** in their capacity as such while acting totally independent of and without the solicitation, assistance, participation or intervention of the **Organization** or any **Insured Person; or**

E.  based upon, attributable to, or arising out of any actual or alleged infringement or violation of any patent, copyright, trademark, trade name, trade dress, or service mark; any misappropriation of ideas, trade secrets or other intellectual property rights; any false patent markings; or any violation of a federal, state, local or foreign intellectual property law, rule or regulation, provided that this Exclusion F. shall not apply to **Claims** brought by a securityholder of the **Organization** in their capacity as such while acting totally independent of and without the solicitation, assistance, participation or intervention of the **Organization** or any **Insured Person.**

VI.  PAYMENT PRIORITY

A.  If **Loss** for which payment is concurrently due under Insuring Agreement A under this D&O Coverage Section, and under one or more of the other Insuring Agreements under this D&O Coverage Section, the **Insurer** shall:

1.  first pay such **Loss** for which coverage is provided under Insuring Agreement A; and then

2.  pay such **Loss** for which coverage is provided under any other Insuring Agreement, provided that such **Loss** shall only be paid from whatever remaining amount of the applicable Limit of Liability is available after payment under this Clause VI., subparagraph A.1. above.

B.  The **Insurer** may pay covered **Loss** as it becomes due under this D&O Coverage Section regardless of the potential for other future payment obligations under this D&O Coverage Section.

VII.  SECURITIES TRANSACTIONS

If an **Organization** intends to sell or offer to sell securities during the **Policy Period** that are required to be registered under the Securities Act of 1933 or that are exempt from such registration by reason of the JOBS ACT, the **Organization** shall provide the **Insurer** written notice of the proposed sale or offering no later than thirty (30) days prior to the effective date of such sale or offering, along with all information requested by the **Insurer** relating to such sale or offering. The **Insurer** shall provide a quotation to the **Organization** for the deletion of Clause IV., paragraph I. (Securities) of this D&O Coverage Section with respect to such sale or offering; provided that such quotation shall be subject to such other terms, conditions, and limitations of coverage and such additional premium as the **Insurer,** in its sole discretion, may require.

VIII.  OUTSIDE CAPACITY COVERAGE

A.  Any coverage provided under this D&O Coverage Section for a **Claim** in connection with an **Insured Person** serving in an **Outside Capacity** for an **Outside Entity** shall be specifically excess of any indemnification and insurance available from or provided by the **Outside Entity.**

B.  If a **Claim** against an **Insured Person** serving in an **Outside Capacity** is covered under this D&O Coverage Section and is also covered under any other coverage section or policy issued by the **Insurer** or any subsidiary or affiliate of the **Insurer** to any other entity, then solely for purposes of such **Claim** any payment under such other coverage section or policy shall reduce any applicable Limit of Liability under this D&O Coverage Section by the amount of such payment.



**FREEDOM SPECIALTY**
INSURANCE COMPANY®
a Nationwide Insurance® company

A Stock Insurance Company, herein called the Insurer
Freedom Specialty Insurance Company
7 World Trade Center, 37th Floor
250 Greenwich Street
New York, NY 10007-0033

**FREEDOM 360°**
**PRIVATE COMPANY PACKAGE POLICY DECLARATIONS**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION**
**("EPL DECLARATIONS")**

| | |
|---|---|
| Item 1. Parent Organization: CAVALIERS HOLDINGS, LLC | |
| Item 2. Limits of Liability: | |
|     A. Maximum Aggregate Limit of Liability for this Coverage Section: ........... | $5,000,000 |
|     B. Insuring Agreement A: | |
|        Employment Practices Liability Coverage: ................................................ | $5,000,000 |
|     C. Insuring Agreement B: | |
|        Third Party Liability Coverage: .................................................................. | $5,000,000 |
| Item 3. Retentions: | |
|     A. Insuring Agreement A: | |
|        Employment Practices Liability Coverage: ................................................ | SEE ENDT 2 |
|     B. Insuring Agreement B: | |
|        Third Party Liability Coverage: .................................................................. | SEE ENDT 2 |
| Item 4. Pending or Prior Proceedings Date: | |
|     A. Insuring Agreement A: ................................................................................... | 05/01/2017 |
|     B. Insuring Agreement B: ................................................................................... | 05/01/2017 |

PHF-D-2 (6-15)

EXHIBIT A

**FREEDOM SPECIALTY**
INSURANCE COMPANY®
a Nationwide Insurance® company

A Stock Insurance Company, herein called the **Insurer**

**FREEDOM 360°**
**PRIVATE COMPANY PACKAGE POLICY**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION**

In consideration of the payment of the premium and in reliance upon the **Application,** which is hereby made a part of this Policy, and subject to the Declarations, General Terms and Conditions and to all other terms of this Policy including all endorsements hereto, the Insurer and the **Parent Organization,** on behalf of all **Insureds,** agree as follows:

I.  INSURING AGREEMENTS

    A.  Employment Practices Liability Coverage

        The **Insurer** shall pay, on behalf of an **Insured, Loss** resulting from an **Employment Claim** first made against the **Insured** during the **Policy Period,** or, if applicable, the Extended Reporting Period, for an **Employment Practices Wrongful Act.**

    B.  Third Party Liability Coverage

        The **Insurer** shall pay, on behalf of an **Insured, Loss** resulting from a **Third Party Claim** first made against the **Insured** during the **Policy Period,** or, if applicable, the Extended Reporting Period, for a **Third Party Wrongful Act.**

II.  DEFINITIONS

    A.  **Benefits** means perquisites, fringe benefits, deferred compensation, payments for time off, or leave of absence, including but not limited to any payment (including insurance premiums) in connection with an employee benefit plan. **Benefits** includes any other payment to or for the benefit of an **Employee** arising out of the employment relationship but shall not include salary, wages, commissions, bonuses, non-deferred cash incentive compensation or **Stock Benefits.**

    B.  **Claim** means any:

        1.  **Employment Claim;** or

        2.  **Third Party Claim.**

    C.  **Defense Costs** means that part of a **Loss** consisting of reasonable costs, charges, fees (including attorneys' fees, experts' fees and **Electronic Discovery Defense Expenses**) and expenses (other than regular or overtime wages, salaries, fees or benefits of the **Insured Persons**) incurred:

        1.  in the defense of, the opposition of, or appeal of any **Claim,** including the premium for appeal, attachment or similar bonds, provided that the **Insurer** shall not be obligated to apply for or furnish such bonds; or

        2.  to assist the **Insurer,** at the **Insurer's** request, in investigating a **Claim.**

    D.  **Electronic Discovery Defense Expenses** means costs relating to the collection, processing, converting, reviewing and producing electronically stored information.

    E.  **Employee** means any natural person whose service or labor was, now is, or shall become engaged and directed by an **Organization,** including any part-time, seasonal, or temporary employee, leased employee, intern or volunteer. An **Independent Contractor** also shall be considered an **Employee.**

EXHIBIT A

F.  **Employment Claim** means any of the following which are brought and maintained against an **Insured** by or on behalf of any actual or alleged past, present or prospective **Employee** or applicant for employment of an **Organization,** including, if applicable, any appeal therefrom:

   1.  written demand against an **Insured** for monetary damages or non-monetary or injunctive relief commenced by the **Insured's** receipt of such demand, including a written demand for reinstatement, reemployment, or re-engagement;

   2.  civil proceeding against an **Insured** commenced by the service of a complaint or similar pleading upon the **Insured;**

   3.  criminal proceeding outside the United States of America commenced by:

      a.  an arrest of the **Insured;** or

      b.  the return of an indictment, information or similar document against the **Insured;**

   4.  arbitration proceeding against an **Insured** pursuant to an **Organization's** employment contract, policy or practice, commenced by the **Insured's** receipt of a demand for an arbitration or similar document;

   5.  other external alternative dispute resolution proceeding against an **Insured** commenced by the **Insured's** receipt of a demand for an alternative dispute resolution or similar document;

   6.  formal administrative or formal regulatory proceeding against an **Insured** commenced by the **Insured's** receipt of a notice of charges, formal investigative order or similar document, including but not limited to any administrative or regulatory proceeding before or brought by or on behalf of the Equal Employment Opportunity Commission, the Office of Federal Contract Compliance Programs, or any similar governmental agency located anywhere in the world with jurisdiction over the employment practices of the **Organization;** provided that with respect to an audit by the Office of Federal Contract Compliance Programs, such a proceeding shall be commenced by the **Insured** receiving a Notice of Violation or Order to Show Cause; or

   7.  written request to toll or waive a statute of limitations relating to a potential **Employment Claim** as set forth in this Clause II., subparagraphs F.2. and F.3. above commenced by the **Insured's** receipt of such request.

   Notwithstanding anything to the contrary contained within the definition of **Employment Claim** above, **Employment Claim** shall not include any labor or grievance arbitration or other proceeding pursuant to or governed by a collective bargaining agreement.

G.  **Employment Contract Breach** means any breach of any employment-related oral, written or implied contract with the **Organization,** including any such contract arising out of any personnel manual, employee handbook, policy statement or other representation.

H.  **Employment Discrimination** means any violation of employment discrimination laws or public policy, including but not limited to, any actual, alleged or constructive employment termination, dismissal, or discharge, employment demotion, denial of tenure, modification of any term or condition of employment, any failure or refusal to hire or promote, or any limitation or segregation of any **Employee** or applicant for employment in any way that would deprive any person of employment opportunities or otherwise affect his or her status as an employee based on such person's race, color, religion, creed, age, sex, disability, marital status, genetic information, national origin, pregnancy, HIV status, sexual orientation or preference, veteran status or any other status that is protected pursuant to any foreign, federal, state, or local statutory law or common law.

I.  **Employment Practices Wrongful Act** means any of the following actually or allegedly committed by an **Organization** or by an **Insured Person** in their capacity as such:

   1.  **Employment Contract Breach;**

   2.  **Employment Discrimination;**

3. **Harassment;**

4. **Retaliation;**

5. **Workplace Tort;**

6. **Wrongful Employment Decision;** or

7. **Wrongful Termination;**

committed, attempted, or allegedly committed or attempted by an **Organization** or by an **Insured Person** while acting in his or her capacity as such.

J. **Harassment** means:

1. harassment, including unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature that is made as a condition of employment with, used as a basis for employment decisions by, interferes with performance or creates an intimidating, hostile or offensive working environment within an **Organization;** or

2. workplace harassment, including work-related harassment or bullying of a non-sexual nature that interferes with performance or creates an intimidating, hostile or offensive working environment within an **Organization.**

K. **Independent Contractor** means any natural person working in the capacity as an independent contractor for an **Organization** pursuant to an express contract or agreement between such independent contractor and the **Organization,** provided that such express contract or agreement governs the nature of the **Organization's** engagement of such independent contractor.

L. **Insured** means any **Organization** and any **Insured Person.**

M. **Insured Persons,** either in the singular or plural, means any:

1. **Employee** other than an **Independent Contractor;**

2. **Executive;** or

3. **Independent Contractor,** but only if the **Organization** has agreed, within thirty (30) days after the **Claim** is made, to provide indemnification to such individual in the same manner as that provided to the **Organization's** employees.

N. **Loss** means the amount the **Insured** becomes legally obligated to pay as a result of any **Claim,** including **Defense Costs;** compensatory, punitive, exemplary or multiple damages; judgments; settlements; an award of pre-judgment or post-judgment interest with respect to covered damages; liquidated damages awarded in accordance with the Age Discrimination in Employment Act, the Family and Medical Leave Act or the Equal Pay Act; back pay and front pay; and claimant's attorney's fees awarded by a court against an **Insured** or, in connection with a settlement, agreed to by the **Insurer.**

**Loss** shall not include any of the following, provided this sentence does not exclude **Defense Costs** with respect to any of the following:

1. costs of compliance with respect to non-monetary or injunctive relief;

2. taxes, fines or penalties imposed by law, other than punitive, exemplary, multiple or liquidated damages expressly referenced in this definition above;

3. amounts which are uninsurable under the law pursuant to which this EPL Coverage Section is construed;

4. salary, wages, commissions, bonuses, non-deferred cash incentive compensation, or other monetary amounts if actually or allegedly earned by the claimant in the course of employment other than back pay, front pay or any additional compensation allegedly due as a result of an Employment Practices Wrongful Act;

EXHIBIT A

5. future salary, wages, commissions or **Benefits** of a claimant who:

    a. has been hired, promoted or reinstated to employment; or

    b. shall be hired, promoted or reinstated to employment; pursuant to a settlement, order or other resolution of any **Claim;**

6. costs associated with providing any accommodation for disabled persons or any other status protected under applicable federal, state or local statutory law or common law anywhere in the world, including the Civil Rights Act or 1964, the Americans with Disabilities Act, or any amendments to or rules or regulations promulgated thereunder;

7. amounts incurred by an **Insured** in the investigation or defense of any action, proceeding or demand that was not then a **Claim** even if:

    a. such amounts also benefit the defense of a covered **Claim;** or

    b. such action, proceeding or demand subsequently gives rise to a **Claim;**

8. **Benefits** due or that are to become due, or the equivalent value of such **Benefits,** except with respect to any **Employment Claim** for **Wrongful Termination;** or

9. **Stock Benefits.**

The insurability of any punitive, exemplary, multiple or liquidated damages otherwise covered under this EPL Coverage Section shall be determined under the internal laws of any applicable jurisdiction most favorable to the **Insured,** including without limitation the jurisdiction in which the **Organization,** the **Insured,** the **Insurer,** this Policy or such **Claim** is located or has a substantial relationship.

O. **Retaliation** means retaliatory treatment against an **Employee** based upon such individual:

1. refusing to violate any law, or opposing any unlawful practice, or exercising his or her rights under law;

2. threatening to disclose or disclosing to: (i) a **Manager;** or (ii) any governmental agency, any alleged violations of law by an **Insured;**

3. having assisted, testified or cooperated with a proceeding or investigation (including an **Organization's** internal investigation conducted by its human resources or legal department) regarding the **Insured's** alleged violations of law; or

4. filing any claim against the **Organization** pursuant to the Federal False Claims Act, Section 806 of the Sarbanes Oxley Act or any other federal, state, local or foreign whistleblower law.

P. **Stock Benefits** means:

1. any offering, plan or agreement between an **Organization** and any employee which grants stock, stock options, warrants, or shares of the **Organization** to such employees, including grants of stock options, restricted stock, stock warrants, performance stock shares, membership shares, or any other incentive or compensation granted in the form of securities of the **Organization;** or

2. any instrument or payment whereby the value or amount of such instrument or payment is derived from the value of the **Organization's** securities, including phantom stock plan or arrangements, or stock appreciation rights;

provided that **Stock Benefits** shall not include any amounts based upon, attributable to, or arising out of employee stock purchase plans or employee stock ownership plans.

Q. **Third Party** means any natural person who is a customer, vendor, service provider or other business invitee of the **Organization. Third Party** shall also include any independent contractor who

is not an Insured Person as defined in this EPL Coverage Section under Clause II. subparagraph M.3., above. Third Party shall not include any Insured Person or any applicant for employment with the Organization.

R.  **Third Party Claim** means any of the following which are brought and maintained against an **Insured** by or on behalf of a **Third Party,** including, if applicable, any appeal therefrom:

1.  written demand for monetary damages or non-monetary or injunctive relief commenced by the **Insured's** receipt of such demand;

2.  civil proceeding commenced by the service of a complaint or similar pleading upon an **Insured;**

3.  formal administrative or formal regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document which names the **Insured** as a target or subject of such proceeding;

4.  arbitration proceeding commenced by the **Insured's** receipt of a demand for an arbitration or similar document; or

5.  other external alternative dispute resolution proceeding commenced by the **Insured's** receipt of a demand for an alternative dispute resolution or similar document; or

6.  written request to toll or waive a statute of limitations relating to a potential **Third Party Claim** as set forth in Clause II. subparagraphs R.1. through 5. above commenced by the **Insured's** receipt of such request.

S.  **Third Party Wrongful Act** means any actual or alleged:

1.  discrimination against a **Third Party** based upon such **Third Party's** race, color, religion, creed, age, sex, disability, marital status, genetic information, national origin, pregnancy, HIV status, sexual orientation or preference, veteran status or any other status that is protected pursuant to any foreign, federal, state, or local statutory law or common law anywhere in the world; or

2.  sexual harassment directed against a **Third Party,** including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature;

    committed, attempted, or allegedly committed or attempted by any **Organization** or by any **Insured Person** while acting in his or her capacity as such.

T.  **Workplace Tort** means any employment-related:

1.  misrepresentation, defamation (including libel and slander);

2.  invasion of privacy, including the unauthorized use or disclosure of an **Employee's:**

    a.  medical information in violation of the Health Insurance Portability and Accountability Act ("HIPAA");

    b.  credit information or related information in violation of the Fair Credit Reporting Act;

    c.  other information obtained through an employment-related background check; or

3.  negligent evaluation, wrongful discipline or wrongful deprivation of a career opportunity.

4.  **Workplace Tort** shall also mean any employment-related:

    a.  negligent retention, negligent supervision, negligent hiring or negligent training;

    b.  false arrest, false detention, false imprisonment;

    c.  wrongful infliction of emotional distress, mental anguish or humiliation; or

    d.  failure to provide or enforce consistent employment-related corporate policies and procedures; solely when alleged as part of an Employment Claim for any Employment Contract

Breach, Employment Discrimination, Harassment, Retaliation, Wrongful Employment Decision, or Wrongful Termination, or any act set forth in Clause II. subparagraphs T.1., T.2. and T.3. above.

U. **Wrongful Act** means:

   1. an **Employment Practices Wrongful Act;** or

   2. solely with respect to coverage provided under Clause I. Insuring Agreement B., a **Third Party Wrongful Act.**

V. **Wrongful Employment Decision** means any actual or alleged wrongful demotion, denial of tenure, or failure or refusal to hire or promote, failure to employ, or wrongful or negligent employee reference.

W. **Wrongful Termination** means any wrongful dismissal, termination or discharge of employment, including constructive dismissal, termination or discharge. **Wrongful Termination** does not include **Employment Contract Breach.**

III. EXCLUSIONS

The **Insurer** shall not be liable to pay any **Loss** resulting from, and shall not be obligated to defend, any **Claim** against an **Insured**:

A. based upon, attributable to, or arising out of any fact, circumstance, situation, transaction, event or **Wrongful Act** which has been the subject of a written notice under any prior employment practices liability insurance policy or coverage section or any other liability policy or coverage section that includes coverage for employment practices liability, whether excess or underlying, of which this EPL Coverage Section is a direct or indirect renewal or replacement; provided the **Insurer** of such prior policy or coverage section does not reject such notice as invalid;

B. based upon, attributable to, or arising out of any written demand, suit, formal administrative or regulatory proceeding or other proceeding pending against, or decree, judgment or order entered for or against any **Insured,** on or prior to the applicable Pending or Prior Proceedings Date set forth in Item 4. of the EPL Declarations, or the same or substantially the same **Wrongful Acts, Interrelated Wrongful Acts,** facts or circumstances alleged or underlying such written demand, suit or proceeding;

C. for bodily injury, sickness, mental anguish, humiliation, emotional distress, disease or death of any person, assault, or battery or for damage to or destruction of any tangible property, including the loss of its use, whether or not it is damaged or destroyed; provided that this Exclusion C. shall not apply to **Loss** for emotional distress, humiliation or mental anguish when alleged as part of an otherwise covered **Claim;**

D. for any breach of any express contract or agreement between an **Independent Contractor** and the **Organization;**

E. for any actual or alleged breach of any written employment agreement or written severance obligation, provided that this Exclusion E. shall not apply to: (i) **Loss** to the extent that an **Insured** would have been liable for such **Loss** in the absence of such written employment contract or written severance obligation; or (ii) **Defense Costs;**

F. for any actual or alleged violation of the responsibilities, obligations or duties imposed by:

   1. any law governing workers' compensation, unemployment insurance, unemployment compensation, social security, retirement or disability benefits, or benefits of any kind;

   2. the Fair Labor Standards Act (except the Equal Pay Act) or any other law concerning wage and hour practices, including without limitation:

      a. any **Claim** for off-the-clock work, failure to provide rest or meal periods, failure to reimburse expenses, improper classification of employees as exempt or non-exempt, failure to properly maintain accurate time records, or failure to properly determine or timely pay wages,

b. any **Claim** for conversion, unjust enrichment, unfair business practices or similar causes of action to the extent such causes of action relate to the alleged violation of any law described in this subparagraph F.2;

3. the National Labor Relations Act or any law governing the rights of employees to engage in, or to refrain from engaging in, union or other collective activities, or any law governing the enforcement of any collective bargaining agreement;

4. the Worker Adjustment and Retraining Notification Act;

5. the Occupational Safety and Health Act;

6. **ERISA,** except § 510 thereof; or

7. any federal, state, local or foreign statute, rule, regulation or common law similar or related to, or promulgated pursuant to, any of the statutes described in subparagraphs F.1. through F.6. above;

provided that this Exclusion F. shall not apply to **Loss** arising out of any **Employment Claim** for **Retaliation;**

IV. COVERAGE DISPUTE RESOLUTION

A. Any dispute between the **Insurer** and the **Insured** based upon, attributable to, or arising out of: (i) any actual or alleged coverage under this EPL Coverage Section, or (ii) the validity, breach or termination of this EPL Coverage Section shall be resolved by final and binding arbitration, provided that:

1. the **Insured** shall first have the option to resolve any such dispute through non-binding mediation; and

2. the parties shall share the common costs of such arbitration or mediation, but shall bear their own legal fees and expenses therein.

B. In the event of a binding arbitration, such proceeding shall be pursuant to such rules and procedures as the parties may agree. If the parties cannot agree, the arbitration shall be administered by the American Arbitration Association in accordance with its then prevailing Commercial Arbitration Rules. The arbitration panel shall consist of one arbitrator selected by the **Insured,** one selected by the **Insurer,** and the third independent arbitrator selected by the two party-appointed arbitrators.

C. In any such arbitration or mediation, this Policy shall be construed and enforced in accordance with the internal laws of New York, without application of any applicable conflict of law analysis.

V. OTHER INSURANCE

A. The coverage provided under this EPL Coverage Section for **Employment Claims** shall be primary to and not excess of any other valid and collectible insurance, unless specifically stated to the contrary within this EPL Coverage Section, provided that **Loss** payable on behalf of any temporary or leased employee or **Independent Contractor** under this EPL Coverage Section for an **Employment Claim** made against such temporary or leased employee or **Independent Contractor,** shall be excess of and shall not contribute with any other valid and collectible insurance policy, other than a policy that is issued specifically as excess of the insurance provided under this EPL Coverage Section, regardless of whether or not such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

B. The coverage provided under this EPL Coverage Section for **Third Party Claims** shall be excess of and shall not contribute with any other valid and collectible insurance policy, other than a policy that is issued specifically as excess of the insurance provided under this EPL Coverage Section, regardless of whether or not such other insurance is stated to be primary, contributory, excess, contingent or otherwise.



**FREEDOM SPECIALTY**
INSURANCE COMPANY®
a Nationwide Insurance® company

A Stock Insurance Company, herein called the **Insurer**
Freedom Specialty Insurance Company
7 World Trade Center, 37th Floor
250 Greenwich Street
New York, NY 10007-0033

## FREEDOM 360°
## PRIVATE COMPANY PACKAGE POLICY DECLARATIONS

### FIDUCIARY LIABILITY COVERAGE SECTION
### ("FIDUCIARY LIABILITY DECLARATIONS")

| | |
|---|---|
| Item 1. Parent Organization: <u>Cavaliers Holdings, LLC</u> | |
| **Item 2.** Limits of Liability: | |
| A. Maximum Aggregate Limit of Liability for this Coverage Section: ........ <u>$3,000,000</u> | |
| B. Voluntary Compliance Program Loss Sub-limit of Liability: ................ <u>$150,000</u> | |
| C. 502(c) Penalties Sub-limit of Liability: .................................................. <u>$50,000</u> | |
| D. HIPAA Sub-limit of Liability: .................................................................. <u>$150,000</u> | |
| E. PPACA Sub-limit of Liability: ................................................................. <u>$50,000</u> | |
| F. IRS Section 4975 Sub-limit of Liability: ................................................. <u>$50,000</u> | |
| **Item 3.** Retentions: | |
| A. Insuring Agreement A: | |
| Fiduciary Liability Coverage: ............................................................ <u>N/A</u> | |
| B. Insuring Agreement B: | |
| Voluntary Compliance Settlement Program: ...................................... <u>N/A</u> | |
| **Item 4.** Pending or Prior Proceedings Date: | |
| A. Insuring Agreement A: .................................................................... <u>5/1/2017</u> | |
| B. Insuring Agreement B: .................................................................... <u>5/1/2017</u> | |

EXHIBIT A

**FREEDOM SPECIALTY**
INSURANCE COMPANY®
a Nationwide Insurance® company

A Stock Insurance Company, herein called the **Insurer**

## FREEDOM 360° PRIVATE COMPANY PACKAGE POLICY
## FIDUCIARY LIABILITY COVERAGE SECTION

In consideration of the payment of the premium and in reliance upon the **Application,** which is hereby made a part of this Policy, and subject to the Declarations, General Terms and Conditions and to all other terms of this Policy including all endorsements hereto, the **Insurer** and the **Parent Organization,** on behalf of all **Insureds,** agree as follows:

I.  INSURING AGREEMENTS

    A.  Fiduciary Liability Coverage

        The **Insurer** shall pay, on behalf of an **Insured, Loss** which the **Insured** becomes legally obligated to pay resulting from a **Claim** first made against the **Insured** during the **Policy Period,** or, if applicable, the Extended Reporting Period, for a **Wrongful Act.**

    B.  Voluntary Compliance Settlement Program Coverage

        The **Insurer** shall pay, on behalf of an **Insured, Voluntary Compliance Program Loss** and **Defense Costs** resulting from a **Voluntary Compliance Program Notice** that is first given to the **Insurer** during the **Policy Period,** provided that the **Insurer's** maximum liability for all **Voluntary Compliance Program Loss** and **Defense Costs** covered pursuant to this Clause I., paragraph B. shall not exceed in an aggregate amount the **Voluntary Compliance Program Loss** Sublimit of Liability as set forth in Item 2.b. of the Fiduciary Liability Declarations, which aggregate amount shall be part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2.a. of the Fiduciary Liability Declarations. The **Insureds,** not the **Insurer,** shall have the duty to defend any **Voluntary Compliance Program Notice.**

II.  DEFINITIONS

    A.  **Administration** means, with respect to any **Plan,** advising, counseling or giving notice to **Executives, Employees,** participants or beneficiaries, providing interpretations, or handling of records or effecting enrollment, termination or cancellation of **Executives, Employees,** participants or beneficiaries under the **Plan.**

    B.  **Claim** means any of the following, including, if applicable, any appeal therefrom:

        1.  written demand against an **Insured** for monetary damages or non-monetary or injunctive relief commenced by the **Insured's** receipt of such demand;

        2.  civil proceeding against an **Insured** commenced by the service of a complaint or similar pleading upon the **Insured;**

        3.  criminal proceeding against an **Insured** commenced by:

            a.  an arrest of the **Insured;** or

            b.  the return of an indictment, information or similar document against the **Insured;**

        4.  formal administrative or formal regulatory proceeding against an **Insured** commenced by the filing of a notice of charges, formal investigative order or similar document which names the **Insured** as a target or subject of such proceeding;

        5.  arbitration or mediation proceeding against an **Insured** commenced by **the Insured's** receipt of a demand for arbitration or mediation, or similar document;

EXHIBIT A

6. official request for **Extradition;**

7. civil, criminal, administrative or regulatory investigation commenced by the service upon or other receipt by the **Insured** of a notice, target letter or other written notice from the investigating authority identifying by name the **Insured** as an individual or entity against whom a proceeding may be commenced, including any such fact-finding investigation by the U.S. Department of Labor, the U.S. Pension Benefit Guaranty Corporation, the Pension Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions or the Pensions Regulator or any successor thereto, or any similar governmental authority located within or outside the U.S.;

8. written request to toll or waive a statute of limitations relating to a potential **Claim** as set forth in this Clause II., subparagraphs A. through H. above commenced by the **Insured's** receipt of such request; or

9. solely for purposes of Insuring Agreement B as set forth in Clause I. of this Fiduciary Liability Coverage Section, any **Voluntary Compliance Program Notice.**

C. **Committee** means, with respect to a **Plan,** any committee consisting of members who are natural person **Executives** or **Employees,** provided that such committee was established by an **Organization.**

D. **Defense Costs** means that part of a **Loss** consisting of reasonable costs, charges, fees (including attorneys' fees, experts' fees and **Electronic Discovery Defense Expenses**) and expenses (other than regular or overtime wages, salaries, fees or benefits of the **Insured Persons**) incurred:

1. in the defense or appeal of any **Claim,** or any **Voluntary Compliance Program Notice,** including the premium for appeal, attachment or similar bonds, provided that the **Insurer** shall not be obligated to apply for or furnish such bonds; or

2. to assist the **Insurer,** at the **Insurer's** request, in investigating a **Claim** or any **Voluntary Compliance Program Notice.**

E. **Electronic Discovery Defense Expenses** means costs relating to the collection, processing, converting, reviewing and producing electronically stored information.

F. **Employee** means any natural person whose service or labor was, now is, or shall become engaged and directed by an **Organization,** including any part-time, seasonal or temporary employee, intern or volunteer. An individual who is leased to the **Organization** shall also be considered an **Employee,** but only if the **Organization** provides indemnification to such leased individual in the same manner as is provided to the **Organization's** employees. Any other individual who is contracted to perform work for the **Organization,** or who is an independent contractor for the **Organization,** shall also be an **Employee,** but only if the **Organization** has agreed pursuant to a written contract, prior to the date of any alleged **Wrongful Act,** to provide indemnification to such individual in the same manner as that provided to the **Organization's** employees.

G. **Extradition** means any formal process by which an **Insured Person** located in any country is or is sought to be surrendered to any other country for trial, or otherwise to answer any criminal accusation, for a **Wrongful Act.**

H. **Insured** means any **Organization,** any **Plan,** any **Committee** and any **Insured Person.**

I. **Insured Persons,** either in the singular or plural, means:

1. any **Employee** or **Executive** of an **Organization;**

2. any past, present or future natural person employee or trustee of a **Plan** described in Clause II., Plan A., B., or C.; and

3. any other past, present or future natural person fiduciary of a **Plan** described in Clause II., Plan A., B., or C.; provided that such natural person fiduciary is added to this Fiduciary Liability Coverage Section as an **Insured Person** by written endorsement.

J. **Loss** means the amount the **Insured** becomes legally obligated to pay as a result of any **Claim,** including **Defense Costs;** compensatory, punitive, exemplary or multiple damages; judgments; settlements; an award of pre-judgment and post-judgment interest with respect to covered damages; claimant's attorney fees awarded by a court against an **Insured** or, in connection with a settlement, agreed to by the **Insurer;** and

1. the five percent (5%) or less, or the twenty percent (20%) or less, civil penalties imposed upon an **Insured** as a fiduciary under Section 502(i) or (l), respectively, of **ERISA;**

2. civil penalties imposed by the Pension Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions or any successor thereto, or the Pensions Regulator or any successor thereto, or Ireland's Pensions Board or Pensions Ombudsman, but only if the funds or assets of the **Organization-Sponsored Plan** are not used to pay, reimburse or fund the premium for this Fiduciary Liability Coverage Section; or

3. civil penalties upon an **Insured** as a fiduciary pursuant to Section 502(c) of **ERISA,** including any amendments thereto pursuant to the Pension Protection Act of 2006, Title V, Section 507; provided that the **Insurer's** maximum limit of liability under this Fiduciary Liability Coverage Section for all such civil penalties resulting from all **Claims** first made during the **Policy Period** shall be the 502(c) Penalties Sublimit of Liability set forth in Item 2.c. of the Fiduciary Liability Declarations, which amount shall be part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2.a. of the Fiduciary Liability Declarations; or

4. civil money penalties imposed upon an **Insured** for the violation by such **Insured** of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996, as amended; provided that the **Insurer's** maximum limit of liability under this Fiduciary Liability Coverage Section for all such civil penalties resulting from all **Claims** first made during the **Policy Period** shall be the HIPAA Sublimit of Liability set forth in Item 2.d. of the Fiduciary Liability Declarations, which amount shall be part of, and not in addition to, the Maximum Aggregate Limit of Liability as set forth in Item 2.a. of the Fiduciary Liability Declarations, and provided further no Retention shall apply to any such civil penalties.

Solely for purposes of Insuring Agreement B set forth in Clause I. of this Fiduciary Liability Coverage Section, **Loss** means **Voluntary Compliance Program Loss** and **Defense Costs** resulting from a **Voluntary Compliance Program Notice.**

**Loss** shall not include any of the following, provided this sentence does not exclude **Defense Costs** with respect to any of the following:

a. cost of compliance with respect to non-monetary relief or injunctive relief;

b. amounts which are uninsurable under the law pursuant to which this Fiduciary Liability Coverage Section is construed;

c. taxes imposed by law;

d. fines or penalties imposed by law, other than civil fines or penalties described above;

e. amounts incurred by an **Insured** in the investigation or defense of any action, proceeding, investigation or demand that was not a **Claim** when such amounts were incurred, regardless of whether or not:

(1) such action, proceeding, investigation or demand later gives rise to a **Claim;** or

(2) such amounts also benefit the defense of a **Claim;**

f.  costs incurred in cleaning-up, removing, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants;** or

g.  (1)  benefits due or to become due under any **Plan;**

(2)  benefits which would be due under any **Plan** if such **Plan** complied with all applicable law; or

(3)  any plaintiff attorneys' fees based upon a percentage of such benefits or payable from a common fund established to pay such benefits; provided this subparagraph g. shall not apply to:

(a)  benefits payable by a natural person **Insured** as a personal obligation, and recovery for such benefits is based upon a covered **Wrongful Act;** or

(b)  that portion of a settlement or judgment attributable to **Wrongful Acts** which actually or allegedly cause or contribute to a reduction or loss in the value of a **Plan's** assets or a participant's account in the **Plan** due to investment losses, lost investment opportunities, excessive costs or failure to comply with the participant's investment directions, even if the amounts sought or recovered by the plaintiff in such **Claim** are described by plaintiffs as "benefits" or determined by a court to be "benefits."

The insurability of any punitive, exemplary or multiple damages, fines or penalties otherwise covered under this Fiduciary Liability Coverage Section shall be determined under the internal laws of any applicable jurisdiction most favorable to the **Insured,** including without limitation the jurisdiction in which the **Organization,** the **Insured,** the **Insurer,** this Policy or such **Claim** is located or has a substantial relationship;

K.  **Plan** means:

1.  any employee benefit plan, welfare benefit plan, or pension benefit plan as defined under **ERISA,** including any **VEBA,** located anywhere in the world, which is operated solely by an **Organization,** or operated jointly by an **Organization** and a labor organization only for the benefit of the **Executives** or **Employees** of such **Organization;** provided that any coverage under this Fiduciary Liability Coverage Section relating to an employee stock ownership plan created or acquired during the **Policy Period** shall be subject to Clause IV., paragraph A. of this Fiduciary Liability Coverage Section;

2.  any other employee benefit plan or program or fringe benefit or excess benefit plan not subject to **ERISA** located anywhere in the world which is operated solely by an **Organization,** or operated jointly by an **Organization** and a labor organization only for the benefit of the **Executives** or **Employees** of such **Organization;**

3.  any other plan, program or fund specifically set forth as a **Plan** by written endorsement to this Fiduciary Liability Coverage Section; and

4.  solely with respect to **Wrongful Acts** in the **Administration** of a **Plan,** any insurance for unemployment, workers compensation, social security or disability benefits for **Executives** and **Employees,** provided that such insurance is government-mandated.

Notwithstanding anything to the contrary set forth in this Policy, and except as otherwise provided in Clause IV., paragraph A., **Plan** shall not include any employee stock ownership plan created or acquired by the **Organization** during the **Policy Period.**

L.  **VEBA** means Voluntary Employees' Beneficiary Associations as. set forth in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended. Such Associations may offer the following benefits for voluntary members who are **Executives, Employees,** their dependents or beneficiaries: life insurance, accident insurance, sick leave pay, supplemental unemployment or other benefits.

M.  **Voluntary Compliance Program** means any compliance resolution program that is voluntary, or any similar settlement program that is voluntary, provided that such program is administered by the U.S. Department of Labor or U.S. Internal Revenue Service. Such program shall include the Voluntary Fiduciary Correction Program, the Employee Plans Compliance Resolution System, the Delinquent Filer Voluntary Compliance Program, or any similar program administered by a governmental authority located outside the U.S.

N.  **Voluntary Compliance Program Loss** means fines, penalties, sanctions, or fees collected from an **Insured** by a governmental authority pursuant to a **Voluntary Compliance Program** resulting from unintentional non-compliance by a **Plan** with any statute, rule or regulation, provided that the **Voluntary Compliance Program Notice** relating thereto was given to the **Insurer** during the **Policy Period.**

O.  **Voluntary Compliance Program Notice** means prior written notice by the **Insured** to the **Insurer** that it is the **Insured's** intent to enter into a **Voluntary Compliance Program** with respect to any **Plan,** provided that no **Insured Person** had any knowledge that such **Plan** actually was or allegedly was not compliant as of:

1.  the inception date of this Fiduciary Liability Coverage Section; or

2.  the inception of the first policy in an uninterrupted series of policies issued by the **Insurer** of which this Fiduciary Liability Coverage Section is a direct or indirect renewal or replacement, whichever is earlier.

P.  **Wrongful Act** means any actual or alleged:

1.  error, misstatement, misleading statement, neglect, breach of duty, omission or act committed or attempted by an **Insured** in the discharge of duties as fiduciaries of any **Plan;**

2.  act, error or omission, committed or attempted by an **Insured** in the **Administration** of any **Plan;** or

3.  matter claimed against an **Insured** solely by reason of the **Insured's** service as a fiduciary of any **Plan,** provided that such matter does not include any matter set forth in Clause II., subparagraphs P.1. or P.2. above.

III.  EXCLUSIONS

The **Insurer** shall not be liable to pay any **Loss** resulting from, and shall not be obligated to defend, any **Claim** against an **Insured:**

A.  based upon, attributable to, or arising out of any fact, circumstance, situation, transaction, event or **Wrongful Act** which has been the subject of a written notice under any prior insurance policy or coverage section of which this Fiduciary Liability Coverage Section is a direct or indirect renewal or replacement; provided that **Insurer** of such prior policy or coverage section does not reject such notice as invalid;

B.  based upon, attributable to, or arising out of any written demand, suit or other proceeding pending against, or decree, judgment or order entered for or against any **Insured,** on or prior to the applicable Pending or Prior Proceedings Date set forth in Item 4. of the Fiduciary Liability Declarations, or the same or substantially the same **Wrongful Acts, Interrelated Wrongful Acts,** facts or circumstances alleged in or underlying such written demand, suit, proceeding, decree, judgment or order;

C.  for bodily injury, sickness, mental anguish, humiliation, emotional distress, disease or death of any person, or for damage to or destruction of any tangible property, including the loss of its use, whether or not it is damaged or destroyed;

D.  based upon, attributable to, or arising out of:

1.  any actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of **Pollutants** at any time provided, however, this Exclusion D.1. shall not apply to:

EXHIBIT A

    a. **Loss** on account of any **Claim** by or on behalf of a beneficiary of or participant in any **Sponsored Plan** based upon, attributable to, or arising out of the diminution in value of any securities owned by the **Sponsored Plan** in any organization if such diminution in value is allegedly as a result of the matters described above in this Clause III., subparagraph D.1.; or

    b. **Loss** which an **Insured Person** becomes legally obligated to pay and for which such **Insured Person** is not indemnified by an **Organization** either because the **Organization** is not permitted by statutory or common law to grant such indemnification or because of **Financial Impairment** of the **Organization,** provided that this exception shall only apply to **Claims** first made during the **Policy Period** or the Extended Reporting Period, if applicable;

2. any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants;**

E. for any actual or alleged violation of the responsibilities, obligations or duties imposed by any law, rule or regulation governing workers' compensation, unemployment insurance, unemployment compensation, social security or disability benefits; provided this exclusion shall not apply with respect to any responsibilities, obligations or duties imposed by:

1. the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and any regulations promulgated thereunder; or

2. the Health Insurance Portability and Accountability Act of 1996, as amended, and any regulations promulgated thereunder;

F. based upon, attributable to, or arising out of such **Insured:**

1. gaining any personal profit, financial gain, remuneration or other financial advantage to which such **Insured** is not legally entitled if a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by or against the **Insurer** establishes that such **Insured** gained such personal profit, gain, remuneration or advantage; or

2. committing any deliberately fraudulent act or omission or any willful violation of law, if a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by or against the **Insurer** establishes such an act, omission or willful violation,

provided that with respect to this Exclusion F.:

1. no conduct or intent of any **Insured Persons** shall be imputed to any other **Insured Person;** and

2. only the conduct or intent of any past, present or future chief financial officer, chief executive officer or chief operating officer (or any equivalent position to any of the foregoing) of an **Organization** shall be imputed to such **Organization** and its **Subsidiaries.**

IV. CONDITIONS

A. Creation or Acquisition of an ESOP

Notwithstanding anything to the contrary set forth in this Fiduciary Liability Coverage Section, if during the **Policy Period** any **Organization** directly or indirectly acquires or creates an employee stock ownership plan ("ESOP"), the **Organization** shall give the **Insurer** written notice of such creation or acquisition, along with any other information the **Insurer** requests. The **Insurer** shall, at the **Organization's** request, provide a quotation for coverage for **Claims** based upon, attributable to, or arising out of such ESOP, subject to any terms, conditions, limitation of coverage and such additional premium as the **Insurer**, in its sole discretion, may require.

B.  Plan Termination

1.  In the event a **Plan** is terminated by an **Organization** before or after the inception date of this Fiduciary Liability Coverage Section, coverage for such terminated **Plan** under this Fiduciary Liability Coverage Section shall continue until termination of this Fiduciary Liability Coverage Section for those **Insureds** who:

a.  were **Insureds** at the time of such termination of such **Plan;** or

b.  would have been an **Insured** at the time of such termination of such **Plan** if this Fiduciary Liability Coverage Section had been in effect, with respect to **Wrongful Acts** prior to or after the date the **Plan** was terminated.

2.  In the event the Pension Benefit Guaranty Corporation ("PBGC") becomes the Trustee of a **Plan** before or after the inception date of this Fiduciary Liability Coverage Section, coverage with respect to such terminated **Plan** under this Fiduciary Liability Coverage Section shall continue until termination of this Fiduciary Liability Coverage Section but only for **Wrongful Acts** which occurred prior to the effective date the PBGC became the Trustee of such **Plan** and which were committed by those who were **Insureds** prior to the effective date the PBGC became the Trustee of such **Plan.**

C.  Waiver of Recourse

The **Insurer** shall have no right of recourse against any **Insureds** for any payment of **Loss** made by the **Insurer** under this Fiduciary Liability Coverage Section because of a **Wrongful Act** by such **Insured** unless the premium for this Fiduciary Liability Coverage Section was paid by a **Plan.**



**FREEDOM SPECIALTY**
INSURANCE COMPANY®

**ENDORSEMENT NO.** _____1_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## RELIANCE UPON OTHER CARRIER'S APPLICATION

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS**

The **Insurer** has relied upon the statements, representations, (if any) and information contained in the application referenced below (including any materials submitted therewith and attachments submitted thereto, and, if such application is a renewal application, all previous Policy applications for which this Policy is a renewal or succeeds in time, and any materials submitted therewith and attachments submitted thereto) as being accurate and complete (all such applications and materials are collectively referred to hereinafter as **"Subject Application"**). It is agreed that the **Parent Organization** and the **Insureds** represent to the **Insurer** that the statements, representations (if any) and information contained in the **Subject Application** were accurate on the date they were so given. The **Parent Organization** and the **Insureds** hereby reaffirm each and every statement and representation (if any) made in the **Subject Application** to the insurance carrier listed below as accurate as of the effective date such statement and representation was made as if they were made to the **Insurer** on such date. All such statements, representations (if any) and information shall be deemed to be material to the acceptance of the risk or hazard assumed by the Insurer, are the basis of this Policy and are incorporated into and constitute a part of this Policy.

TITLE OF APPLICATION:     ForeFront Portfolio 3.0 New Business Application

INSURANCE CARRIER:        Chubb Group of Insurance Companies

DATE SIGNED:              4/15/2017

**All other terms and conditions of this Policy remain unchanged.**

_____ / _____
AUTHORIZED REPRESENTATIVE                               DATE



**FREEDOM SPECIALTY**
**INSURANCE COMPANY®**

**ENDORSEMENT**
**NO.** ___2___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND EPL AND THIRD PARTY RETENTION AMOUNT ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY DECLARATIONS PAGE**

In consideration of the premium paid, it is hereby understood and agreed Item 3. Retentions, of the Employment Practices Liability Declarations, is deleted in its entirety and replaced with the following:

Item 3.  Retentions:

A.  Insuring Agreement A:
Employment Practices Liability Coverage:

1.  $50,000 for **Claims** brought by or on behalf of claimants earning up to an annual rate of pay of $35,000 per year;

2.  $75,000 for **Claims** brought by or on behalf of claimants earning an annual rate of pay that exceeds $35,000 per year; or

3.  $250,000 for **Claims** brought by or on behalf of five or more claimants, or asserts a class or collective action

Provided, however, that for Items 3.A.1. and 3.A.2., above, the following shall apply:

a.  If a **Claim** is brought by more than one claimant, but less than five claimants, then the Retention shall be determined by using the calculated annual rate of pay that is the highest amongst all such claimants;

b.  The annual rate of pay shall be determined as of:

1.  The date the **Claim** was first made, if the claimant was employed with the **Insured** at such time or was never hired by the **Insured**; or

2.  The date employment with the **Insured** ended, if the claimant was no longer employed with the **Insured** when such **Claim** was made;

c.  For the purpose of determining the annual rate of pay of a claimant, the **Insured** shall provide the **Insurer** with the following:

1.  for claimants that are or have been employed with the **Insured,** a copy of the claimant's earnings statement or any other documentation, indicating the claimant's then rate of pay; or

2.  for claimants that never began employment with the **Insured,** documentation indicating the position

claimant applied for and salary information related to such position, or a copy of the claimant's offer

B.  Insuring Agreement B:
Third Party Liability Coverage:

1.  $50,000 for **Claims** brought by or on behalf of one to four claimants; or

2.  $250,000 for **Claims** brought by or on behalf of five or more claimants, or asserts a class or collective action

**All other terms and conditions of this Policy remain unchanged.**

_____/_____
          AUTHORIZED REPRESENTATIVE                                    DATE

EXHIBIT A



**FREEDOM SPECIALTY**
INSURANCE COMPANY®

**ENDORSEMENT NO.** ___3___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PLAYER AND COACHES EXCESS COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION**

**("EPL Coverage Section")**

In consideration of the premium paid, it is hereby understood and agreed that Section V. OTHER INSURANCE is amended to add the following provisions:

Any **Loss** payable under this EPL Coverage Section for an **Employment Claim** that is based upon, attributable to, or arising out of any alleged **Wrongful Act** of a basketball player or member of the coaching staff of the Cleveland Cavaliers**,** shall be excess of and shall not contribute with any other valid and collectible insurance policy, including specifically, New Hampshire Insurance Company Policy Number 017678902 issued to Cavaliers Holdings, LLC, or any renewal of such policy (hereinafter the "New Hampshire Policy").

It shall be a condition precedent to coverage under this Policy that the **Parent Organization** maintain and keep effective the New Hampshire Policy on an annual basis with an aggregate limit of liability of $15,000,000.

**All other terms and conditions of this Policy remain unchanged.**

_____/_____

AUTHORIZED REPRESENTATIVE                    DATE



**FREEDOM SPECIALTY**
INSURANCE COMPANY®

**ENDORSEMENT NO.** ___4___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND INSURED V. INSURED EXCLUSION – REDUCE LOOKBACK PERIOD FOR EXECUTIVE TO TWO YEARS

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE SECTION**

In consideration of the premium charged, it is hereby understood and agreed that Section IV. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS, subsection G., paragraph 3. is deleted in its entirety and replaced with the following:

G. brought or maintained, directly or indirectly, by or on behalf of any:

   3. **Insured Person** in any capacity against an **Insured,** provided that this subsection G.3. shall not apply to a **Claim:**

      a. brought by an **Employee,** who is not an **Executive,** in his or her capacity as a shareholder of an **Organization;**

      b. brought by an **Executive,** provided that such **Executive** has not:

         i. served in such capacity; nor

         ii. acted as a consultant to the **Organization,** for at least two years prior to the **Claim** being first made;

      c. for contribution or indemnity arising out of another **Claim** otherwise covered under this Coverage Section;

**All other terms and conditions of this Policy remain unchanged.**

_____/_____
AUTHORIZED REPRESENTATIVE            DATE

Electronically Filed 06/20/2018 11:34 / / CV 18 899713 / Confirmation Nbr. 1417012 / CLJSZ
A Nationwide® Company

EXHIBIT A



FREEDOM SPECIALTY
INSURANCE COMPANY®

**ENDORSEMENT NO.** _____5_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF LOSS ENDORSEMENT – ADD SENSITIVITY AND MINORITY DEVELOPMENT COSTS SUBLIMIT

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION**

In consideration of the premium charged, it is hereby understood and agreed that the Policy is amended as follows:

1.  Section III. DEFINITIONS, subsection N. **Loss,** is deleted in its entirety and replaced with the following:
    **N.  Loss** means the amount the **Insured** becomes legally obligated to pay as a result of:

    1.  any **Claim,** including **Defense Costs;** compensatory, punitive, exemplary or multiple damages; judgments; settlements; an award of pre-judgment or post-judgment interest with respect to covered damages; liquidated damages awarded in accordance with the Age Discrimination in Employment Act, the Family and Medical Leave Act or the Equal Pay Act; back pay and front pay; and claimant's attorney's fees awarded by a court against an **Insured** or, in connection with a settlement, agreed to by the **Insurer**.

    2.  costs of complying with a judgment, order, decree or settlement calling for the implementation of training intended to sensitize employees to their attitudes and behaviors that may unwittingly cause offense to others and/or minority employee development programs.

    **Loss** shall not include any of the following, provided this sentence does not exclude **Defense Costs** with respect to any of the following:

    1.  costs of compliance with respect to non-monetary or injunctive relief, other than those costs set forth in subsection **N.,** paragraph 2., herein;

    2.  taxes, fines or penalties imposed by law, other than punitive, exemplary, multiple or liquidated damages expressly referenced in this definition above;

    3.  amounts which are uninsurable under the law pursuant to which this EPL Coverage Section is construed;

    4.  salary, wages, commissions, bonuses, non-deferred cash incentive compensation, or other monetary amounts if actually or allegedly earned by the claimant in the course of employment other than back pay, front pay or any additional compensation allegedly due as a result of an **Employment Practices Wrongful Act;**

    5.  future salary, wages, commissions or **Benefits** of a claimant who:

        a.  has been hired, promoted or reinstated to employment; or

Electronically Filed 06/20/2018 11:34 /  / CV 18 899713 / Confirmation Nbr. 1417012 / CLJSZ
A Nationwide® Company

EXHIBIT A

    b.  shall be hired, promoted or reinstated to employment; pursuant to a settlement, order or other resolution of any **Claim;**

6.  costs associated with providing any accommodation for disabled persons or any other status protected under applicable federal, state or local statutory law or common law anywhere in the world, including the Civil Rights Act or 1964, the Americans with Disabilities Act, or any amendments to or rules or regulations promulgated thereunder;

7.  amounts incurred by an **Insured** in the investigation or defense of any action, proceeding or demand that was not then a **Claim** even if:

    a.  such amounts also benefit the defense of a covered **Claim;** or

    b.  such action, proceeding or demand subsequently gives rise to a **Claim;**

8.  **Benefits** due or that are to become due, or the equivalent value of such **Benefits,** except with respect to any **Employment Claim** for **Wrongful Termination;** or

9.  **Stock Benefits.**

The insurability of any punitive, exemplary, multiple or liquidated damages otherwise covered under this EPL Coverage Section shall be determined under the internal laws of any applicable jurisdiction most favorable to the **Insured,** including without limitation the jurisdiction in which the **Organization, the Insured,** the **Insurer,** this Policy or such **Claim** is located or has a substantial relationship.

2.  Solely with respect to **Loss** defined in subsection **N.,** paragraph 2. herein, the **Insurer's** maximum aggregate liability for all **Loss** shall be the Sublimit Amount set forth below, which is part of and not in addition to any other applicable Limit(s) of Liability under this Policy or Item 2. of the Employment Practices Liability Coverage Section declarations page.

    Sublimit Amount**:**   **$5,000,000**

**All other terms and conditions of this Policy remain unchanged.**

 

_____/_____
AUTHORIZED REPRESENTATIVE               DATE



**FREEDOM SPECIALTY**
INSURANCE COMPANY®

**ENDORSEMENT NO.** _____6_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF ADMINISTRATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**FIDUCIARY LIABILITY COVERAGE SECTION**

In consideration of the premium charged, it is hereby understood and agreed that Section II. DEFINITIONS, subsection A. **Administration** is deleted in its entirety and replaced with the following:

A. **Administration** means, with respect to any **Plan**, advising, counseling or giving notice to **Executives, Employees,** participants, beneficiaries or those who allege to have an interest in such **Plan**; providing interpretations, or handling of records or effecting enrollment, termination or cancellation of **Executives, Employees,** participants, beneficiaries under the **Plan**, or to those who allege to have an interest in such **Plan**; or providing any settlor functions or activities with respect to any **Plan**.

**All other terms and conditions of this Policy remain unchanged.**

_____/_____
AUTHORIZED REPRESENTATIVE                    DATE



**FREEDOM SPECIALTY**
INSURANCE COMPANY®

**ENDORSEMENT NO.** _7_

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## WORKPLACE VIOLENCE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION**

It is agreed that the coverage afforded under the Employment Practices Liability Coverage Section is extended as follows:

A. Coverage

The **Insurer** shall pay to or on behalf of the **Organization** a **Loss** directly resulting from a **Workplace Violence Event** occurring during the **Policy Period.**

B. Definitions

Solely with respect to coverage afforded by this Endorsement, the following definitions shall apply notwithstanding anything to the contrary in this Policy:

**Business Interruption Loss** means the actual reduction of **Net Earnings,** during the **Period of Restoration,** which directly results from impairment of the **Organization's** business activities caused by a **Workplace Violence Event.**

The amount of **Business Interruption Loss** shall be determined based on a consideration of the following information:

1. The **Net Earnings** of the **Organization** before the **Workplace Violence Event;**

2. The likely **Net Earnings** of the **Organization** if no **Workplace Violence Event** had occurred;

3. The operating expenses, including payroll expenses, necessary to resume business activities with the same quality that existed immediately before the **Workplace Violence Event** occurred;

4. All recoveries, insurance and other indemnity which covers or, in the absence of this Endorsement would cover, loss resulting from the **Workplace Violence Event;** and

5. Other relevant sources of information, including without limitation:

   a. The **Organization's** financial records and accounting procedures; and

   b. Bills, invoices and other vouchers.

If the **Organization** fails to resume its business activities or eliminate the business impairment caused by the **Workplace Violence Event** as quickly as is reasonably possible, **Business Interruption Loss** will be determined based on the length of time it would have taken to resume such business activities or eliminate such business impairment as quickly as is reasonably possible.

**Consultant Costs** means the reasonable and customary fees and expenses charged by a security specialist approved in advance by the **Insurer** for services rendered to the **Organization** during the **Period of Restoration** with respect to a **Workplace Violence Event.**

**Crisis Management Costs** means reasonable and customary fees and expenses charged by or incurred at the recommendation of a public relations advisor approved by the **Insurer** in connection with the following services rendered for the **Organization** during the **Period of Restoration:**

1. Advising the **Organization** with respect to minimizing potential loss or liability on account of the **Workplace Violence Event;** and

2. Managing disclosures and communications to customers, suppliers, members, funders or the public regarding the **Workplace Violence Event;**

however, **Crisis Management Costs** shall not include any wages, salaries, fees, expenses or benefits of the trustees, directors, officers or employees of the **Organization.**

**Extra Expenses** means the following expenses incurred by the **Organization** directly as a result of a **Workplace Violence Event:**

1. The **Salary** which the **Organization** continues to pay during the **Period of Restoration** to a **Victim** who is an employee of the **Organization** while such **Victim** is unable to continue to work because of the **Workplace Violence Event;**

2. The **Salary** which the **Organization** pays during the **Period of Restoration** to a temporary employee hired by the **Organization** to perform the duties of a **Victim** while such **Victim** is unable to continue to work because of such **Workplace Violence Event,** provided such **Salary** shall not exceed the **Salary** of such **Victim;**

3. Reasonable and customary medical, dental and psychiatric expenses incurred during the **Period of Restoration** by a **Victim** with the approval or consent of the **Organization;**

4. Reasonable and customary expenses incurred by a **Victim** and his/her spouse and children for up to fifteen (15) days for rest and recovery within twelve (12) months following the **Workplace Violence Event** if the **Organization** approves or consents to such expenses, provided the **Insurer's** maximum liability for all such expenses incurred by all **Victims** of a single **Workplace Violence Event** shall be $50,000;

5. The reasonable amount paid by the **Organization** as a reward to an informant for information not otherwise available which leads to the arrest and conviction of persons responsible for such **Workplace Violence Event;**

6. Reasonable and customary expenses incurred by the **Organization** during the thirty (30) day period immediately following the **Workplace Violence Event** for temporary security mea-sures at the **Organization's Premises** where the **Workplace Violence Event** occurred;

7. A $25,000 death benefit payable to the estate of any **Victim** if the **Workplace Violence Event** directly caused the death of the **Victim;** and

8. Any other reasonable expenses incurred by the **Organization** with the prior approval of the **Insurer.**

EXHIBIT A

**Guest(s)** means any person visiting the **Organization's Premises** for legitimate purposes.

**Loss** means:

1. **Business Interruption Loss;**
2. **Crisis Management Costs;**
3. **Consultant Costs;** and
4. **Extra Expenses.**

**Net Earnings** means the earnings of the **Organization** derived from the **Organization's** normal business operations, less all normal and customary payroll and other operating expenses (other than any income tax) relating directly or indirectly to such business operations.

**Period of Restoration** means the period of ninety (90) days after a **Workplace Violence Event** occurs.

**Premises** means any building, facility or property owned, leased or occupied by the **Organization** as a place to conduct business or operations.

**Salary** means total gross compensation including bonuses, commissions, and benefit contributions, not to exceed the amount of compensation in effect for the respective **Victim** at the time of the **Workplace Violence Event.**

**Victim(s)** means any person against whom a **Workplace Violence Event** is directed or any person in whose presence a **Workplace Violence Event** occurs.

**Workplace Violence Event** means an intentional and unlawful act of deadly force or threat thereof which occurs at the **Organization's Premises** and which directly results in bodily injury or death of any employee, volunteer or **Guest** of the **Organization.** All related **Workplace Violence Events** shall be considered a single **Workplace Violence Event.**

C. Exclusions

In addition to any other exclusion applicable under this Policy, the **Insurer** shall not be liable under this Endorsement to make any payment for **Loss** based upon, attributable to or arising out of:

1. Any demand, suit or proceeding against the **Organization** relating to a **Workplace Violence Event;**
2. A **Workplace Violence Event** committed for the purpose of demanding money, property or other items of value; or
3. Hostile or warlike action in time of peace or war, by any government or sovereign power, or by any authority maintaining or using military, naval or air forces, or by any agent of any such government, power, authority or forces; insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence; seizure or destruction of property under quarantine or customs regulations or by order of any government or public authority.

Exclusion C. in Clause III. of the Employment Practices Liability Coverage Section shall not apply to coverage afforded by this Endorsement.

D. Proof of Loss

As a condition precedent to its rights under this Endorsement, the **Organization** shall submit to the **Insurer** copies of all documents requested by the **Insurer** and a signed, sworn proof of loss

containing all information requested by the **Insurer. The Insurer** shall be allowed as often as may be reasonably requested to examine the books and records of the **Organization** and to examine under oath any trustee, director, officer or employee of the **Organization** (outside the presence of any other director, officer or employee of the **Organization**) regarding any matter relating to the coverage afforded by this Endorsement.

E.  Retention

The **Insurer's** liability under this Endorsement for **Loss** directly resulting from each single **Workplace Violence Event** shall apply only to that part of such **Loss** which is excess of **$50,000**. No Retention Amount shall apply to that portion of **Loss** covered under this Endorsement which consists of (i) death benefits payable to the estate of a **Victim,** or (ii) **Consultant Costs.**

F.  Sublimit of Liability

The **Insurer's** maximum aggregate liability for all **Loss** covered under this Endorsement directly resulting from a single **Workplace Violence Event** shall be **$250,000**; provided that the **Insurer's** maximum liability for all **Crisis Management Costs** incurred on account of a single **Workplace Violence Event** shall not exceed twenty-five percent (25%) of the Sublimit of Liability set forth in the immediately preceding sentence. This paragraph creates sublimits which further limit and do not increase the **Insurer's** maximum liability under this Policy. Any **Loss** paid by the **Insurer** under this Endorsement shall reduce any applicable Limit(s) of Liability under this Policy.

G.  Mitigation

With respect to any **Workplace Violence Event,** the **Organization** shall act at all times substantially as if uninsured and shall undertake all reasonable actions to avoid or mitigate any **Business Interruption Loss.**

H.  Miscellaneous

Solely with respect to coverage under this Endorsement:

a.  Any reference in the Policy to **"Claim"** or **"Wrongful Acts"** shall mean **Workplace Violence Event;** and

b.  Clause VII. in the GTC, Extended Reporting Period, is deleted in its entirety.

**All other terms and conditions of this Policy remain unchanged.**

_____/_____
AUTHORIZED REPRESENTATIVE                           DATE



**FREEDOM SPECIALTY**
INSURANCE COMPANY®

**ENDORSEMENT NO.** ___8___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF EXECUTIVE

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS**

In consideration of the premium charged, it is hereby understood and agreed that Section III. DEFINITIONS, subsection G. **Insured Persons** is deleted in its entirety and replaced with the following:

> **Executive** means any natural person who was, is or shall become a duly elected or appointed director, officer, member of the Advisory Board, **Manager,** in-house general counsel, risk manager, or board manager of any **Organization** or a holder of an equivalent position in any **Organization.**

**All other terms and conditions of this Policy remain unchanged.**

_____ / _____
AUTHORIZED REPRESENTATIVE              DATE



**FREEDOM SPECIALTY**
INSURANCE COMPANY®

**ENDORSEMENT NO.** _____9_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND DEFINITION OF APPLICATION

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

In consideration of the premium charged, it is hereby understood and agreed that the definition of **Application** in Section II. DEFINITIONS, is deleted in its entirety and replaced with the following:

**Application** means, with respect to a Coverage Section:

A. any application provided by or on behalf of the **Insured** to the **Insurer** with regard to such Coverage Section, including attachments and other materials submitted therewith or referenced or incorporated therein; and

B. any warranties provided to the **Insurer** over the last 12 months relating to any Coverage Section or policy of which any Coverage Section or this Policy is a renewal or replacement;

provided that solely for purposes of the Employment Practices Liability Coverage Section and the Fiduciary Liability Coverage Section, **Application** shall also include any documents filed by or on behalf of the **Insured** over the last 12 months with any federal, state, local or foreign regulatory agency, including all such schedules, audited financial statements and other documents filed with the U.S. Department of the Treasury, Internal Revenue Service, the U.S. Department of Labor, Employee Benefits Security Administration, or the Pension Benefit Guarantee Corporation.

**All other terms and conditions of this Policy remain unchanged.**

_____/_____
AUTHORIZED REPRESENTATIVE                          DATE



**FREEDOM SPECIALTY**
INSURANCE COMPANY®

**ENDORSEMENT**
**NO.** ___10___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND NOTICE TRIGGER ENDORSEMENT

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

In consideration of the premium charged, it is hereby understood and agreed that Section V. REPORTING AND NOTICE, subsection A. is deleted in its entirety and replaced with the following"

As a condition precedent to exercising any right to coverage under any **Liability Coverage Section,** the **Insured** shall give to the **Insurer** written notice of any **Claim** as soon as practicable after the Chief Executive Officer, General Counsel, or Risk Manager (or the equivalent thereof) first learn of such **Claim;** provided that such written notice shall not be later than:

1. ninety (90) days after the end of the **Policy Period** if the applicable **Liability Coverage Section** is not renewed; or

2. the expiration of the Extended Reporting Period, if exercised; and further provided that if written notice of termination of any **Liability Coverage Section** for nonpayment of premium is sent to the **Parent Organization** by the **Insurer,** an **Insured** shall provide the **Insurer** written notice of any such Claim under such **Liability Coverage Section** prior to the effective date of such termination.

**All other terms and conditions of this Policy remain unchanged.**

_____ / _____
AUTHORIZED REPRESENTATIVE         DATE

Electronically Filed 06/20/2018 11:34 / / CV 18 899713 / Confirmation Nbr. 1417012 / CLJSZ
A Nationwide® Company

UTF-3g (3-92)

EXHIBIT A



**FREEDOM SPECIALTY**
INSURANCE COMPANY®

**ENDORSEMENT
NO.** ___11___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMEND CONDUCT EXCLUSION

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE SECTION**

In consideration of the premium charged, it is hereby understood and agreed that Section IV. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS, subsection J. is deleted in its entirety and replaced with the following:

J.  based upon, attributable to, or arising out of such **Insured:**

1.  gaining any personal profit, financial gain, remuneration or other financial advantage to which such **Insured** is not legally entitled, if a final and non-appealable adjudication adverse to such Insured in the underlying proceeding establishes that such Insured gained such personal profit, gain, remuneration or advantage; provided however, that this Exclusion J.1. shall not apply to **Defense Costs**; or

2.  committing any deliberately fraudulent act or omission , if a final and non-appealable adjudication adverse to such **Insured** in the underlying proceeding establishes such act or omission, provided that with respect to this Exclusion J.:

    a.  no conduct or intent of any **Insured Persons** shall be imputed to any other **Insured Person;** and

    b.  only the conduct or intent of any past, present or future chief financial officer, chief executive officer or chief operating officer (or any equivalent position to any of the foregoing) of an **Organization** shall be imputed to such **Organization** and its **Subsidiaries;** or

**All other terms and conditions of this Policy remain unchanged.**

_____/_____
AUTHORIZED REPRESENTATIVE                    DATE



**FREEDOM SPECIALTY**
INSURANCE COMPANY®

**ENDORSEMENT NO.** ___12___

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## MAJOR SHAREHOLDER EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND ENTITY LIABILITY COVERAGE SECTION**

In consideration of the premium paid, it is hereby understood and agreed that Section IV. EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS, is amended by adding the following additional exclusion:

The **Insurer** shall not be liable to pay any **Loss** resulting from, and shall not be obligated to defend, any **Claim** against an **Insured**:

    based upon, attributable to, or arising out of any **Claim** made against any **Insured** brought by or on behalf of any individual, firm, corporation or entity owning ten percent (10%) or more the outstanding shares or equity interest of any **Company**, either directly or beneficially.

**All other terms and conditions of this Policy remain unchanged.**

_____/_____
AUTHORIZED REPRESENTATIVE            DATE



**FREEDOM SPECIALTY**
**INSURANCE COMPANY®**
a Nationwide Insurance® company

**ENDORSEMENT**
**NO.** _____13_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | PARENT ORGANIZATION | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## OHIO AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS**

The following applies to the General Terms and Conditions and all coverage sections:

Notwithstanding the foregoing, punitive damages are not insurable under Ohio Law.

The following apply to the General Terms and Conditions Section:

The following is added to Section IX. CONDITIONS, subsection F. Cancellation and Non-Renewal:

1. If the Insurer cancels or non-renews this Policy, the Insurer shall provide **Claim** and **Wrongful Act** information to the **Parent Organization** for any policy issued during the previous three (3) years no later than thirty (30) days before the end of the **Policy Period**.

   If the **Parent Organization** cancels or non-renews this Policy, **the** Insurer will provide the **Parent Organization** with **Claim** and notice of specific **Wrongful Act** information within forty-five (45) days after the Insurer receives a request for such information from the **Parent Organization,** but only if the request is made within sixty (60) days after the end of the **Policy Period**.

2. If the Insurer chooses to substantially increase the renewal premium for this Policy, the Insurer will mail to the **Parent Organization** and to the agent of record, at their last addresses known to the Insurer**,** written notice of our intent to increase the premium at least thirty (30) days prior to the expiration date of this Policy. Proof of mailing will be sufficient proof of notice.

   If the notice is mailed less than thirty (30) days before the expiration date of the Policy, the Policy will remain in effect until thirty (30) days after the date of mailing of the notice. The Insurer will notify the **Parent Organization** of the amount of premium for the time after the expiration date that the existing coverage may remain in effect, and the **Parent Organization** will pay such premium unless the **Parent Organization** notifies us, in writing, that it does not elect to have the Policy extended past the expiration date. The premium will be computed using the rates in effect for the expiring Policy.

   If the **Parent Organization** accepts the increased premium, such change is effective immediately following the expiration date of the **Parent Organization's** coverage then in effect.

All other terms and conditions of this Policy remain unchanged.

EXHIBIT A



**FREEDOM SPECIALTY**
INSURANCE COMPANY®

**ENDORSEMENT NO.** _____14_____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## STATE AMENDATORY INCONSISTENT

This endorsement modifies insurance provided under the following:

### GENERAL TERMS AND CONDITIONS

It is agreed that in the event there is an inconsistency between a state amendatory endorsement attached to this Policy and any term or condition of this Policy, then where permitted by law, the **Insurer** shall apply those terms and conditions of either the amendatory endorsement or the Policy which are more favorable to the **Insured**.

**All other terms and conditions of this Policy remain unchanged.**

_____/_____
AUTHORIZED REPRESENTATIVE                         DATE



FREEDOM SPECIALTY
INSURANCE COMPANY®

**ENDORSEMENT
NO. _____ 15 _____**

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| PHF1700220 | 05/01/2017 | CAVALIERS HOLDINGS, LLC | 12405 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADD SUB-LIMIT OF LIABILITY FOR:
## PATIENT PROTECTION AND AFFORDABLE CARE ACT
## IRS SECTION 4975

This endorsement modifies insurance provided under the following:

**FIDUCIARY LIABILITY DECLARATIONS PAGE
FIDUCIARY LIABILITY COVERAGE SECTION**

In consideration of the premium charged, it is hereby understood and agreed that solely for the purpose of the coverage afforded by this endorsement, the Policy is amended as follows:

1. Item 2., Limits of Liability, of the Fiduciary Liability Declarations Page is amended by adding the following:

   E.  PPACA Sub-limit of Liability: ………………………..………………………………$50,000

   F.  IRS Section 4975 Sub-limit of Liability: …………………………………………………$50,000

2. Section II. DEFINITIONS, paragraph J. **Loss**, of the Fiduciary Liability Coverage Section is deleted in its entirety and replaced with the following:

   J.  **Loss** means the amount the **Insured** becomes legally obligated to pay as a result of any **Claim,** including **Defense Costs;** compensatory, punitive, exemplary or multiple damages; judgments; settlements; an award of pre-judgment and post-judgment interest with respect to covered damages; claimant's attorney fees awarded by a court against an **Insured** or, in connection with a settlement, agreed to by the **Insurer;** and

   1.  the five percent (5%) or less, or the twenty percent (20%) or less, civil penalties imposed upon an **Insured** as a fiduciary under Section 502(i) or (l), respectively, of **ERISA;**

   2.  civil penalties imposed by the Pension Ombudsman appointed by the United Kingdom Secretary of State for Work and Pensions or any successor thereto, or the Pensions Regulator or any successor thereto, or Ireland's Pensions Board or Pensions Ombudsman, but only if the funds or assets of the **Organization's** sponsored **Plan** are not used to pay, reimburse or fund the premium for this Fiduciary Liability Coverage Section; or

   3.  civil penalties upon an **Insured** as a fiduciary pursuant to Section 502(c) of **ERISA,** including any amendments thereto pursuant to the Pension Protection Act of 2006, Title V, Section 507; provided that the **Insurer's** maximum limit of liability under this Fiduciary

Liability Coverage Section for all such civil penalties resulting from all **Claims** first made during the **Policy Period** shall be the 502(c) Penalties Sub-limit of Liability set forth in Item 2.C. of the Fiduciary Liability Declarations, which amount shall be part of, and not in addition to, the Maximum Aggregate Limit of Liability set forth in Item 2.A. of the Fiduciary Liability Declarations;

4. civil money penalties imposed upon an **Insured** for the violation by such **Insured** of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996, as amended; provided that the **Insurer's** maximum limit of liability under this Fiduciary Liability Coverage Section for all such civil penalties resulting from all **Claims** first made during the **Policy Period** shall be the HIPAA Sub-limit of Liability set forth in Item 2.D. of the Fiduciary Liability Declarations, which amount shall be part of, and not in addition to, the Maximum Aggregate Limit of Liability as set forth in Item 2.A. of the Fiduciary Liability Declarations, and provided further no Retention shall apply to any such civil penalties;

5. civil money penalties imposed upon an **Insured** for unintentional violations of the Patient Protection and Affordable Care Act ("PPACA"), as amended, and any rule or regulations promulgated thereunder; provided the **Insurer's** maximum limit of liability under this Fiduciary Liability Coverage Section for all such civil penalties resulting from all **Claims** first made during the **Policy Period** shall be the PPACA Sub-limit of Liability set forth in Item 2.E. above, which amount shall be part of, and not in addition to, the Maximum Aggregate Limit of Liability as set forth in Item 2.A. of the Fiduciary Liability Declarations, and provided further no Retention shall apply to any such civil penalties; or

6. the fifteen percent (15%) or less tax penalty imposed upon an **Insured** under Section 4975 of the Internal Revenue Code of 1986; provided the **Insurer's** maximum limit of liability under this Fiduciary Liability Coverage Section for all such penalties resulting from all **Claims** first made during the **Policy Period** shall be the IRS Section 4975 Sub-limit of Liability set forth in Item 2.F. above, which amount shall be part of, and not in addition to, the Maximum Aggregate Limit of Liability as set forth in Item 2.A. of the Fiduciary Liability Declarations, and provided further no Retention shall apply to any such penalties

Solely for purposes of Insuring Agreement B set forth in Clause I. of this Fiduciary Liability Coverage Section, **Loss** means **Voluntary Compliance Program Loss** and **Defense Costs** resulting from a **Voluntary Compliance Program Notice.**

**Loss** shall not include any of the following, provided this sentence does not exclude **Defense Costs** with respect to any of the following:

a. cost of compliance with respect to non-monetary relief or injunctive relief;

b. amounts which are uninsurable under the law pursuant to which this Fiduciary Liability Coverage Section is construed;

c. taxes imposed by law;

d. fines or penalties imposed by law, other than civil fines or penalties described above;

e. amounts incurred by an **Insured** in the investigation or defense of any action, proceeding, investigation or demand that was not a **Claim** when such amounts were incurred, regardless of whether or not:

(1) such action, proceeding, investigation or demand later gives rise to a **Claim;** or

(2) such amounts also benefit the defense of a **Claim;**

f.  costs incurred in cleaning-up, removing, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants; or**

g.  (1) benefits due or to become due under any **Plan;**

    (2) benefits which would be due under any **Plan** if such **Plan** complied with all applicable law; or

    (3) any plaintiff attorneys' fees based upon a percentage of such benefits or payable from a common fund established to pay such benefits; provided this subparagraph g. shall not apply to:

        (a) benefits payable by a natural person **Insured** as a personal obligation, and recovery for such benefits is based upon a covered **Wrongful Act; or**

        (b) that portion of a settlement or judgment attributable to **Wrongful Acts** which actually or allegedly cause or contribute to a reduction or loss in the value of a **Plan's** assets or a participant's account in the **Plan** due to investment losses, lost investment opportunities, excessive costs or failure to comply with the participant's investment directions, even if the amounts sought or recovered by the plaintiff in such **Claim** are described by plaintiffs as "benefits" or determined by a court to be "benefits."

The insurability of any punitive, exemplary or multiple damages, fines or penalties otherwise covered under this Fiduciary Liability Coverage Section shall be determined under the internal laws of any applicable jurisdiction most favorable to the **Insured,** including without limitation the jurisdiction in which the **Organization,** the **Insured,** the **Insurer,** this Policy or such **Claim** is located or has a substantial relationship;

**All other terms and conditions of this Policy remain unchanged.**

_____/_____
          AUTHORIZED REPRESENTATIVE            DATE

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG).  The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy.  You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation  or by calling 1-800-706-3102.

91222 (9/16)

EXHIBIT B



### New Hampshire Insurance Company

A capital stock company

---

POLICY NUMBER: 01-767-89-02          REPLACEMENT OF POLICY NUMBER: 01-615-22-73

### Employment Practices Liability Insurance Policy

### DECLARATIONS

**ITEM 1:**   **NAMED INSURED:**   NATIONAL BASKETBALL ASSOCIATION, INC.

**MAILING ADDRESS:**   100 PLAZA DR FL 3
SECAUCUS, NJ 07094-3677

**ITEM 2:**   **POLICY PERIOD:**   **From:** 07/31/2017   **To:** 07/31/2018
(12:01 A.M. standard time at the address stated in Item #1)

**ITEM 3:**   **LIMITS OF INSURANCE AND RETENTION:**

**A.** Each Insured Event Limit:          $15,000,000

**B.** Total Policy Period Limit:          $15,000,000

**C.** Self Insured Retention Amount:
$100,000 Per **Claim**, including **Defense Costs**.
$500,000 Per **Mass or Class Action Claim**, including **Defense Costs**.
$100,000 Per **Non-Mass or Non-Class Action Claim**, including **Defense Costs**.
$250,000 Per **Third Party Claim** brought against a **Player**, including **Defense Costs**.

**ITEM 4:**   **PREMIUM:**   $1,070,000 + $6,420 New Jersey Surcharge
Due and payable in full at inception

Premium for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act, as amended (TRIA): $10,594 included in policy premium. Any coverage provided for losses caused by an act of terrorism as defined by TRIA (TRIA Losses) may be partially reimbursed by the United States under a formula established by TRIA as follows: 84% of

Electronically Filed 06/20/2018 11:34 / CV 18 899713 / Confirmation Nbr. 1417012 / CLJSZ

© All rights reserved.

EXHIBIT B

TRIA Losses in  excess of the  insurer deductible mandated  by TRIA, the  deductible to be based on a percentage of  the insurer's direct earned  premiums for the year preceding  the act of terrorism.

The TRIA disclosure is attached hereto.

© All rights reserved.

EXHIBIT B

**IN WITNESS WHEREOF,** the **Insurer** has caused this Policy to be signed by its President, Secretary and Authorized Representative. This Policy shall not be valid unless signed below at the time of issuance by an authorized representative of the insurer.

_____
**PRESIDENT**
**New Hampshire Insurance Company**

_____
**SECRETARY**
**New Hampshire Insurance Company**

_____
**AUTHORIZED REPRESENTATIVE**

_____    _____    _____
**COUNTERSIGNED AT**                **DATE**                        **COUNTERSIGNATURE**

_NFP PROPERTY & CASUALTY SERVICES_
_45 EXECUTIVE DRIVE_
_PLAINVIEW, NY 11803_

_1476917_

© All rights reserved.

EXHIBIT B

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE
### (RIGHT TO PURCHASE COVERAGE)

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury-in consultation with the Secretary of Homeland Security, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING JANUARY 1, 2018; 81% BEGINNING JANUARY 1, 2019 and 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

## COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE

Insured Name: *NATIONAL BASKETBALL ASSOCIATION, INC.*


Policy Number: *01-767-89-02*
Policy Period Effective Date From: *July 31, 2017*     To: *July 31, 2018*

© 2015 National Association of Insurance Commissioner

EXHIBIT B

**NEW HAMPSHIRE INSURANCE COMPANY**
Administrative Offices: 175 Water Street, 18th Floor, New York, NY 10038
(hereinafter called the Company)

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY
CLAIMS-MADE**

I.    **PREAMBLE**

THIS IS A CLAIMS-MADE POLICY IN WHICH COSTS OF DEFENSE ARE INCLUDED WITHIN AND SUBJECT TO THE LIMITS OF INSURANCE. READ THIS POLICY CAREFULLY.

Throughout this policy, unless the context otherwise requires, the words **you** and **your** refer to the **Named Insured** as identified in the Declarations and any other person qualifying as an **Insured** under Section III of this policy ( **WHO IS AN INSURED**). The words **we**, **us** and **our** refer to New Hampshire Insurance Company.

Words appearing in boldface type in this policy shall have the meaning as defined in the **DEFINITIONS** section or elsewhere in this policy.

This policy covers employment related **Wrongful Termination, Discrimination, Sexual Harassment** and **Workplace Torts** liability, all subject to the terms, definitions, conditions, limitations, exclusions and other provisions set forth in this policy.

This policy has been issued by **us** in reliance upon the statements made to **us** by **you** or **your** authorized representative in **your** application for this policy, which application is attached to and forms a part of this policy.

II.    **INSURING AGREEMENT**

A.    **INDEMNITY**

1.    Subject to **all** of the terms, limitations, conditions, definitions, exclusions and other provisions of this policy, **we** will pay all **Loss Amounts** that the **Insured** is legally obligated to pay because of an **Insured Event** to which this insurance applies. The amount **we** will pay is limited as described in Item 3 of the Declarations and in the Sections of this policy dealing with **LIMITS OF INSURANCE, DEFENSE, SELF INSURED RETENTION** and **OTHER INSURANCE**.

2.    This policy applies only if:

a.    **Claim** because of an **Insured Event** is first made against any **Insured** during the **Policy Period** as set forth in Item 2 of the Declarations, and

MNSCH

© All rights reserved.

EXHIBIT B

b.  the **Insured Event** out of which the **Claim** arises does not happen or commence prior to the date of the inception of the Employment Practices Liability coverage first provided by Chubb to the specific **Insured**, or after the **Policy Period** has ended.

B.  **DEFENSE**

1.  **We** have the right and duty to defend any **Claim** because of an **Insured Event** to which this insurance applies made or brought against any **Insured**(s). With respect to **Mass** or **Class Action Claims**, **we** have the sole right to select defense counsel. The **Insured** has the right to select defense counsel for **Non-Mass** or **Non-Class Action Claims** with **our** consent, which shall not be unreasonably withheld. The **Insureds** listed in Endorsement Number 2 shall be permitted to use the law firm listed next to each **Insured** to represent them solely with respect to any **Non-Mass** or **Non-Class Action Claim** brought or maintained in the geographical location listed next to each law firm.

   The **Named Insured** shall be required to provide **us** with a bordereau of **Claims** twice a year.

2.  a.  **Our** duty to defend any **Claim** ends when the Limits of Insurance applicable to that **Insured Event** (Item 3A of the Declarations) or to the **Policy Period** (Item 3B of the Declarations) have been exhausted.

   b.  If the **Policy Period** Limit (Item 3B of the Declarations) is exhausted, **we** will notify the **Named Insured** of all outstanding **Claims** so that the **Insured** can assume control of the defense of all such **Claims**.

   c.  In the event of exhaustion of the per **Insured Event** Limit and/or the total **Policy Period** Limit (Items 3A and 3B of the Declarations, respectively,) so that a transfer of the control of the defense from **us** to **you** becomes appropriate, **we** agree to continue the defense of the **Claim**(s) during that reasonable period of time necessary for **you** to assume control of the defense. However, **you** agree that, by so doing, **we** do not waive or surrender any of **our** rights including the right to withdraw from the defense of such **Claim**(s). **You** also agree to promptly reimburse **us** for the expenses **we** incur in continuing to conduct the defense during the transition period from the time the applicable Limits of Insurance were exhausted until the time **you** have assumed such defense.

   d.  **We** have the right to investigate and settle, with the **Insureds** consent, up to the applicable Limits of Insurance any **Claim** that

MNSCPT                                                          2

© All rights reserved.

EXHIBIT B

we deem proper.  Notwithstanding the foregoing, the **Insured** shall have the right to effectively associate with us in the negotiation of any settlement of any **Claim**.

In the event that a claimant offers a settlement and **we** recommend that such settlement be accepted, but the **Insured** withholds consent to so settle and the **Claim** later results in a judgment or settlement in excess of the amount of the earlier settlement offer, then the **Insured** shall be subject to a 20% coinsurance obligation with respect to all **Loss Amounts** in excess of the greater of 1) the Self Insured Retention or 2) the amount of such settlement offer and **Defense Costs** incurred to that time.  The **Loss Amounts** we will pay is limited as described in item 3 of the Declarations and in the Sections of the policy dealing with **LIMITS OF INSURANCE, DEFENSE, DEDUCTIBLE** and **OTHER INSURANCE**.

e.  The costs of defense are not in addition to but rather are included within and subject to the Limits of Insurance.

f.  To the extent that a **Claim** contains allegations covered under this policy and allegations not covered under this policy, **we** will pay all **Defense Costs** associated with the defense of such a **Claim**. **We** will not provide indemnification, however, for any **Claims** that are not covered by this policy even though **we** may pay **Defense Costs** associated with said **Claims**. **Our** obligation with respect to indemnification extends only to covered **Claims** under this policy.

## C.   OTHER BENEFITS

### 1.   Pre-judgment Interest

**We** shall pay the amount of pre-judgment interest imposed on a verdict. However, **our** obligation to pay pre-judgment interest shall not be in addition to the applicable Limits of Insurance but rather shall be within and subject to said Limits of Insurance.

### 2.   Post-judgment Interest

**We** shall pay the entire amount of post-judgment interest calculated upon the amount for which **we** are liable under this policy until such time as **we** have paid or tendered such amount.

## D.   VIRTUAL ENVIRONMENT COVERAGE

This policy is extended to cover an **Insured Event** committed through the **Virtual**

© All rights reserved.

EXHIBIT B

**Environment** by any **Insured**.   Notwithstanding any other provision of this policy to the contrary, the coverage provided by this Clause II.D shall only apply to a **Claim** made by or brought by a claimant who is **your Employee**, **your** former **Employee** or an applicant for employment with **you**.

E.   **WRONGFUL BUSINESS ENVIRONMENT COVERAGE**

Subject to all the terms, limitations, conditions, definitions, exclusions, and other provisions of this policy, we will pay all **Loss Amounts** that the **Insured** is legally obligated to pay because of a **Claim** alleging **Wrongful Business Environment.** The amount we will pay is included within and limited as described in item 3 of the **Declarations** dealing with **LIMITS OF INSURANCE, DEFENSE, SELF INSURED RETENTION, AND OTHER INSURANCE.**

This coverage only applies if:

1. the **Claim** alleging **Wrongful Business Environment** is first made against the **Insured** during the **policy period** as set forth in item 2 of the **Declarations,** and

2. **The Claim** alleging **Wrongful Business Environment** does not arise out of, is not based upon or attributable to **Known Incidents** which happened or commenced prior to the Inception Date of the **policy period** as set forth in item 2 of the **Declarations.**

F.   **THIRD PARTY COVERAGE**

Subject to all of the terms, limitations, conditions, definitions, exclusions and other provisions of this policy, we shall pay all **Loss Amounts** that an **Insured** is legally obligated to pay because of any **Third Party Claim** first made against an **Insured** during the **Policy Period** or, if applicable, during the **Extended Reporting Period, for Third Party Wrongful Acts**.

G.   **RETALIATION COVERAGE**

This policy shall provide coverage (subject to the policy's other terms, conditions and exclusions) for **Loss Amount** arising from a **Claim** for retaliation against an **Employee** in response to such **Employee's** attempt to exercise his or her rights under law including, but not limited to, any of the following laws or benefit rights:

(i)   Employee Retirement Income Security Act of 1974 (ERISA), specifically including **Claims** against an **Insured** brought under Section 510 of ERISA.

(ii)   Fair Labor Standards Act (except the Equal Pay Act),

(iii)   National Labor Relations Act (NLRA),

© All rights reserved.

EXHIBIT B

| | |
|---|---|
| (iv) | Worker Adjustment and Retraining Notification Act (WARN) |
| (v) | Consolidated Omnibus Budget Reconciliation Act (COBRA) |
| (vi) | Occupational Safety and Health Act (OSHA) |
| (vii) | workers' compensation, |
| (viii) | disability benefits, |
| (ix) | unemployment compensation, |
| (x) | unemployment insurance, |
| (xi) | retirement benefits or social security benefits, or |
| (xii) | any rules or regulations of the foregoing promulgated thereunder |

For **purposes of** this Retaliation Coverage, **Loss Amount** shall not include any amount or sum payable to the **Employee** under any of the foregoing terms.

III. **WHO IS AN INSURED**

A. **Individual.** If **you** are shown in the Declarations as an individual, **you** are insured only for the conduct of a business of which **you** are the sole owner.

B. **Corporation.** If **you** are shown in the Declarations as a corporation or organization other than a partnership or joint venture, **you**, and any entity in which **you** own a 50.1% or greater interest at the time of Inception Date of this policy or which is identified in the Declarations or by endorsement to this policy, are an **Insured.** **Your** officers and directors are **Insureds,** but only with respect to their duties as **your** officers or directors.

C. **Partnership or joint venture.** If **you** are shown in the Declarations as a partnership or joint venture, **you** are an **Insured.** **Your** partners or joint venturers are also **Insured**s but only for the conduct of **your** business.

However, no person or organization is covered for the conduct of any current or past partnership or joint venture not named in the Declarations.

D. **Acquisitions.** Any organization that **you** newly acquire or form during the **Policy Period** which at the time of acquisition or formation constitutes less than 20% of the overall total **employee** count of the **Insured** becomes an **Insured** when **you** own at least 50.1% of it, but no newly acquired or formed organization is covered for:

1) any **Loss Amount** that results from an act or incident that happened or commenced before **you** acquired or formed it,

2) any **Loss Amount** covered under other insurance.

Any newly acquired or formed organization which at the time of acquisition or formation constitutes 20% or more of the overall total **employee** count of the **Insured** becomes an **Insured** when **you** own at least 50.1% of it, but no newly acquired or formed organization is covered for

© All rights reserved.

a)   any Loss **Amount** that results from an act or incident that happened or commenced before **you** acquired or formed it,

b)   any Loss **Amount** covered under other insurance,

c)   more than ninety (90) days or the remainder of the **Policy Period**, whichever is less, unless the **Named Insured** gives **us** written acceptance of any special terms, conditions, exclusions, or additional premium charge we may require.

E.   **Employees. Your Employees** are **Insureds** but only for the conduct of **your** business within the scope of their employment. **Your Employees'** status as **Insureds** will be determined as of the date of the alleged **Discrimination, Sexual Harassment, Wrongful Termination or Workplace Torts.**

F.   **Additional Named Insureds.**

1)   The following organizations are **Named Insureds** under this policy, but solely in connection with any such organization's operation of an **NBA Team, NBADL Team** or **WNBA Team:**

Atlanta Hawks, LP;
Golden State Warriors LLC; SC Warriors LLC; GWS LLC;
Rocket Ball, Ltd.;
The Los Angeles Lakers, Inc., LAL D Team, LLC (Los Angeles Lakers & D-Fenders);
Memphis Basketball, LLC;
Miami Heat Limited Partnership;
MSG Holdings, LP, but solely in connection with its operation of New York Knickerbockers and New York Liberty;
Orlando Magic, Ltd;
Sixers Holdco LP;
Suns Legacy Partners, LLC; Phoenix Mercury Basketball, LLC;
San Antonio Spurs, LLC; San Antonio WNBA Basketball, LLC; Spurs D-League, LLC;
Trail Blazers, Inc.;
The Professional Basketball Club, LLC; PBC NBADL, LLC;
Jazz Basketball Investors, Inc.;
New Jersey Basketball, LLC dba Brooklyn Nets;
Banner Seventeen, LLC; Boston Celtics;
Boston Basketball Partners, LLC;
Boston Championship Basketball, LLC;
Chicago Professional Sports Limited Partnership dba Chicago Bulls;
KMN Ball, LLC; The Denver Nuggets Limited Partnership;
Detroit Pistons Basketball Company (Detroit Pistons);

© All rights reserved.

EXHIBIT B

Minnesota Timberwolves Basketball Limited Partnership (Minnesota Timberwolves & Lynx); Taylor  Sports Group; Fastbreak  Foundation; TC Arena Group, LLC;
Dallas Basketball, Limited;
Maple Leaf Sports & Entertainment, Ltd. dba Toronto Raptors;
Milwaukee Bucks, Inc.;
LAC Basketball Club, Inc.;
New Orleans Pelicans NBA, LLC;
Mohegan Basketball Club, LLC;
Pacers Basketball LLC; Fever Basketball LLC;
Sacramento Kings Limited Partnership, LP;
Cavaliers Holdings, LLC; Cavaliers D-league, LLC;
Force Ten Hoops, LLC;
The Women's Basketball Club of Seattle, LLC dba Seattle Storm;
Harmon Services, LLC;
The Sting, LLC;
Bobcats Basketball Holdings, LLC d/b/a Bobcats Sports and Entertainment;
Cats Care Foundation, Inc;
Bobcats Basketball, LLC;
Carolina Sports Entertainment Television, LLC;
Houston Temporary Operating Company, LLC (Delaware);
Reno Bighorns, LLC;
Anaheim Arsenal, LLC;
NBA Youth Basketball Holdings, LLC;
Youth Basketball LLC;
Lincoln Holdings, LLC dba Monumental Sports & Entertainment (basketball operations for Wizards & Mystics);
any Subsidiary(ies) and **Team Affiliate(s)** of the above organizations; and

2) The following  organizations  are **Named Insureds** under this  policy,  but solely in  connection with  any such  organization's operation  of an  **NBA Team, NBADL Team, WNBA Team**, or any other event operation:

San Antonio Spurs & Silver Stars (Community Arena Management, Inc.);
Indiana Pacers & Fever (Pacers Basketball Corp.);
Sacramento Kings & Monarchs (Sacramento Kings Limited Partnership, LP);
Charlotte Bobcats & Sting (Bobcats Basketball Holdings, LLC);
Cleveland Cavaliers (Cavaliers Operating Company, LLC); and
Trail Blazers, Inc. (RIP City Management LLC).

G. **Spousal, Domestic Partner Estates, Heirs, and Legal Representatives.**

This  policy shall cover **Loss Amounts** arising  from employment related **Wrongful Termination, Discrimination**, and **Sexual Harassment Claim(s)** otherwise covered by this  policy made against  the lawful spouse,  domestic partner (whether such  status is  derived by  reason of statutory  or common law), estate, heirs and  their legal representative  of an **Insured** arising solely out of

© All rights reserved.

EXHIBIT B

their status  as the spouse,  domestic partner, estates,  heirs and their  legal representative  of  an  **Insured**,  including  **Claim(s)**  that  seek  damages recoverable from marital community property and  property jointly held by an **Insured** or the spouse.

This Clause  G shall  not afford  coverage for  any **Claim(s)**  arising  from any actual or alleged wrongful act of the spouse, domestic partner, estates, heirs and their legal representative of an **Insured**.

H.     **Outside Directors.**

**Insureds** who serve  as directors or  officers of  a Not for Profit Organization (hereinafter, **NPO**) at the request  and direction of the **Named  Insured** or any entity qualifying as an **Insured** under this  Policy shall receive coverage under this Policy for **Claims** alleging an  **Insured Event** brought by the employees  of the **NPO** to the same extent as if the **Claim** were made against such **Insureds** by the **Employees**  of the **Insured**.  Coverage under this  section shall  be excess of any valid and collectable insurance or indemnification with respect to the **Claim**.  This section  shall no way be construed to  increase, reinstate, or extend the limits of insurance provided by this policy.

I.     **Parent Companies.**

Additional Insured status  shall be  provided to  the parent companies  of **our Named Insureds** for  said parent  companies' vicarious  liability arising out  of **our Named Insured's**  covered operations.   The parent companies  will have Additional  Insured  status  only, and **we**  have  no  obligation  to provide coverage to  the parent  companies for  their own  wrongful acts or  for any liabilities arising out of any non-covered operations of **our Named Insureds**.

J.     **Non-Profits Sponsored by Named Insureds.**

If **you** are a not-for-profit entity sponsored exclusively by a **Named Insured(s)** , then **you** are an **Insured**.

IV.     <u>**EXCLUSIONS**</u>

A.     **Workers' Compensation.**  This  policy does not  cover any obligation  under a workers' compensation,  disability benefits  or  unemployment compensation law, or any similar law.

B.     **Liability Assumed by Contract.**  This policy does not cover  any **Loss Amount** which  the  **Insured**  is  obligated  to  pay  by  reason  of  the  assumption  of another's liability for an **Insured Event** in a contract or agreement.

This exclusion shall not apply  to liability for damages  because of an **Insured Event** that the **Insured** would have had even in the  absence of such contract or agreement.

MNSCPI                                                                8

© All rights reserved.

EXHIBIT B

C. **Employee Retirement Income Security Act.** This policy does not cover any liability imposed on the **Insured** under the Employee Retirement Income Security Act of 1974, Public Law 93-406, or any amendments thereto.

D. **Strikes and Lockouts.**

1. Non-players: This policy does not cover any **Loss Amount(s)** or costs arising out of or associated with a lockout, strike, picket line, replacement or other similar actions in connection with labor disputes or labor negotiations. Except for past, present and future NBA players, this exclusion shall not apply to a **Claim** brought by any **Employee(s)** who are Non-Players, alleging **Wrongful Termination** or retaliation as a result of a lockout, strike, picket line, replacement or other similar actions in connection with labor disputes or labor negotiations.

2. Past, Present or Future NBA Players: This policy does not cover any **Loss Amount(s)** or costs arising out of or associated with a lockout, strike, picket line, replacement or other similar actions in connection with labor disputes or labor negotiations. This exclusion shall not apply to a **Claim** brought by any **Employee(s)** who are Past, Present or Future NBA Players, alleging **Wrongful Termination** or retaliation as a result of strike activity or union involvement.

Whether an individual is considered a Past, Present or Future NBA Player or a Non-Player shall be determined by their capacity at the time the alleged **Wrongful Termination** or retaliation occurs.

E. **W.A.R.N. Act.** This policy does not cover any liability arising out of the Workers' Adjustment and Retraining Notification Act, Public Law 100-379 (1988), or any amendment thereto, or any similar federal, state or local law.

F. This policy does not apply with respect to liability or costs incurred by any **Insured** to modify any building or property in order to make said building or property more accessible or accommodating to any disabled person.

G. This policy does not apply, other than **Defense Costs**, to damages imposed as a result of the termination of an express contract of employment.

H. **Wage Claims.** This policy does not cover any **Claim** brought against any **Insured** for failure to pay wages earned by an **employee,** including but not limited to any **claim** brought under the overtime compensation or minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. 201 et seq., or any state or local law governing the payment of overtime compensation or minimum wage. This exclusion does not apply to any **claim** brought pursuant to the Equal Pay Act, 29 U.S.C. s. 206 (d).

© All rights reserved.

EXHIBIT B

V.    **LIMITS OF INSURANCE**

    A.    **Player Limit of Liability.**

        **Our** Total Aggregate Policy  Period Limit for all  **Loss Amounts** on account  of all **Claims** brought by or on behalf of, or in the name or right of:

        (1)    any **NBA Player;**
        (2)    any **NBADL Player;** or
        (3)    any **WNBA Player,**

        shall be $5,000,000,  which amount  is part  of, and  not in  addition to, **our Total Policy Period Limit** set forth in Item 3B of the Declarations.

    B.    **Each Insured Event Limit.**

        The amount  shown  as  the  **Each  Insured  Event** Limit in Item  3A of  the Declarations is the most  **we** will pay  for all **Claims**  made or brought  arising out of one **Insured  Event**,  regardless of  the  number  of **Claims** made, claimants, or **Insureds** against whom such **Claims** are made.

    C.    **Total Policy Period Limit.**

        Subject to  the **Each  Insured  Event Limit**,  the amount  shown  as  the  **Total Policy Period Limit**  in Item  3B of  the Declarations is  the most  **we** will  pay under this policy for all **Claims** made or brought during the **Policy Period.**

    D.    **Third Party Limit.**

        With respect to coverage  available under Clause II.F  for **Third Party  Claims, our** maximum  liability  for **all  Loss  Amounts** on  account  of all  **Third Party Claims** made against any **NBA Player**, **NBADL Player** or **WNBA Player** shall be $5,000,000, which amount is  part of, and  not  in addition to, **our**  maximum aggregate **Total Policy Period Limit** set forth in Item 3B of the Declarations.

VI.    **WHEN COVERAGE IS PROVIDED**

    A.    Subject to  the  other  provisions  of this  policy,  including  those regarding **Limited and Extended Reporting Periods,** if applicable, this policy applies only to **Claims** first made against any **Insured** during the **Policy Period.**

    B.    A **Claim** shall be considered to be made on the earlier of:

        1.    the date any **Insured** receives a written  notice of a  **Claim** being made against any **Insured** seeking damages covered by this policy; or

MNSCPT                                                                16                              © All rights reserved.

EXHIBIT B

2.    the date **we** make a settlement on account of an **Insured Event** but in advance of written **Claim** being made.

C.    All **Claims** arising out of one **Insured Event** shall be considered to be one **Claim** and shall be deemed to be made at the time the first of such **Claims** is made. If such **Claims** are made while this policy is in effect and also while predecessor or successor policies issued by **us** are in effect, all such **Claims** shall still be considered to have been made at the time the first of such **Claims** is made and only the policy in effect at that time shall apply to all such **Claims**.

## VII.   __DEFINITIONS__

A.    **Claim** means a written demand or notice received by an **Insured** in which damages likely to be covered by this policy are alleged. **Claim** includes a civil action, an administrative proceeding, alternative dispute resolution proceeding, or an action brought by a person or entity acting on behalf of an **Employee(s)** of the **Insured** to which **you** must submit or to which you submit with **our** consent. **Claim** shall include a proceeding for injunctive or non-monetary relief. **Claim** shall not include labor or grievance arbitration subject to a collective bargaining agreement. A class action lawsuit is considered one **Claim**.

B.    **Defense Costs** means those reasonable expenses that result from the investigation, settlement, defense of a specific **Claim**, including attorney fees and expenses, expert fees, the cost of legal, administrative, or alternative dispute resolution proceedings, the cost of appeal bonds, the cost of bonds to release property being used to secure a legal obligation (but only for bond amounts within the Limit of Insurance that applies; **we** have no obligation to furnish such bonds), all reasonable expenses that any **Insured** incurs at **our** request while helping **us** investigate or defend a **Claim** and, subject to Section II. C. of this policy, all costs taxes against any **Insured** in a suit.

Salaries and expenses of any **Insured's Employees** shall not be deemed to be covered **Defense Costs**.

**Defense Costs** are included within, and are not in addition to, the applicable Limits of Insurance and Retention.

C.    **Discrimination** means termination of an employment relationship or a demotion or a failure or refusal to hire or promote or otherwise to take any action against any individual with respect to his or her compensation, terms, conditions, privileges or opportunities of employment because of race, color, religion, age, sex, disability, pregnancy, national origin, sexual orientation or other protected category or characteristic established pursuant to any applicable United States federal, state, or local statute or ordinance.

MNSCPT

© All rights reserved.

EXHIBIT B

D.   **Employee** means an individual whose labor or service is engaged by and directed by an **Insured**. This includes part-time, seasonal and temporary **Employees** as well as any individual employed in a supervisory, managerial, or confidential position.  **Supervisory Employee** means an officer or director of an **Insured** or any **Employee** of an **Insured** who has authority to employ or terminate the employment of other **Employees** of an **Insured**.  An individual who is an independent contractor to the **Insured**, or a leased worker to the **Insured**, or a volunteer to the **Insured** shall be an **Employee**, but only if the **Insured** provides indemnification to such individual in the same manner as is provided to the **Insured's Employees**.

E.   **Foreign Jurisdiction** means any jurisdiction, other than the United States of America or any of its territories or possessions.

F.   **Foreign Policy** means the standard employment practices liability policy (including all mandatory endorsements, if any) approved by us or any of **our** affiliates to be sold within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded under this policy.  If more than one such policy exists, then " **Foreign Policy**" means the standard basic policy form most recently offered for sale for comparable risks by **us** or any of **our** affiliates in that **Foreign Jurisdiction**.

G.   **Insured Event** means (1) **your Employee** or former **Employee**, or an applicant for employment with **you**, alleging **Discrimination** by an **Insured**, or (2) **your Employee** or former **Employee** alleging **Sexual Harassment** by an **Insured**, or (3) **your** former **Employee** alleging **Wrongful Termination** by an **Insured**, (4) **your Employee** or former **Employee** or an applicant for employment with **you** alleging **Workplace Torts** by an **Insured.** Alleging means lodging an oral or written complaint or charge with **your** management or **Supervisory Employee(s)** or with **your** corporate legal or human resource departments.

H.   **Known Incidents** are defined as the lodging of an oral or written complaint or charge with **your** management or **Supervisory Employee(s)** or your Risk Management, Corporate Legal, or Human Resource Department alleging **Wrongful Business Environment.**

I.   **Loss Amount** means all forms of compensatory damages, monetary damages, statutory damages, multiplied damages, back pay, front pay, punitive or exemplary damages, judgments, settlements, statutory attorney fees, and **Defense Costs** arising out of **Claim(s)** alleging **Discrimination, Sexual Harassment, Wrongful Termination** or **Workplace Torts.**

It is agreed that the law of the jurisdiction most favorable to the insurability of punitive or exemplary damages shall control for the purpose of resolving any issue or dispute regarding whether these damages are insurable under this policy.

**Loss Amount** shall not include criminal fines or penalties.

© All rights reserved.

EXHIBIT B

Loss Amount also shall not include payment of insurance plan benefits claimed

by or on behalf of any retired Employee,  or that a claimant would have been entitled to  as an  Employee  had the  Insured  provided the  claimant  with a continuation of insurance.

Loss Amount also shall not  include amounts awarded pursuant to  a labor or grievance arbitration pursuant to a collective bargaining agreement.

Loss Amount also shall  not  include vested  and  non-vested stock  options, retirement  benefits,  severance pay,  bonus, prerequisites,  commissions, fringe benefits, vacation days or sick days.

J.  **Mass or Class Action** means any **Claim** brought or maintained:

   (1)  by or  on behalf  of five  or  more  natural persons  who are  acting  in concert, whether or not such  natural persons are represented  by one or more legal counsel;

   (2)  by or  on behalf  of one to  four natural  persons  if any  such  natural persons are making a pattern  and practice or systemic  discrimination allegations and  are seeking  monetary  relief on  behalf  of a  class or group of complainants in order to  resolve such **Claim**, whether or  not such natural persons are represented by one or more legal counsel; or

   (3)  by a governmental entity, department or agency making a pattern and practice or  systemic  discrimination allegation or  seeking  monetary relief on behalf of a class or group of complainants in order  to resolve such **Claim**.

K.  **NBA Player** means any present player who has entered into a Uniform  Player Contract (as that terms is defined in the  Collective Bargaining Agreement by and between the National Basketball Association and the National Basketball Player's  Association, Effective  December 8,  2011) or  any  other  similar contract with any **NBA Team**.

L.  **NBA Team** means  any team  that is or  has been  a member of  the National Basketball Association.

M.  **NBADL Player** means any  present player  who has  entered  into a  contract with the NBDL  Enterprises, LLC for  the purposes of  service in  the National Basketball Association Development League.

N.  **NBADL Team** means any team that is or has  been a member of the National Basketball Association Development League.

© All rights reserved.

EXHIBIT B

O.  **Non-Mass or Non-Class Action** means any **Claim** brought or maintained by  or on behalf of one to four natural persons, whether or not such natural persons are represented by one or more legal counsel, provided that: (a) none of such natural persons are making a pattern and practice  or systemic discrimination allegations; and/or  (b)  none  of such  natural persons  are  seeking monetary relief on behalf of a class or group of complainants to resolve such **Claim**.

P.  **Policy Period** means the period of  time commencing with the Inception  Date shown in Item 2  of the Declarations  and the earlier  of the termination  date shown in  Item  2  of  the  Declarations  or  the  date on  which  this policy  is terminated by cancellation by you or by us.

Q.  **Sexual Harassment** means  unwelcome sexual advances  and/or requests for sexual favors and/or other verbal or physical conduct of a sexual nature that: (1) are made  a condition of  employment and/or (2)  are used  as a basis  for employment decisions and/or  (3) create a  work environment  that interferes with  performance  or  creates  an  intimidating,  hostile,  or  offensive  work environment.  **Sexual  Harassment  shall  include  "same-sex"  sexual harassment.**

R.  **Team Affiliate** means  any entity, other  than a Subsidiary,  during such  time as:

(1)  any organization  listed in  Clause  III.F(1) of  this  policy or  any Subsidiary thereof has the authority  to direct the managerial decision making  of  such  entity,  whether  by  operation of  law, pursuant  to contract or  agreement, by means of  stock ownership or membership, or pursuant  to such  entity's  charter,  articles  of  incorporation,  or by-law provisions; or

(2)  such entity is actively  engaged in the  managerial decision making  of any organization  listed in  Clause  III.F(1) of  this  policy or  any Subsidiary thereof, whether by operation of law, pursuant to  contract or  agreement  by means  of stock  ownership  or  membership,  or pursuant  to such organization's  charter, articles of incorporation,  or by-law provisions.

S.  **Third Party** means any  natural person  who is  a customer,  vendor,  service provider or other business invitee of an **Insured.**

T.  **Third Party Claim** means:

(1)  any of the following:

(i)  a written demand for monetary relief or non-monetary relief;

14

© All rights reserved.

EXHIBIT B

(ii)     a civil proceeding commenced by the service of a complaint, summons, notice of application, writ, claim or similar pleading in any jurisdiction in the world;

(iii)    an arbitration proceeding commenced by receipt of a demand for arbitration or similar document; or

(iv)    an administrative, regulatory or tribunal proceeding commenced by the issuance of a notice of charge, formal investigative order or similar document,

which is brought or maintained by or on behalf of a **Third Party** against any **Insured** for a **Third Party Wrongful Act**, including any appeal therefrom; or

(2)    a written request received by an **Insured** to toll or waive a statute of limitations relating to a potential **Third Party Claim** as described in subparagraph (1) above.

U.    **Third Party Wrongful Act** means:

(1)    discrimination against a **Third Party** based upon such **Third Party**'s race, color, religion, age, sex, disability, pregnancy, national origin, sexual orientation or other protected category or characteristic established pursuant to any applicable United States federal, state, or local statute or ordinance; or

(2)    sexual harassment, including unwelcome sexual advances and/or requests for sexual favors and/or other verbal or physical conduct of a sexual nature that: (a) are made a condition of employment; and/or (b) are used as a basis for employment decisions; and/or (c) creates a work environment that interferes with performance or creates and intimidating, hostile, or offensive work environment.

V.    **Virtual Environment** means the employment-related use of: electronic communications including, but not limited to, emails, phone calls, videoconferencing, electronic images, texting, instant messaging, tweets or similar communications through any electronic method, including the internet, social networking sites, or other similar media regardless of whether such communication occurs during or after work hours or on or off the work premises.

W.    **WBNA Player** means any present player who has entered into a Standard Player Contract (as that term is defined in the Collective Bargaining Agreement by and between the Women's National Basketball Association and the Women's National Basketball Players Association, effective April 30, 1999) or any other similar contract with the Women's National Basketball Association.

MNSCPT       15

© All rights reserved.

EXHIBIT B

X.    **WNBA Team** means any team that is or has been a member of the Women's Basketball Association.

Y.    **Workplace Torts** means retaliation, defamation, infliction of emotional distress, invasion of privacy, workplace harassment, workplace bullying, negligent evaluation, wrongful discipline, wrongful reference, failure to grant tenure, wrongful failure to employ or promote, or wrongful demotion. **Workplace Torts** also includes mental anguish, humiliation, emotional distress, negligent retention, negligent supervision, negligent hiring and negligent training provided these torts arise from allegations of **Wrongful Termination**, **Discrimination** or **Sexual Harassment**.

    **Workplace Torts** shall include the acts set forth in the preceding paragraph of this definition even if the actual or alleged acts occurred by way of electronic communication, including, without limitation, by way of a social networking site; but only if such acts were committed by an **Insured** in such **Insured's** capacity as such.

Z.    **Wrongful Business Environment** is defined as allegations of direct, indirect, intentional, or unintentional **Discrimination**, **Sexual Harassment** or any other civil rights violations committed by an Insured and brought by the **Insured's** customer(s), client(s) or any other individual(s), class of individuals or group which results from exposure to the business environment of the **Insured.**

AA.    **Wrongful Termination** means termination of an employment relationship in a manner which is against the law and wrongful or in breach of an implied agreement to continue employment. Wrongful Termination shall include but shall not be limited to breach of an implied employment contract, retaliation, or the filing of a Claim under federal, state, local or foreign "whistleblower" laws.

## VIII.   SELF INSURED RETENTION

A.    **Self Insured Retention**

    **Our** obligations under the coverages provided by this policy to pay **Loss Amounts** on behalf of the **Insured** apply only to **Loss Amounts** in excess of the **Self Insured Retention** as stated in the **Declarations** and subject to the **Limits of Insurance** states in the **Declarations**. The terms of this policy with respect to **Our** rights and duties relative to investigation, settlement, duty to defend and selection of defense counsel apply in excess of the application of the Insured's **Self Insured Retention.**

B.    The **Named Insured** shall reimburse us promptly for any amounts **we** have paid which are within the self insured retention amount.

## IX.   LIMITED AND EXTENDED REPORTING PERIODS

MNSCPP           16

© All rights reserved.

EXHIBIT B

A. **Limited Reporting Period** means the  sixty (60) day  period starting  with the end of the **Policy  Period**. Any **Claim**  which is first  made during the  **Limited Reporting  Period**  because  of  an  **Insured  Event**  which happened  or commenced  after  the  inception  date  of  the  first  Employment  Practices Liability
Policy issued  by  **us** to  the  **Named Insured**  because  of an  act  or  incident which happened or commenced prior to the end  of the **Policy Period** shall be deemed to have been made on the last day of the **Policy Period.**

B. When the **Limited Reporting Period**  will apply.  The **Limited  Reporting Period** will apply only  if this insurance  is cancelled or  not renewed for  any reason other  than  your  non-payment  of  a  premium  or self insured retention  or non-compliance with the terms  and conditions of this policy.  However, the **Limited Reporting Period** will  not apply to **Claims**  if other insurance you  buy covers them  or would  cover them  if its  Limits  of Insurance  had not  been exhausted.

C. How to add  an **Extended Reporting  Period.**  If the **Limited  Reporting Period** applies, an **Extended Reporting Period** of one (1),  two (2),  or three (3) years, starting at the end of  the **Limited Reporting Period,**  can be added by  means of an Extended  Reporting  Period  Endorsement  and the  payment of  an additional premium.  The Extended  Reporting Period  Endorsement attached to this policy sets forth  the terms and conditions  of the **Extended Reporting Period.**

Any **Claim** which is first made during the **Extended Reporting Period**  because of an **Insured Event** which happened  or commenced after the inception  date of the first Employment  Practices Liability Policy issued  by **us** to the specific **Insured** because of  an act or  incident which happened  or commenced prior to the end of  the **Policy Period**  shall be deemed  to have been  made on the last day of the **Policy Period.**

The Extended  Reporting Period  Endorsement will  not  be issued  unless we receive a written  request for  it within  sixty (60) days  after the end of the **Policy Period,**  nor will  it take  effect unless  the additional  premium  is paid when due.  Once that  additional premium is paid, the  endorsement may not be cancelled and the premium will be fully earned.

The additional premium for the Extended Reporting Period Endorsement for:

1. one year  shall be 100% of the "full annual premium;"

2. two years shall be 150% of the "full annual premium; "

3. three years shall be 175% of the "full annual premium."

4. As used  herein, "full annual  premium" means  the premium  level  in effect immediately prior to the end of the **Policy Period.**

© All rights reserved.

EXHIBIT B

D.  How the Limits of Insurance apply to the **Limited** and **Extended Reporting Periods**. The Limits of Insurance that remain at the end of the **Policy Period** after payment of all **Loss Amounts** and **Defense Costs** made on account of **Claims** made during the **Policy Period** are not reinstated, renewed or increased for **Claims** first made or brought during the **Limited Reporting Period** or the **Extended Reporting Period**. Any **Claim** first made or brought during the **Limited Reporting Period** or the **Extended Reporting Period** will be deemed to have been first made on the last day of the **Policy Period** which terminated immediately prior to the start of the **Limited Reporting Period**.

X.  <u>**CONDITIONS**</u>

It shall be a condition precedent to our obligations under this policy that the Insureds comply with all of the Conditions.

A.  **DUTIES IN THE EVENT OF AN INCIDENT, CLAIM OR SUIT**

1.  **Notice of incident -**

The **Insured** shall have the duty to notify **us**, in writing, of a circumstance that may give rise to a **Claim** being made against an **Insured**. Such notice shall include as much detail as possible and shall include, to the extent possible:

a.  the identity of the person(s) alleging **Discrimination, Wrongful Termination, Sexual Harassment** or **Workplace Torts**;

b.  the identities of the **Insured(s)** who allegedly committed the **Discrimination, Wrongful Termination, Sexual Harassment** or **Workplace Torts** and any witnesses;

c.  the date the alleged incident took place; and

d.  any other information or documentation pertinent to the alleged incident.

Notice of such an incident likely to give rise to a **Claim** nevertheless does not constitute a **Claim** being made.

2.  If a **Claim** is made or suit is brought against any **Insured you** must:

a.  immediately record the specifics of the **Claim** and the date received; and

b.  notify **us** in writing as soon as practicable;

c.  immediately send **us** copies of any demands, notices, summonses or legal papers received in connection with the

© All rights reserved.

EXHIBIT B

**Claim;**

d.     authorize **us** to obtain records and other information;

e.     cooperate with **us** in the investigation, settlement or defense of the **Claim**; and

f.     assist **us**, upon **our** request, in the enforcement of any right against any person or organization which may be liable to any **Insured** because of injury or damage to which this insurance may also apply.

3.     All notices hereunder of **Claims**, or of incidents which may reasonably be expected to give rise to a **Claim** being made against the **Insured**, shall be in writing to New Hampshire Insurance Company, 200 State Street, Boston, Massachusetts 02109; Attention: Supervisor of Professional Liability Claims.

**B.   OTHER INSURANCE**

1.     **Primary Insurance**-Unless expressly written to be excess over other applicable insurance, it is intended that this insurance be primary with respect to **Wrongful Termination, Discrimination, Sexual Harassment** and **Workplace Torts**.

2.     **Excess Insurance**- When this insurance is specifically written to be excess of other insurance, **we** will have no duty to defend any **Claim** that any other insurer has a duty to defend until such time as the underlying insurance is exhausted by payment of **Loss Amounts** that would, in the absence of such primary policy, be recoverable under this policy. When this policy is excess, **we** will pay only that amount, in excess of the primary insurance, any deductible or self insured retention in connection with the primary insurance, and the self insured retention amount set forth in this policy.

**C.   VOLUNTARY PAYMENTS**

No **Insured** shall, except at the **Insureds'** sole cost, make any payment, assume any obligation or incur any expense without **our** consent.

**D.   REPRESENTATIONS**

By accepting this policy, **you** agree that:

1.     the statements in the Application and Declarations are accurate and complete;

MNSCPT

13

© All rights reserved.

EXHIBIT B

2.      those statements  are based  upon  representations **you**  made  to us;
and

3.      we have issued this policy in reliance upon **your** representations.

However, in no event shall  the representations made by  any one **Insured** be
binding upon any other **Insured**.

### E.      TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any **Insured** has rights to recover all or part of any payment **we** have made
under this policy,  those rights  are transferred  to **us**.  The **Insured**  must do
nothing after an **Insured Event** or a **Claim** to impair them.  At **our** request, the
**Insured** will transfer those rights to **us** and help **us** enforce them.

### F.      BANKRUPTCY

The  bankruptcy,  insolvency  or  inability  to  pay  of  an **Insured**  or  of  an
**Insured's** estate  will  not  relieve  **us**  of  **our**  obligations  under  this  policy.
However,  neither  shall  such  bankruptcy,  insolvency  or  inability  to  pay
increase **our**  liability  with  respect  to  the  self  insured  retention,  nor  in  any
other  way.

### G.      CANCELLATION

1.      The **Named Insured** shown in the  Declarations may cancel this policy
by mailing or delivering to **us** advance written notice of cancellation.

2.      **We** may only  cancel this policy for nonpayment  of premium.   If  **we**
cancel for  nonpayment of  premium, **we**  shall  mail or  deliver  to  the
**Named Insured** written notice of  cancellation at least 10 days  before
the effective time of cancellation.

3.      **We** will mail or deliver **our**  notice to the **Named Insured's** last  mailing
address known to  **us**.

4.      Notice of  cancellation  will state  the  effective  time  of  cancellation.
The **Policy Period** will end at that time.

5.      If  this  policy  is  cancelled, **we**  will  send  the  **Named Insured**  any
premium refund due in due course. If the  **Named Insured** cancels, the
refund will be on the customary short rate basis. The return or tender
of  a  return  premium  shall  not  be  a  condition  precedent  to  the
cancellation becoming effective at the time  stated in the cancellation
notice.

© All rights reserved.

EXHIBIT B

6.   If notice is mailed, proof of mailing will be sufficient proof of notice.

7.   If any law controlling requires a longer period of notice by **us**, **we** will give the longer notice.

H.   **CHANGES**

This policy contains all the agreements between **you** and **us** concerning the insurance afforded. The **Named Insured** shown in the Declarations is authorized by all other **Insureds** to negotiate changes in the terms of this policy with **us** and to receive and give all notices under this policy. This policy's terms can be amended or waived only by endorsement issued by **us** and made part of the policy.

I.   **PREMIUMS**

The **Named Insured** shown in the Declarations:

1.   is responsible for the payment of all premiums; and

2.   will be the payee for any return premiums **we** pay.

J.   **LEGAL ACTION AGAINST US**

1.   No person or organization has a right under this policy:

a.   to join **us** as a party or otherwise bring **us** into a suit asking for damages from any **Insured**; or

b.   to sue **us** on this policy unless all of its terms have been fully complied with.

2.   A person or organization may sue **us** to recover on an agreed settlement or on a final judgment against the **Insured** obtained after an actual trial, but **we** will not be liable for any **Loss Amount** that is not payable under the terms of this policy or that is in excess of the applicable Limits of Insurance. An agreed settlement means a settlement and release of liability signed by **us**, the **Insured** and the claimant or the claimant's legal representative.

K.   **TAKEOVER OF INSURED**

© All rights reserved.

EXHIBIT B

In the event 50.1% or more of the controlling interest of the **Named Insured** is changed during the **Policy Period**, then this policy shall automatically terminate upon the completion of such change in control. From that point forward, such insurance as is afforded by this policy shall apply only to **Claims** which had first been made prior to that change in control.

In the event 50.1% or more of the controlling interest of any **Named Insured** as listed in Clause III.F is changed during the **Policy Period**, then this policy shall automatically terminate upon the completion of such change in control. From that point forward, such insurance as is afforded by this policy shall apply only to **Claims** which had first been made prior to that change in control.

In the event 50.1% or more of the controlling interest of a subsidiary of any **Named Insured** as listed in Clause III.F is changed during the **Policy Period**, then this policy shall automatically terminate upon the completion of such change in control. From that point forward, such insurance as is afforded by this policy shall apply only to **Claims** which had first been made prior to that change in control.

In the event that a subsidiary of any **Named Insured** is sold by any **Insured** during the **Policy Period**, coverage with respect to such subsidiary shall continue as long as the **Named Insured** entity selling such subsidiary is an **Insured** under this policy and the acts or incidents giving rise to any **Claim** occurred prior to the sale by the **Named Insured**.


L.      **NON-BINDING MEDIATION**

Notwithstanding the Service of Suit condition above, in the event of a disagreement as to the interpretation of this policy, it is mutually agreed that such dispute shall be submitted to non-binding mediation before a panel of three (3) Mediators consisting of two (2) party-nominated (non-impartial) Mediators and a third (impartial) Mediator (hereinafter "umpire"). The party desiring mediation of a dispute shall notify the other party, said notice including the name, address and occupation of the Mediator nominated by the demanding party. The other party shall, within 30 days following receipt of the demand, notify in writing the demanding party of the name, address and occupation of the Mediator nominated by it. The two (2) Mediators so selected shall, within 30 days of the appointment of the second Mediator, select an umpire. If the Mediators are unable to agree upon an umpire, each Mediator shall submit to the other Mediator a list of three (3) proposed individuals, from which list each Mediator shall choose one (1) individual. The names of the two (2) individuals so chosen shall be subject to a draw, whereby the individual drawn shall serve as umpire.

© All rights reserved.

EXHIBIT B

The parties shall submit their cases to the panel by written and oral evidence at a hearing time and place selected by the umpire. Said hearings shall be held within 30 days of the selection of the umpire. The panel shall be relieved of all judicial formality, shall not be obligated to adhere to the strict rules of law or of evidence, shall seek to enforce the intent of the parties hereto and may refer to, but are not limited to, relevant legal principles. The award will be issued within 30 days of the close of the hearings. Each party shall bear the expenses of its designated Mediator and shall jointly and equally share with the other the expense of the umpire and of the mediation.

The mediation proceeding shall take place either in or in the vicinity of Boston, Massachusetts or New York City, New York, at the selection of the **Insured**. The procedural rules applicable to this mediation shall, except as provided otherwise herein, be in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

**M.    MIDTERM CHANGE IN TEAM OWNERSHIP ENTITIES**

1.  Former Team Ownership Entities:

    In the event 50.1% or more of the controlling interest of any **Named Insured** as listed in Clause III.F is changed during the **Policy Period** (hereinafter, the **Transaction**), then notwithstanding Clause X.K, this policy will continue in full force and effect as to **Discrimination**, **Wrongful Termination**, **Sexual Harassment**, **Workplace Torts** or **Wrongful Business Environment** that occurs prior to the effective date of such **Transaction**. There will be no coverage afforded by this Policy for **Discrimination**, **Wrongful Termination**, **Sexual Harassment**, **Workplace Torts** or **Wrongful Business Environment** that occurs on or after the effective date such **Transaction**.

2.  Newly Acquiring Team Ownership Entities:

    A Newly Acquiring Team Ownership Entity shall automatically become a **Named Insured** on the date that such entity acquires a 50.1% or more controlling interest in an **NBA Team**, **NBADL Team** or **WNBA Team** (all of these prior terms hereinafter referred to as the Team) until the end of this **Policy Period**, but coverage shall only be provided with respect to such **Team's** operations, provided that, all of the following conditions are met:

    a.  The total **Employee** count of the **Team** and the Newly Acquiring Team Ownership Entity is not more than 10% greater than the total **Employee** count of the Former Team Entity; and

    b.  The **Named Insured** provides written notice to **us** no later than 30 days after the date of such acquisition.

© All rights reserved.

EXHIBIT B

If the **Named Insured** notifies **us** after such 30 day period, then coverage shall only apply from the date of receipt of such written notice by **us** until the end of this **Policy Period**.

There is no coverage for the Newly Acquiring Team Ownership Entity for **Claims** arising from layoffs or terminations which occur on or after the date of such acquisition unless **we** have receipt and positive reaction to a completed Layoff Questionnaire within 30 days after the date of such acquisition.

N.  **TERRITORY**

    1.  Global Liberalization

For **Loss** from that portion of any **Claim** maintained in a **Foreign Jurisdiction** or to which the law of a **Foreign Jurisdiction** is applied, the **Insurer** shall apply the terms and conditions of this policy as amended to include those of the **Foreign Policy** in the **Foreign Jurisdiction** that are more favorable to **Insureds** in the **Foreign Jurisdiction**. This *Global Liberalization Clause* shall not apply to any provision of any policy that has worldwide effect, including but not limited to any provision addressing limits of liability (primary, excess or sublimits), retentions, other insurance, non-renewal, duty to defend, defense within or outside limits, taxes, conformance to law or to excess liability coverage, claims made provisions, and any endorsement to this policy that excludes or limits coverage for specific events or litigation or that specifically states that it will have worldwide effect. This Clause X.O.1 is not meant to alter or change Clause X.O.2 of this policy entitled OFAC.

    2.  OFAC

Payment of loss under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

O.  **RECOVERY OF LIMITS**

In the event **we** recover amounts **we** paid under this policy, **we** will reinstate the applicable **Total Policy Period Limit** of this policy to the extent of such recovery, less **our** costs incurred in administering and obtaining such recovery. **We** assume no duty to seek a recovery of any amounts paid under this policy.

MNSCPT         24

© All rights reserved.

EXHIBIT B

## ENDORSEMENT# *1*

This endorsement, effective *12:01 am    July 31, 2017*          forms a part of policy number    *01-767-89-02*
issued to *NATIONAL BASKETBALL ASSOCIATION, INC.*

by    *New Hampshire Insurance Company*

### NEW JERSEY
### CANCELLATION/NONRENEWAL ENDORSEMENT

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

In consideration of the premium charged, it is hereby understood and agreed that the cancellation provision of this policy is amended as follows:

"Pursuant to New Jersey law, this policy cannot be cancelled or nonrenewed for any underwriting reason or guideline(s) which is arbitrary, capricious or unfairly discriminatory or without adequate prior notice to the Insured. The underwriting reasons or guidelines that an Insurer can use to cancel or nonrenew this policy are maintained by the Insurer in writing and will be furnished to the Insured and/or the Insured's lawful representative upon written request.

This shall not apply to any policy which has been in effect for less than sixty (60) days at the time notice of cancellation is mailed or delivered, unless the policy is a renewal policy."

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
**AUTHORIZED REPRESENTATIVE**

◊ All rights reserved.
*END 001*

EXHIBIT B

## ENDORSEMENT# *2*

This endorsement, effective *12:01 am*    *July 31, 2017*        forms a part of
policy number   *01-767-89-02*
issued to   *NATIONAL BASKETBALL ASSOCIATION, INC.*

by    *New Hampshire Insurance Company*

### EMPLOYMENT PRACTICES LIABILITY RISK MANAGEMENT SERVICES BENEFITS

IT IS UNDERSTOOD AND AGREED THAT  the COMPANY makes its Employment Practices Liability Risk Management Services Benefits ("Benefits") available to the NAMED INSURED during the POLICY PERIOD.   These Benefits are  complimentary and at  the sole discretion of the NAMED INSURED.

These unique  and  comprehensive  Benefits are  designed  to  give  the NAMED INSURED access to comprehensive  resources  and training  tutorials  to  help create  a  better,  less litigious workplace.

An abbreviated description of these Benefits is noted below. For a full explanation of these Benefits visit www.lexeplhelp.com,  or contact  Lexington's Director  of Risk  Management Services at (617) 330-8254.

- **www.lexeplhelp.com**, on-line training & testing  designed to help the NAMED INSURED create a workplace free of discrimination and harassment and create defenses to claims that do arise.   This site also includes training to help satisfy  California legislation Bill No. 1825's  requirement of annual training on sexual harassment.
- **An Initial EPL Risk Evaluation** by Seyfarth Shaw, LLP
- **Policy Review and Analysis** by Seyfarth Shaw, LLP
- **Toll-Free Employee Hotline** managed by Kroll Inc.
- **Toll-Free Management Hotline** managed by Seyfarth Shaw, LLP to help insureds make sound employment decisions on a daily basis
- **Best Workplace Practices Manual** highlighting the critical policies and procedures all employers should utilize
- **Regional Seminars** covering topical EPL issues
- **On-Site Seminars** for qualified NAMED INSUREDS
- **Electronic Monthly Newsletters** detailing recent cases and legislation

ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.

LX9894 (04/06)  Printed 06/20/2018 11:34 / / CV 18-3892 / Confirmation Nbr. 1417012 / CLJSZ   *END 2*

EXHIBIT B

**ENDORSEMENT# 3**

This endorsement, effective *12:01 am    July 31, 2017*        forms a part of policy number  *01-767-89-02*
issued to  *NATIONAL BASKETBALL ASSOCIATION, INC.*

by   *New Hampshire Insurance Company*

**LEXGUARD EMPLOYMENT CRISIS RESPONSE COVERAGE EXTENSION ENDORSEMENT (INCLUDING VIOLENCE GUARD® SERVICES)**

This endorsement modifies insurance provided under the following policies:

**LEX GUARD EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

**EXCESS EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

• **CRISIS RESPONSE NOTIFICATION TELEPHONE NUMBER:  888-790-7233**

**THIS ENDORSEMENT EXTENDS COVERAGE TO PROVIDE FOR CRISIS MANAGEMENT LOSS DUE TO A CRISIS EVENT AND VIOLENCE GUARD® SERVICE EXPENSES DUE TO A WORKPLACE VIOLENCE EVENT.   THE LIMITS OF INSURANCE PROVIDED FOR SUCH COVERAGES ARE IN ADDITION TO THE LIMITS OF INSURANCE OR LIMITS OF LIABILITY SHOWN ON THE DECLARATIONS OF THE POLICY.**

**SCHEDULE**

| Employment Crisis Response Coverage Extension | Limits of Insurance | |
|---|---|---|
| Crisis Response Aggregate Limit | $25,000 | |
| Each Crisis Management Loss Limit | $25,000 | Each **Crisis Event** |
| Each Violence Guard® Response Limit | $25,000 | Each **Workplace Violence Event** |

Notwithstanding any provisions to the  contrary in the policy to  which this endorsement is attached, including  the attachment  point of the  "Excess  Employment Practices  Liability Insurance Policy", if applicable,  subject to the Limits  of Insurance as  shown in the above Schedule and in accordance  with the terms and  conditions set forth  in this endorsement, the policy is extended to  provide **crisis management loss** resulting  from a **crisis event**  and **Violence Guard® service expenses** resulting from a **workplace violence event.**

Throughout this  endorsement, the  words **you**  and **your** refer to  the first  Named Insured shown  in the  Declarations.   The  words **we, us** and **our** refer to Lexington Insurance Company. Other words and  phrases that appear in boldfaced  type have special meaning. Refer to **SECTION IV. - DEFINITIONS.**

LX8948 (05/12)               ***END 3***

EXHIBIT B

**ENDORSEMENT# 3** (Continued)

This endorsement, effective *12:01 am* *July 31, 2017* forms a part of policy number *01-767-89-02* issued to *NATIONAL BASKETBALL ASSOCIATION, INC.*

by *New Hampshire Insurance Company*

## SECTION I. - EMPLOYMENT Crisis RESPONSE COVERAGE EXTENSION

### A. CRISIS MANAGEMENT LOSS

1. **We** will reimburse **you** or pay on **your** behalf reasonable and necessary **crisis management loss** arising out of a **crisis event** to which this Coverage Extension applies. The amount **we** will reimburse **you** or pay on **your** behalf for such **crisis management loss** is limited as described in **SECTION III - EMPLOYMENT CRISIS RESPONSE LIMITS OF INSURANCE**. No self-insured retention or deductible shall apply to this Coverage Extension endorsement.

2. **We** will reimburse **you** or pay on **your** behalf **crisis management loss** arising out of a **crisis event** only if:
   a. The **insured event** first commences during the **policy period**, and
   b. The **crisis event**, arising out of such **insured event** stated in Subparagraph **2.a.** above, must first occur during the **policy period**, and
   c. Such **crisis management loss** is incurred within ninety (90) days after the commencement date of the **crisis event**. The end of the **policy period** will not cut short this ninety (90) day period.

### B. VIOLENCE GUARD® SERVICES

1. **We** will reimburse **you** or pay on **your** behalf reasonable and necessary **Violence Guard®** service expenses arising out of a **workplace violence event** to which this Coverage Extension applies. The amount **we** will reimburse **you** or pay on **your** behalf for such **Violence Guard®** service expenses is limited as described in **SECTION III - EMPLOYMENT CRISIS RESPONSE LIMITS OF INSURANCE** No self-insured retention or deductible shall apply to this Coverage Extension endorsement.

2. **We** will reimburse **you** or pay on **your** behalf **Violence Guard®** service expenses arising out of a **workplace violence event** only if:
   a. The **workplace violence event** first commences during the **policy period**, and
   b. Such **Violence Guard®** service expenses are incurred within ninety (90) days after the commencement date of the **workplace violence event**. The end of the **policy period** will not cut short this ninety (90) day period.

LX8948 (05/12)     ***END 3***

EXHIBIT B

**ENDORSEMENT# *3*** **(Continued)**

This endorsement, effective *12:01 am    July 31, 2017*        forms a part of policy number  *01-767-89-02*
issued to   *NATIONAL BASKETBALL ASSOCIATION, INC.*

by    *New Hampshire Insurance Company*

## SECTION II. - EXCLUSIONS

The exclusions applicable to the policy apply to this Coverage Extension.

## SECTION III. - EMPLOYMENT CRISIS RESPONSE LIMITS OF INSURANCE

A. The Schedule above and the rules below establish the most we will reimburse or pay on **your** behalf for **crisis management** loss and/or **Violence Guard®** **service** expenses regardless of the number of **crisis events** or **workplace violence events**.

B. The Crisis Response Aggregate Limit is the most **we** will reimburse or pay on **your** behalf for the sum of:
   1. All **crisis management loss** for all **crisis events** under this Coverage Extension; and
   2. All **Violence Guard®** service expenses for all **workplace violence events** under this Coverage Extension.

C. Subject to Paragraph **B.** above, the Crisis Management Loss Limit is the most **we** will reimburse or pay on **your** behalf for all **crisis management loss** arising out of any one **crisis event**.
   All **crisis events** arising out of same **insured event** or related or interrelated **insured events** will be deemed to be one **crisis event** and shall be deemed to have occurred when the first of such **crisis events** commences to occur.

D. Subject to Paragraph **B.** above, the Each Violence Guard® Response Limit is the most **we** will reimburse or pay on **your** behalf for all **Violence Guard®** **service** expenses arising out of any one **workplace violence event**.
   Regardless of the number of perpetrators, persons affected or **workplace violence events**, all related or interrelated **workplace violence events** will be deemed to be one **workplace violence event** and shall be deemed to have occurred when the first of such **workplace violence events** commences to occur.

## SECTION IV. - DEFINITIONS

The following definitions apply to this Coverage Extension only and supersede any similar definitions in the policy or Underlying Policy to the contrary.

A. **Associated Violence Guard®** services means emergency **transport** expenses and funeral expenses.

**ENDORSEMENT# 3** (Continued)

This endorsement, effective *12:01 am* *July 31, 2017* forms a part of policy number *01-767-89-02* issued to *NATIONAL BASKETBALL ASSOCIATION, INC.*

by *New Hampshire Insurance Company*

B. **Crisis event** means the date **your** senior management reasonably determines that an **insure**d **event** may result in significant adverse regional or national news media coverage.

C. **Crisis management firm** means a public relations firm or crisis management firm, assigned or approved by **us** in writing, that is hired by **you** to perform services of the type covered under **crisis management loss** in connection with a **crisis event**.

D. **Crisis management loss** means reasonable and necessary costs and expenses incurred by:
   1. A **crisis management firm** or **your employee**s in providing public relations and media management services for the purpose of maintaining and restoring public confidence in **you**. These expenses may include printing, advertising, or mailing of materials to manage reputational risk; and
   2. **You:**
      a. In meeting any obligation under a security breach notification law or requirement with respect to notifying **your** employee, former **employee** or an applicant for employment for release of personally identifiable information or protected health information, and
      b. In defending any claim or suit brought by or on behalf of **your employee**, former **employee** or an applicant for employment with **you** for release of personally identifiable information or protected health information. However, **we** have no duty to defend such claim or suit.

However, **crisis management loss** does not include the salaries of **your employee**s and the costs and expenses to remedy any issues with computer systems, software, firmware or hardware or to address any practices, protocols, policies or training.

E. **Customer** means an individual who receives services from **you** or is a vendor providing services to **you**, and with respect **workplace violence event**, such **customer** must be in the immediate area of the **workplace violence event** and must be directly affected by the **workplace violence event**.

F. **Discrimination** means:
   1. With respect to **your employee**, former **employee**, or applicant for employment with **you**, termination of an employment relationship or a demotion or a failure or refusal to hire or promote or otherwise to take any action against any individual with respect to his or her compensation, terms, conditions, privileges or opportunities of employment because of race, color, religion, age, gender, gender identity or

LX8948 (05/12)    ***END 3***                                    EXHIBIT B

**ENDORSEMENT# 3**   (Continued)

This endorsement, effective *12:01 am    July 31, 2017*        forms a part of policy number  *01-767-89-02*
issued to  *NATIONAL BASKETBALL ASSOCIATION, INC.*

by    *New Hampshire Insurance Company*

    expression, disability, martial or family status, pregnancy, national origin, military bias, sexual orientation or preference, genetic information or other protected category or characteristic established pursuant to any applicable United States federal, state, or local statute or ordinance; or

    2. With respect to **your customers**, an allegation that **your customer's** rights have been violated on the basis of race, color, religion, age, gender, gender identity or expression, disability, martial or family status, pregnancy, national origin, military bias, sexual orientation or preference, genetic information or other protected category or characteristic established pursuant to any applicable United States federal, state, or local statute or ordinance.

G. **Emergency psychology** services means reasonable and necessary expenses for psychology or counseling services provided to **employees or customers** and incurred within the first fourteen (14) days after a **workplace violence event**. This does not include the costs or expenses of any medications or hospitalizations.

H. **Emergency transport expenses** means reasonable and necessary emergency transport expenses to transport an **employee** or **customer** sustaining bodily injury in a **workplace violence event** to a local medical treatment facility.

I. **Employee** means an individual whose labor or service is engaged by and directed by an **insured** and includes:
    1. A full-time, part-time, seasonal or temporary **Employees, Supervisory Employees** as well as any individual employed in a managerial or confidential position;
    2. A volunteer worker; or
    3. Any other individual: who is contracted to perform work for the **Insured**, who is an independent contractor for the **Insured** or who is a worker leased to the **Insured** shall also be an **Employee**.

J. **Harassment** means:
    1. With respect to **your employee** or former **employee**, employment related: bullying, intimidation, threats or sexual harassment whether "quid pro quo", hostile work environment or otherwise, including any gender-based or "same-sex" harassment; or
    2. With respect to **your customers**, an allegation of bullying, intimidation, threats or sexual harassment, including any gender-based or "same-sex" harassment which occurs at a location owned, occupied or rented by **you** and where **your employees** work or through the **virtual environment**.

**ENDORSEMENT#** *3*   (Continued)

This endorsement, effective *12:01 am*    *July 31, 2017*          forms a part of
policy number  *01-767-89-02*
issued to   *NATIONAL BASKETBALL ASSOCIATION, INC.*

by   *New Hampshire Insurance Company*

K.  **Insured** means whoever qualifies as an insured under the policy  to which this Coverage
Extension is attached to and forms a part of.

L.  **Insured Event** means:
1. **Your employee**, former **employee** or an applicant for  employment with **you** alleging
**discrimination** by an **insured;**
2. **Your employee**, former **employee** or an applicant for  employment with **you** alleging
**harassment** by an **insured;**
3. **Your** former **employee** alleging **wrongful termination** by an **insured;**
4. **Your employee**, former **employee** or an applicant for  employment with **you** alleging
**workplace torts** by an **insured;**
5. a **workplace violence event.**

**Insured Event** includes an **insured event** as described  in Subparagraphs  L.1. through
L.5., inclusive, committed  by an **insured**  through the **virtual  environment** (known as  a
**virtual environment insured event).**

Alleging means lodging a  written complaint or  written charge with   **your** management,
**your supervisory employee** or **your** corporate legal or human resource departments.

M. **Security  services** means:  (1)  the  hiring  of  additional security  guards to protect  any
location owned,  occupied or  rented by **you** and  where **your employees** work, (2)
post-evaluation of security at  the location where the  **workplace violence event** occurs
and (3) the costs for security consulting services to protect any location owned,
occupied or rented by **you** and where **your employees** work.

N. **Violence Guard®** **service expenses** means expenses incurred for **security services**,
**emergency psychology services**, and **associated Violence Guard®** services.

O. **Virtual  Environment** means the  use  of  electronic communications  including,  but not
limited to,  emails, phone  calls, videoconferencing,  electronic images,  texting, instant
messaging, tweets or similar communications through any electronic  method, including
the internet, social networking sites, or other similar  media regardless of whether such
communication occurs during or after work hours or on or off the work premises.

P. **Workplace Torts**  means employment-related:  retaliation, defamation,  infliction of
emotional distress,  libel,  slander,  humiliation, defamation,  invasion of privacy, false
arrest,  false  imprisonment,  negligent  evaluation,  wrongful  discipline,  wrongful
reference, failure  to grant  tenure, wrongful failure to employ or promote, wrongful
demotion  or  release  of  personally  identifiable  information  or  protected  health
information.

**ENDORSEMENT# *3*    (Continued)**

This endorsement, effective *12:01 am    July 31, 2017*          forms a part of
policy number  *01-767-89-02*
issued to   *NATIONAL BASKETBALL ASSOCIATION, INC.*


by    *New Hampshire Insurance Company*


Q. **Wrongful Termination** means termination of an employment relationship or constructive discharge, in a manner which is against the law and wrongful or in breach of an implied agreement to continue employment.

R. **Workplace violence event** means the use of deadly force or the threatened use of deadly force which is directed at any **customer** or **employee** at a location owned, occupied or rented by **you** and where **your employees** work.

**SECTION V. - CONDITIONS**

The following conditions applicable to this endorsement supersede any similar conditions in the policy to the contrary.

A. **Insured's Duties in the Event of a "Crisis Event" or Workplace Violence Event**
   1. **You** must see to it that **we** are notified by telephone within twenty-four (24) hours after a **crisis event** which may result in **crisis management loss**. The call must be made to 888-790-7233. If necessary, **we** will provide **you** with an approved **crisis management firm** unless **we** agree to accept a **crisis management** firm that **you** have selected.
   2. If **you** wish assistance with a **workplace violence event**, **you** may contact **us** at 888-790-7233, **we** can refer **you** to a risk consulting company.
   3. Thereafter **you** must provide written notice, as soon as practicable. To the extent possible, this written notice should include:
      a. How, when and where the **crisis event** or **workplace violence event** took place;
      b. The names and addresses of any affected individuals; and
      c. The nature and location of any injury or damage arising out of the **crisis event** or **workplace violence event**.
   4. If reimbursement is sought directly by **you**, **you** must submit a claim for reimbursement of **crisis management loss** or **Violence Guard® service expenses** within ninety (90) days after incurring such **crisis management loss** or **Violence Guard® service expenses**, whichever is applicable. Such claim(s) must include invoices and/or receipts supporting such **crisis management loss** or **Violence Guard® service expenses**.
   5. Written notice and claim submission under this Coverage Extension shall be mailed, faxed *or* emailed to:
      a. Lexington Insurance Company
         Professional Liability Department
         99 High Street
         Boston, MA 02110

**ENDORSEMENT#** *3* **(Continued)**

This endorsement, effective *12:01 am* *July 31, 2017* forms a part of
policy number *01-767-89-02*
issued to *NATIONAL BASKETBALL ASSOCIATION, INC.*

by *New Hampshire Insurance Company*

    b. Fax Number: (866) 947-1638, Attention: Professional Liability Department.
    c. LexEPLClaims@chartisinsurance.com
    **You** have the duty to maintain proof of mailing, faxing or emailing of all documents

B. **Anti-Stacking Provision**

If **crisis** management loss and/or **Violence Guard**® service expenses provided by this
Coverage Extension endorsement are also provided by any other insurance issued to
**you** by **us** or any of **our** affiliated companies (whether or not such costs or loss are
referred to using these same terms), the maximum limit of insurance under all
insurance available shall not exceed the highest applicable limit of insurance available
under any one policy or endorsement. This condition does not apply to any other
insurance issued by **us** or any of **our** affiliated companies specifically intended to apply
as excess insurance over this Coverage Extension endorsement.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN THE SAME.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 3*

EXHIBIT B

## ENDORSEMENT# 4

This endorsement, effective *12:01 am     July 31, 2017*          forms a part of
policy number  *01-767-89-02*
issued to   *NATIONAL BASKETBALL ASSOCIATION, INC.*

by    *New Hampshire Insurance Company*

### E- DATA RETRIEVAL COVERAGE EXTENSION ENDORSEMENT

This endorsement modifies insurance provided by the policy:

**THIS ENDORSEMENT EXTENDS COVERAGE TO PROVIDE FOR INFORMATION TECHNOLOGY (IT) INTERNAL LOSS IN THE EVENT OF A WRITTEN DISCOVERY REQUEST FOR E-Data AS DEFINED HEREIN.  IT INTERNAL LOSS IS PART OF DEFENSE COSTS AND THEREFORE, REDUCES THE LIMITS OF INSURANCE AND IS INCLUDED WITHIN AND REDUCES THE DEDUCTIBLE OR SELF-INSURED RETENTION SHOWN IN THE DECLARATIONS.**

### SCHEDULE

| Crisis Response Coverage Extension | Sublimits of Insurance | |
|---|---|---|
| IT Internal Loss Policy Period Sublimit | $100,000 | |
| IT Internal Loss Each Insured Event Sublimit | $100,000 | Per **Insured Event** |

Notwithstanding any provisions to the  contrary in the policy to  which this endorsement is attached, subject to  the Sublimits of Insurance as shown  in the  above Schedule and in accordance with  the  terms and  conditions set forth  in  this  endorsement, the  policy  is extended to provide  reimbursement for  **IT Internal Costs**  incurred in  direct response to  a written discovery request for **E-Data.**

## SECTION I. - E-DATA RETRIEVAL COVERAGE EXTENSION

A.  **We** will reimburse **you** for  reasonable and necessary **IT  Internal Loss** incurred in  direct response to a written discovery request for **E-Data** arising out of a **Claim** because  of an **Insured Event** to which  this insurance applies.  The amount **we** will  reimburse **you** for such **IT  Internal Loss** is  limited  as  described in  **SECTION III -  IT  INTERNAL LOSS SUBLIMITS OF INSURANCE AND DEDUCTIBLE/SELF INSURED RETENTION.**

B.  **We**  will reimburse  **you**  for **IT  Internal Loss** incurred  in  direct response  to a written discovery request for **E-Data** only if:

1.  The **Claim** for  the **Insured Event** is  first made against  **you** during the **Policy  Period,** and
2.  the **Insured Event** out of which the  **Claim** arises does not happen or commence prior to the Inception Date of the first Employment  Practices Liability Policy issued by **us** to the Named **Insure**d, or after the **Policy Period** has ended.

LX8700 (04/11)                *END 4*                                    EXHIBIT B

## ENDORSEMENT# *4*    (Continued)

This endorsement, effective *12:01 am      July 31, 2017*        forms a part of
policy number  *01-767-89-02*
issued to  *NATIONAL BASKETBALL ASSOCIATION, INC.*

by    *New Hampshire Insurance Company*

### SECTION II. - EXCLUSIONS

The exclusions of the policy apply to this endorsement.  However, the following additional
exclusions applicable to this endorsement supersede any similar exclusions in the policy.
This coverage extension does not apply to:

**Capital Improvements.**  Any costs arising out of capital improvements, modifications,
upgrades, or reconfiguration of **your** information systems, including, but not limited to,
computer hardware or software, and/or communication systems.

**Equipment and Supplies.**  Any costs arising out of the purchase of any equipment,
materials, or supplies, including, but not limited to, cables, printers, and modems,
and/or any media used to record data, such as, tape and disc drives, back-up disks.

### SECTION III. -   IT INTERNAL LOSS SUBLIMITS OF INSURANCE AND DEDUCTIBLE/SELF INSURED RETENTION

A. The Schedule above and the rules below establish the most **we** will reimburse for **IT Internal Loss** regardless of the number of **Claims** made, claimants, or **Insureds** against whom such **Claims** are made.
B. The IT Internal Loss Policy Period Sublimit shown in the above Schedule is the most **we** will reimburse for the sum of all **IT Internal Loss** for all **Claims** made or brought during the **Policy Period**.
C. Subject to Paragraph **B.** of this section, and the Limits of Insurance shown in Item 3A and 3B of the Declarations, the IT Internal Loss Each Insured Event Sublimit shown in the above Schedule is the most **we** will reimburse for all **IT Internal Loss** arising out of any one **Insured Event**.
D. **IT Internal Loss** is part of **Defense Costs** and therefore, reduces the Limits of Insurance and is included within and reduces the Deductible or Self Insured Retention shown in the Declarations. **We** shall only reimburse **IT Internal Loss** in excess of the Deductible or Self Insured Retention.

### SECTION IV. - DEFINITIONS

The definitions of the policy apply to this endorsement.  However, the following additional
definitions applicable to this endorsement only supersede any similar definitions in the
policy.

LX8700 (04/11)                    *END 4*                                    EXHIBIT B

## ENDORSEMENT# *4* (Continued)

This endorsement, effective *12:01 am* *July 31, 2017* forms a part of
policy number *01-767-89-02*
issued to *NATIONAL BASKETBALL ASSOCIATION, INC.*

by *New Hampshire Insurance Company*

A. **Defense Costs** means those reasonable and necessary expenses, including **IT Internal Loss**, that result from the investigation, settlement, or defense of a specific **Claim**, including attorney fees and expenses, the cost of legal, administrative, or alternative dispute resolution proceedings, the cost of appeal bonds, the cost of bonds to release property being used to secure a legal obligation (but only for bond amounts within the Limit of Insurance that applies; **we** have no obligation to furnish such bonds), all reasonable expenses that any **Insured** incurs at **our** request while helping **us** investigate or defend a **Claim** and subject to Section II C of this Policy, all costs taxed against any **Insured** in a suit.

Salaries and expenses of the **Insured's Employees**, other than **IT Internal Loss** of **your Information Technology Employees**, shall not be deemed to be **Defense Costs**.
**Defense Costs** are included within, and are not in addition to, the applicable Limits of Insurance and Retention.

B. **E-data** means all electronically stored information, including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilation in any medium from which information can be obtained, or translated, if necessary, by **you** through detection devices into reasonably usable form; and which are in **your** possession, custody, and control.

C. **Information Technology Employees** means the **Insured's Employees** who have as a primary function, the development, operation and maintenance of the information and communication systems utilized by **you** in the conduct of **your** business.

D. **IT Internal Loss** means reasonable and necessary internal labor costs, inclusive of payroll taxes and fringe benefits, **you** incur to have **your Information Technology Employees** locate, extract, translate, and/or restore **E-Data**. **IT Internal** Loss shall not include any costs associated with retirement plans, inclusive of 401K contributions, or any incentive bonuses.

## SECTION V. - CONDITIONS

The general and/or common conditions of the policy apply to this endorsement. However, the following conditions applicable to this endorsement supersede any similar conditions in the policy to the contrary.

LX8700 (04/11)  *END 4*  EXHIBIT B

**ENDORSEMENT#** *4*     (Continued)

This endorsement, effective *12:01 am      July 31, 2017*          forms a part of
policy number  *01-767-89-02*
issued to   *NATIONAL BASKETBALL ASSOCIATION, INC.*

by     *New Hampshire Insurance Company*

A. **Insured's Duties upon Receipt of a Written Discovery Request for E-Data**

   Regardless of whether this policy contains a Deductible or a Self Insured Retention:

   1. **You** must see to it that **we** are notified as soon as practicable upon receipt of a written discovery request for **E-Data** which may result in **IT Internal Loss**. To the extent possible, notice should include:
      a. Copy of the written discovery request;
      b. Strategy to be employed by the **Insured** to comply with the written discovery request; and
      c. A plan for how **you** will calculate and track **IT Internal Loss**.

   2. **You** must have **our** approval of **your** plan to calculate and track **IT Internal Loss** prior to incurring any **IT Internal Loss**. Such plan is hereinafter referred to as **your** IT Internal Loss plan.

   3. **You** must submit a claim for reimbursement of **IT Internal Loss** within ninety (90) days after incurring such **IT Internal Loss**. Such claim(s) must include documentation sufficient to verify **IT Internal Loss** and must be calculated in accordance with **your** approved IT Internal Loss plan.

   4. Written notice, IT Internal Loss plan and claim submission as required above shall be mailed or delivered to:

      Lexington Insurance Company
      Employment Practices Claim Department
      99 High Street
      Boston, MA  02110

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN THE SAME.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.
*END 4*

EXHIBIT B

## ENDORSEMENT# 5

This endorsement, effective *12:01 am*    *July 31, 2017*         forms a part of
policy number  *01-767-89-02*
issued to  *NATIONAL BASKETBALL ASSOCIATION, INC.*

by    *New Hampshire Insurance Company*

### NON-MASS OR NON-CLASS ACTION COUNSEL ENDORSEMENT

| Insured | Law Firm Name | Geographical Location(s) | Partner Rate/Hour | Associate Rate/Hour | Paralegal Rate/Hour |
|---|---|---|---|---|---|
| Madison Square Garden, LP | Proskauer Rose LLP | New York | $350.00 | $275.00 | $90.00 |
| New Jersey Basketball, LLC | Proskauer Rose LLP | New Jersey | $350.00 | $275.00 | $90.00 |
| Atlanta Hawks, LP | Crowley & Clarida, LLP | Georgia | $250.00 | $250.00 | $90.00 |
| Atlanta Hawks, LP | Taylor English | Georgia | $250.00 | $250.00 | $90.00 |
| Cavaliers Operating Co., LLC | Reminger & Reminger Co., LPA | Ohio | $250.00 | $200.00 | $90.00 |
| Dallas Basketball, Ltd. | Thompson & Knight LLP | Texas | $275.00 | $200.00 | $90.00 |
| Detroit Pistons Basketball Company | Dykema Gosset, PLLC | Michigan | $250.00 | $200.00 | $90.00 |
| Detroit Pistons Basketball Company | Vercruysse, Murray & Calzone PC | Detroit, Michigan only | $250.00 | $200.00 | $90.00 |
| Pacers Basketball Corporation | Sommer, Barnard Attorneys, PC | Indianapolis, IN only | $250.00 | $200.00 | $90.00 |
| Comcast Spectacor LP dba Philadelphia 76ers | Ballard Spahr, Andrews & Ingersoll, LLP | Pennsylvania | $250.00 | $190.00 | $90.00 |

**ENDORSEMENT# 5**    (Continued)

This endorsement, effective *12:01 am    July 31, 2017*       forms a part of
policy number  *01-767-89-02*
issued to   *NATIONAL BASKETBALL ASSOCIATION, INC.*

by    *New Hampshire Insurance Company*

| | | | | | |
|---|---|---|---|---|---|
| Trailblazers, Inc. | Schwabe, Williamson & Wyatt, PC | Oregon | $235.00 | $190.00 | $90.00 |
| Sacramento Kings Limited Partnership, LP | Murphy Austin, Adams Schoenfeld LLP | Sacramento, CA only | $250.00 | $200.00 | $100.00 |
| CC Partners, LP dba Golden State Warriors | Thelen, Reid & Preist LLP | San Francisco, CA only | $250.00 | $200.00 | $95.00 |
| New Orleans Hornets NBA Limited Partnership | Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP | Louisiana | $250.00 | $185.00 | $85.00 |

ALL OTHER PROVISIONS OF THE POLICY REMAIN THE SAME.

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 5*

EXHIBIT B

## ENDORSEMENT# *6*

This endorsement, effective *12:01 am    July 31, 2017*      forms a part of
policy number  *01-767-89-02*
issued to   *NATIONAL BASKETBALL ASSOCIATION, INC.*

by   *New Hampshire Insurance Company*

### ECONOMIC SANCTIONS ENDORSEMENT

*This endorsement modifies insurance provided under the following:*

Coverage shall only be provided  and payment of loss  under this policy shall only  be made
in full compliance with  enforceable United Nations economic  and trade sanctions  and the
trade and  economic sanction  laws or  regulations of  the European  Union and  the United
States  of  America,  including,  but  not  limited to,  sanctions, laws  and regulations
administered and  enforced by  the U.S.  Treasury Department's  Office  of Foreign  Assets
Control ("OFAC").

AUTHORIZED REPRESENTATIVE

© All rights reserved.

*END 6*

EXHIBIT B

## ENDORSEMENT# 7

This endorsement, effective 12:01 am    July 31, 2017        forms a part of
policy number  01-767-89-02
issued to NATIONAL BASKETBALL ASSOCIATION, INC.

by   New Hampshire Insurance Company

### FORMS INDEX ENDORSEMENT

The contents of the Policy is comprised of the following forms:

| FORM NUMBER | EDITION DATE | FORM TITLE |
|---|---|---|
| MNSCPT | | EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY |
| 96555 | 01/15 | TRIA DEC DISCLOSURE FORM |
| MNSCPT | | EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY |
| 52158 | 06/91 | NEW JERSEY AMENDATORY - CANCELLATION/NONRENEWAL |
| LX9894 | 01/06 | EMPLOYMENT PRACTICES LIABILITY RISK MANAGEMENT SERVICES BENEFITS |
| LX8948 | 05/12 | LEXGUARD EMPLOYMENT CRISIS RESPONSE COVERAGE EXTENSION ENDORSEMENT |
| LX8700 | 04/11 | E-DATA RETRIEVAL COVERAGE EXTENSION ENDORSEMENT |
| MNSCPT | | NON-MASS OR NON-CLASS ACTION COUNSEL ENDORSEMENT |
| 119679 | 09/15 | ECONOMIC SANCTIONS ENDORSEMENT |
| 78859 | 10/01 | FORMS INDEX ENDORSEMENT |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____
AUTHORIZED REPRESENTATIVE

© All rights reserved.



## CLAIM REPORTING FORM

Issuing Company: *New Hampshire Insurance Company*

Reported under Policy/Bond Number: *01-767-89-02*    Date: _____

Type of Coverage: D&O _____ E&O _____ Fidelity _____ (complete the Fidelity Supplemental on the next page)

Insured's Name, as given on Policy Declarations (Face Page):

*NATIONAL BASKETBALL ASSOCIATION, INC.* _____

_____,

_____

Contact Person: _____

Title: _____

Phone: _(_____)_____ - _____Ext _____

eMail: _____ @ _____

Case or Claimant Name: _____

_____

If the party involved is different from "Insured" Name (as given on Policy Declarations) state relationship:

_____

Insurance Broker/Agent: *NFP PROPERTY & CASUALTY SERVICES* _____

Address: *45 EXECUTIVE DRIVE, PLAINVIEW, NY 11803* _____

Address: _____

Contact: *JIM MCHUGH* _____    Phone: _____

eMail: *Robert.Crocitto@aig.com* _____

Send Notice of Claims to:    AIG                        Phone: (888) 602-5246
                             Financial Lines Claims     Fax:   (866) 227-1750
                             P.O. Box 25947             Email: c-Claim@AIG.com
                             Shawnee Mission, KS 66225

EXHIBIT B



## CLAIM REPORTING FORM
## FIDELITY SUPPLEMENTAL
**(Only complete this supplemental if the Claim is being reported under Fidelity Coverage)**

Issuing Company: *New Hampshire Insurance Company*

Reported under Policy/Bond Number: *01-767-89-02*

Date of Discovery: —————————— Estimated Amount of loss: ——————————

Cause of Loss:

| | | | |
|---|---|---|---|
| Employee Dishonesty | _____ | Computer Fraud | _____ |
| Funds Transfer | _____ | Robbery/Burglary | _____ |
| ID Theft | _____ | Forgery | _____ |
| Client Property | _____ | In Transit | _____ |
| ERISA | _____ | Credit Card Forgery | _____ |
| Other | _____ | if Other, describe: | _____ |

Send Notice Of Claims To:    AIG                          Phone: (888) 602-5246
                             Financial Lines Claims        Fax:   (866) 227-1750
                             P.O. Box 25947                Email: c-Claim@AIG.com
                             Shawnee Mission, KS 66225

EXHIBIT B

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| MOZELLE JACKSON | ) | CASE NO.: CV-18-897540 |
| | ) | |
| Plaintiff, | ) | JUDGE: MICHAEL P. SHAUGHNESSY |
| | ) | |
| vs. | ) | |
| | ) | **AMENDED COMPLAINT** |
| | ) | |
| CAVALIERS HOLDINGS, LLC, et al. | ) | *(Jury Demand Endorsed Hereon)* |
| | ) | |
| And | ) | |
| | ) | |
| NIC BARLAGE | ) | |
| 19700 Shelburne Road | ) | |
| Shaker Heights, Ohio 44118 | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Now comes Plaintiff, Mozelle Jackson, by and through undersigned counsel, and for her Amended Complaint against Defendants Cavaliers Holdings, LLC, Cavaliers Operating Company, LLC, Len Komoroski, Howard Luckoff, Nic Barlage, XYZ Companies 1-5, and John/Jane Does 1-5 states as follows:

### THE PARTIES

1.     Plaintiff Mozelle Jackson is a resident of Cuyahoga County, Ohio.  Ms. Jackson is a "person" and an "employee" as those terms are defined by Ohio Revised Code § 4112.01.

2.     Defendant Cavaliers Holdings, LLC is a Delaware corporation with a principal place of business in Cuyahoga County, Ohio.  Cavaliers Holdings, LLC is a "person" and an "employer" as those terms are defined by Ohio Revised Code § 4112.01.

EXHIBIT C

3.      Defendant Cavaliers Operating Company, LLC is a Delaware corporation with a principal place of business in Cuyahoga County, Ohio.  Cavaliers Operating Company, LLC is a "person" and an "employer" as those terms are defined by Ohio Revised Code § 4112.01.

4.      Howard Luckoff is a resident of the State of Michigan.  Mr. Luckoff is a "person" and an "employer" as those terms are defined by Ohio Revised Code § 4112.01.  Mr. Luckoff is the General Counsel of Rock Ventures, the organization that "serves and connects" the business interests of Dan Gilbert, the Chairman and majority owner of Cavaliers Holdings, LLC and Cavaliers Operating Company, LLC.  In that capacity, Mr. Luckoff regularly serves as a representative of and/or counsel for Cavaliers Holdings, LLC and Cavaliers Operating Company, LLC.

5.      Len Komoroski is a resident of Cuyahoga County, Ohio.  Mr. Komoroski is a "person" and an "employer" as those terms are defined by Ohio Revised Code § 4112.01.  Mr. Komoroski is the Chief Executive Officer of Defendants Cavaliers Holdings, LLC and Cavaliers Operating Company, LLC.

6.      Nic Barlage is a resident of Cuyahoga County, Ohio.  Mr. Barlage is a "person" and an "employer" as those terms are defined by Ohio Revised Code §4112.01.  Mr. Barlage is the President of Business Operations of Defendants Cavaliers Holdings, LLC and Cavaliers Operating Company, LLC.

7.      By virtue of their respective positions with Defendants Cavaliers Holdings, LLC and/or Cavaliers Operating Company, LLC, Mr. Luckoff, Mr. Komoroski, and/or Mr. Barlage had the ability to make, prevent and/or impact employment decisions relative to Ms. Jackson. Moreover, as a result of their positions with Defendants Cavaliers Holdings, LLC and/or Cavaliers Operating Company, LLC and their knowledge of the facts and circumstances alleged

EXHIBIT C

herein, Mr. Luckoff, Mr. Komoroski, and/or Mr. Barlage participated and/or acquiesced in the discharge of Ms. Jackson as a result of the complaints and objections that she raised. Furthermore, and upon information and belief, Mr. Luckoff, Mr. Komoroski, and/or Mr. Barlage had the opportunity to prevent Ms. Jackson's unlawful termination but failed to do so.

8.     Defendants XYZ Company 1-5 and John/Jane Doe 1-5 are entities and/or individuals, other than those specifically identified as Defendants, responsible for interfering with any of the legal rights which are now, or upon amendment may be, the subject of this litigation.  Upon discovery, the Complaint will be amended to include the names of such entities and/or individuals.

9.     Under the "single employer" or "integrated entity" doctrine, Defendants Cavaliers Holdings, LLC and Cavaliers Operating Company, LLC constitute a single employer/integrated entity given, among other things, the following factors: (a) the interrelated nature of these entities in areas such as corporate offices and structure, record keeping, bank accounts, and equipment; (b) the commonality in management amongst these organizations in areas such as supervisory authority, directors, and officers; (c) the centralized nature of their human resources, employee relations, and legal functions; and/or (d) the fact that these entities share common ownership and financial control.  As such, Defendants Cavaliers Holdings, LLC and Cavaliers Operating Company, LLC will be referred to herein as simply the "Cavaliers."

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiff's claims insofar as they arise under Ohio statutory and common law.

11.     Venue is proper in this Court pursuant to Civ. R. 3(B)(1), (2), (3), and (6) because the Cavaliers have their principal place of business in Cuyahoga County, Defendants Komoroski

EXHIBIT C

and Barlage reside in Cuyahoga County, the Defendants conducted activity in Cuyahoga County giving rise to Plaintiff's claims for relief, and all or part of Plaintiff's claims for relief arose in Cuyahoga County.

## FACTUAL ALLEGATIONS

12.     Ms. Jackson was hired by the Cavaliers in March 2010 as their Chief Financial Officer.   In that capacity, Ms. Jackson had oversight responsibility for accounting/finance, human resources, information technologies and sourcing.   Thereafter, Ms. Jackson assumed oversight responsibility for the Cavaliers' legal, facility operations and process improvement function.

13.     In joining the Cavaliers, Ms. Jackson welcomed the opportunity to be a part of an organization guided by the "ISMS" espoused by its majority owner, Dan Gilbert.   Among Mr. Gilbert's "ISMS" is his directive to always "Do the right thing," specifically:

> The high road is not a shortcut.  Stick to the highest standard of integrity, without compromise.   Character is what you do when no one is looking over your shoulder! Doing the wrong thing is **never worth it.**  How can you go wrong doing the right thing?  Remember, eventually three things always come out:  the sun, the moon, and the truth.[1]

14.     In October 2011, Ms. Jackson was promoted to Executive Vice President and Chief Financial Officer.

15.     As recently as September 2017, Ms. Jackson received additional responsibilities and assumed the title of Executive Vice President – Chief Financial and Administrative Officer. In that capacity, Ms. Jackson still had oversight responsibility for the Cavaliers' accounting/finance, human resources, sourcing, legal, facility operations and process improvement functions.

---

[1] https://www.quickenloans.com/press-room/fast-facts/#isms last visited May 8, 2018 (emphasis in the original).

EXHIBIT C

16.     Throughout her employment Ms. Jackson has consistently received strong performance reviews and praise for her work, professionalism, and integrity.  Importantly, prior to the events described herein, the Cavaliers never expressed any intention of terminating Ms. Jackson's employment or otherwise suggested that her job was in jeopardy.

17.     In March 2018, Ms. Jackson was advised of a workplace incident involving a Cavaliers' employee, commonly referred to as a "team member." The team member was known by the Cavaliers ███████████ .

18.     Upon receiving notice, and with Ms. Jackson's knowledge, the Cavaliers' human resources and operations team members and ultimately legal counsel conducted an investigation into the workplace incident.

19.     The ███████ team member was ████████████████████████████ during the pendency of the investigation.  Before the investigation was completed, the team member – ████████████████████████████████████ ████████████████████████████████████████ ███████ .

20.     On Thursday March 15, 2018, the Cavaliers conducted a conference call involving Mr. Luckoff, Mr. Barlage, outside counsel, members of the in-house legal team, human resources, security and Plaintiff for purposes of discussing ████████████████ ██████████████████████████ .

21.     As of the date of this conference call, a ████████████████████████ ████████████████████████ .

22.     On March 19, 2018, Ms. Jackson observed members of the Cavaliers' information technologies team, the legal team and human resources team deleting electronically stored

EXHIBIT C

evidence which Ms. Jackson reasonably believes was relevant to ████████████████ ████████████ of the ████████ team member.

23.     By deleting such evidence, the Cavaliers and their employees were acting to preemptively obstruct and prevent the soon-to-be-terminated ████████ team member from exercising his rights under R.C. § 4112.02 to advance and prosecute a claim for discrimination.

24.     On March 20, 2018, Ms. Jackson verbally raised concerns to the Cavaliers' in-house counsel concerning the deletion of evidence relevant to ████████ team member's termination.

25.     Despite Ms. Jackson's objections, the Cavaliers did not take any remedial steps to reverse or otherwise address the apparent destruction of evidence.

26.     On March 23, 2018, Ms. Jackson, through counsel, delivered a letter to Mr. Komoroski.

27.     In that letter, Ms. Jackson, through counsel, specifically referenced Ohio's prohibition on employment discrimination against qualified individuals ████████████ and memorialized the Cavaliers' acknowledged concern that ████████████ from the underlying workplace incident was ████████████████.

28.     In that letter, Ms. Jackson, through counsel, explained the fundamental obligation to preserve evidence and to prevent its spoliation or destruction.

29.     In that letter, Ms. Jackson, through counsel, detailed the significant ramifications that could result from the destruction of evidence, both to the Cavaliers and to representatives of the Cavaliers, including Ms. Jackson.

30.     In that letter, Ms. Jackson, through counsel, once again demanded that the Cavaliers take prompt remedial action.  Specifically, Ms. Jackson demanded that the Cavaliers

6

EXHIBIT C

retrieve and fully preserve any electronically stored information concerning ███████ team member that had been deleted.

31.     In that letter, Ms. Jackson, through counsel, warned the Cavaliers that it would be unlawful for them to retaliate against her because of her objections to the destruction of evidence.

32.     Rather than simply taking action to rectify the destruction of evidence as requested, the Defendants promptly retaliated against Ms. Jackson.

33.     Specifically, after receiving the letter, outside counsel for the Cavaliers requested a meeting to address the issues raised therein.

34.     The meeting took place on April 10, 2018.  Mr. Luckoff, Mr. Komoroski and their outside counsel and Ms. Jackson and her counsel participated in the meeting.

35.     Mr. Luckoff spoke first to open the meeting.  Mr. Luckoff explained that he was present, and speaking, on behalf of Mr. Gilbert and the entire Cavaliers organization.  Mr. Luckoff then stated that the entire Cavaliers organization thought "extremely highly of" Ms. Jackson and that she was a "highly valued team member."

36.     Shockingly, Mr. Luckoff then explained that Ms. Jackson had caused there to be "a lot of noise in the system," and, as a result, "separation [of her employment] was inevitable." Indeed, Mr. Luckoff made it crystal clear that Ms. Jackson would soon be out of a job. Mr. Luckoff stated that they wished for the parting to be amicable, but if Ms. Jackson were to "fight them on this" she should understand that "Dan Gilbert is a billionaire and had the money to fight in Court for as long as it takes."

7

EXHIBIT C

37.     Mr. Luckoff explained that if Ms. Jackson chose to fight the Cavaliers, they would "ruin" her exemplary professional reputation by publishing unfounded allegations of poor job performance on the internet.

38.     Mr. Luckoff brazenly explained that it did not matter if the disparaging allegations were true because, once posted on the internet, they would ruin her professional reputation.  Mr. Luckoff stated that people tend to believe what they read on the internet.

39.     Indeed, Mr. Luckoff went so far as to emphasize that Mr. Gilbert would be an active participant in the Cavaliers' efforts to "ruin" Ms. Jackson's professional reputation, as he would proudly sit on the witness stand and testify "under oath" to the unfounded performance issues.

40.     These threats were made in the presence of the Cavaliers' Chief Executive Officer Len Komoroski who sat idly by without disavowing or repudiating them.  Thus, the threats were made either with the express approval of the Cavaliers, or were thereafter ratified by the Cavaliers through their acts and omissions.

41.     The Cavaliers' threats, communicated through Mr. Luckoff, were intended to dissuade a reasonable person from making or supporting a claim of discrimination or acting in a manner to protect the rights of those who would complain of discrimination.

42.     On May 10, 2018, at approximately 3:23 pm, Ms. Jackson, through counsel, filed a Complaint asserting that Cavaliers Holdings, LLC, Cavaliers Operating Company, LLC, Howard Luckoff and Len Komoroski had retaliated against her for engaging in protected activity, i.e. objecting to the destruction of evidence.

43.     On May 10, 2018, at approximately 5:05 pm, a copy of the Complaint was sent to counsel for Defendants by e-mail.

8

EXHIBIT C

44.     On May 10, 2018, at approximately 6:15pm, the Defendants locked Ms. Jackson out of the computer network and terminated her ability to receive e-mail communications.

45.     On May 10, 2018, at 8:38 pm, the Defendants terminated Ms. Jackson's employment, effective immediately.

46.     The termination of Ms. Jackson's employment came just fifty-five (55) days after she received a positive developmental review from Mr. Barlage; forty-eight (48) days after she sent the letter objecting to the destruction of evidence; thirty (30) days after the meeting where Mr. Luckoff threatened to ruin Ms. Jackson professionally; approximately five (5) hours after the Complaint was filed; and within three and one half (3½) hours after Defendants' counsel was notified of this lawsuit. Ms. Jackson's termination was a direct and proximate result of her protected activity.

47.      Ms. Jackson was forced to work for an employer that – despite its purported insistence that all employees "Do the right thing" -- tolerates the destruction of evidence, condones efforts to obstruct employees' exercise of protected rights and treats an employee's efforts to "do the right thing" as ground for termination.

**COUNT ONE**
**(Retaliation – Ohio R.C. § 4112.02(I))**

48.     Ms. Jackson restates each allegation above as if fully rewritten herein.

49.     Ms. Jackson engaged in protected activity, which includes, but is not limited to, (1) objecting to the destruction of evidence that may be relevant to another employee's anticipated claims of discrimination; and, (2) filing a civil complaint alleging retaliation in violation of O.R.C. §4112.02(I).

50.     Defendants knew of Ms. Jackson's protected activity.

9

EXHIBIT C

51.     Defendants subjected Ms. Jackson to materially adverse actions in the form of threats, including, but not limited to, advising her that her separation was inevitable, that she must resign or her employment would be terminated, threatening to ruin her professional reputation, and threatening to publish derogatory information, regardless of its truth, on the internet.  Thereafter, Defendants acted upon their threats by terminating her employment within hours of filing this lawsuit.

52.     A causal connection exists between Ms. Jackson's protected conduct and the materially adverse actions taken by the Defendants.

53.     Defendants' conduct violated Ohio R.C. § 4112.02(I).

54.     As a direct and proximate result of Defendants' unlawful conduct, Ms. Jackson has suffered, and continues to suffer, damages, including, but not limited to, economic damages, emotional pain and suffering, and other losses to be proven at trial.

55.     Defendants' conduct was intentional, malicious, willful, and in complete and conscious disregard for Ms. Jackson's legal rights.  Thus, Ms. Jackson is entitled to punitive damages.

## COUNT TWO
### (Violation of Ohio Public Policy)

56.     Ms. Jackson restates each allegation above as if fully rewritten herein.

57.     The allegations herein implicate several well-recognized public policies in the State of Ohio, including but not limited to, the following:

(a)     The policy against termination an employee for exercising her right to consult a lawyer.  See *Chapman v. Adia Services*, 116 Ohio App. 3d 534, 544 (1st App. Dist. 1997) ("it is repugnant to the public policy of [Ohio] for employers to terminate employees for exercising their right to consult a lawyer."); *Simonelli v. Anderson Concrete Co.*, 99 Ohio App. 3d 254, 259

Electronically Filed 06/20/2018 11:34 / / CV 18 899713 / Confirmation Nbr. 1417012 / CLJSZ

EXHIBIT C

("…we conclude that the act of firing an employee for consulting an attorney could serve as the basis for a public policy exception to the common-law employment-at-will doctrine.")

(b)     The policy in favor of "open courts." <u>Ohio Constitution</u> Art. I, §16

(c)     The policy that encourages access to legal services.  Ohio Rules of Professional Conduct.

(d)     The policy in favor of permitting private citizens the right to obtain adequate legal representation;

(e)     The policy against "discharging an employee because he or she has sued them." *Terrell v. Uniscribe Professional Services, Inc.*, 348 F. Supp. 2d 890, 896 (N.D. Ohio 2004); *Jenkins v. Parkview Counseling Center, Inc.*, 2001 WL 15938, 2001-Ohio-3151 (7th Dist. 2001)

(f)     The policy against spoliation of evidence. *Moskovitz v. Mt. Sinai Medical Center*, 69 Ohio St. 3d 638 (1994)

58.     The Defendants' actions in terminating Ms. Jackson's employment after she retained counsel, objected to the destruction of evidence and ultimately filed a lawsuit to seek redress for the unlawful retaliation jeopardizes the aforementioned public policies.

59.     The Defendants' actions in directing, participating, acquiescing, and/or failing to prevent Ms. Jackson's termination after she retained counsel, objected to the destruction of evidence and ultimately filed a lawsuit to seek redress for the unlawful retaliation jeopardizes the aforementioned public policies.

60.     The Defendants' actions were motivated because Ms. Jackson retained counsel, objected to the destruction of evidence and ultimately filed a lawsuit to seek redress for the unlawful retaliation.

EXHIBIT C

61.     Defendants had no overriding business justification for terminating Ms. Jackson's employment.

62.     As a direct and proximate result of this illegal activity, Ms. Jackson has suffered, and continues to suffer, damages, including, but not limited to, pain and suffering, emotional distress, and the loss of past and future salary, wages, benefits, and other privileges and conditions of employment.

63.     Defendants' conduct was intentional, malicious, willful, and in complete and conscious disregard for Ms. Jackson's legal rights.  Thus, Ms. Jackson is entitled to punitive damages.

WHEREFORE, Plaintiff prays for the following relief:

A.      Any and all remedies available under Ohio R.C. § 4112 and/or for claims of Wrongful Termination in Violation of Public Policy, including, but not limited to, past and future economic and non-economic damages in an amount in excess of $25,000, back pay, front pay, loss of benefits and perquisites, punitive damages, interest, all attorneys' fees, expert fees, and costs.

B.      Any other relief that this Court deems appropriate.

Respectfully submitted,

/s/ Richard C. Haber
Richard C. Haber (0046788)
Andrew A. Kabat (0063720)
Haber Polk Kabat, LLP
1300 W. 78th Street, Suite 305
Cleveland, OH 44102
(216) 241-0700
Fax: (216) 241-0739
rhaber@haberpolk.com
akabat@haberpolk.com

*Attorneys for Plaintiff, Mozelle Jackson*

EXHIBIT C

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

/s/ *Richard C. Haber*
Richard C. Haber (0046788)

EXHIBIT C



June 28,2018

Dear Customer:

The following is the proof-of-delivery for tracking number **781521112365**.

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered to:** | FedEx Location |
| **Signed for by:** | R.MANN | **Delivery location:** | 20 PINE STREET |
| | | | NEW YORK, NY 10014 |
| **Service type:** | FedEx Express Saver | **Delivery date:** | Jun 25, 2018 09:24 |
| **Special Handling:** | Deliver Weekday | | |
| | Direct Signature Required | | |



---

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 781521112365 | **Ship date:** | Jun 21, 2018 |
| | | **Weight:** | 2.0 lbs/0.9 kg |

**Recipient:**
NEW HAMPSHIRE INSURANCE COMPANY
175 WATER STREET, 18TH FLOOR
NEW YORK, NY 10038 US

**Shipper:**
CCoC
1200 Ontario
Cleveland, OH 44113 US

**Reference**
**Invoice number**

CV18899713
35709472

Thank you for choosing FedEx.

CV18899713 / 35709472 / NEW HAMPSHIRE INSURANCE COMPANY / 2018-6-28 05:38



104686088

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

FREEDOM SPECIALTY INSURANCE COMPANY
    Plaintiff

Case No: CV-18-899713

Judge: CASSANDRA COLLIER-WILLIAMS

NEW HAMPSHIRE INSURANCE COMPANY
    Defendant

## __JOURNAL ENTRY__

CMC BY PHONE SET FOR 08/02/2018 AT 09:00 AM.  FAILURE OF THE PLAINTIFF TO APPEAR FOR THIS CMC WILL RESULT IN A DISMISSAL WITHOUT PREJUDICE.

ALL PARTIES COUNSELS ARE TO CALL THE CONFERENCE CALL NUMBER 712-775-7031 AND ENTER ACCESS CODE 478196# AT THE SCHEDULED DATE AND TIME.

COUNSEL FOR PLAINTIFF(S) SHALL INFORM ALL OPPOSING COUNSEL AND UNREPRESENTED PARTIES OF THE DATE, TIME AND CONFERENCE CALL DIRECTIONS.  CASE MANAGEMENT CONFERENCE (CMC) WILL BE CONDUCTED BY TELEPHONE.

ANY ATTORNEY OR UNREPRESENTED PARTY WHO IS NOT AVAILABLE WILL BE DEEMED TO HAVE WAIVED HIS/HER PARTICIPATION AND TO HAVE ACCEPTED THE CASE SCHEDULING ORDER ESTABLISHED BY THE COURT.

PARTIES SHOULD NOT WAIT FOR THE CMC BEFORE BEGINNING TO CONDUCT DISCOVERY.

FAILURE TO APPEAR AT ANY COURT SCHEDULED EVENT IN THE FUTURE MAY RESULT IN DISMISSAL OF PLAINTIFF'S CLAIMS FOR WANT OF PROSECUTION OR JUDGMENT RENDERED AGAINST DEFENDANT.

SO ORDERED.

_____
Judge Signature            07/20/2018

07/20/2018